4:26-Cv-611-DPM   Exhibit M



**U.S. Securities and Exchange Commission**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 0 2 2026

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

# Tips, Complaints, and Referrals

## Summary Page - After Submission

### This export was generated on Fri, June 26, 2026 at 10:36:04 AM EDT

The Complaint Form questions that you responded to, the answers you entered for those questions, and any documents that you have uploaded to this TCR are listed below.

## Submission Number: 17824-845-629-788

Thank you for contacting the United States Securities and Exchange Commission. This automated response with your Submission Number confirms that your submission has been received successfully. Please write down your Submission Number or print/save a copy of your submission for future reference. Once you navigate away from this page you will not be able to get back to your submission.

We are always interested in hearing from the public, and your submission will be given careful consideration in view of the Commission's overall responsibilities under the federal securities laws. Please note, however, that it is the Commission's policy to conduct its investigations on a non-public basis in order to preserve the integrity of its investigative process. Subject to the provisions of the Freedom of Information Act, we cannot disclose to you any information which we may gather, nor can we confirm the existence or nonexistence of an investigation, unless such information is made a matter of public record in proceedings brought before the Commission or the courts. Therefore, this may be the only response that you receive. If you want to learn more about how the Commission handles inquiries or complaints, please visit http://www.sec.gov/complaint/info_tipscomplaint.shtml.

Please note that if you selected an answer of "Yes" to the question indicating that you want to file this information under the SEC's Whistleblower program, you are agreeing to the following statement:

- I declare under penalty of perjury under the laws of the United States that the information contained herein is true, correct and complete to the best of my knowledge, information, and belief. I fully understand that I may be subject to prosecution and ineligible for a whistleblower award if, in my submission of information, my other dealings with the SEC, or my dealings with another authority in connection with a related action, I knowingly and willfully make any false, fictitious, or fraudulent statements or representations, or use any false writing or document knowing that the writing or document contains any false, fictitious, or fraudulent statement or entry.

If you are an attorney completing this form on behalf of your client, by selecting an answer of "Yes" to the question indicating that you want to file this information under the SEC's Whistleblower program, you are agreeing to the following statement:

- I certify that I have reviewed this form for completeness and accuracy and that the information contained herein is true, correct and complete to the best of my knowledge, information and belief. I further certify that I have verified the identity of the whistleblower on whose behalf this form is being submitted by viewing the whistleblower's valid, unexpired government issued identification (e.g., driver's license, passport) and will retain an original, signed copy of this form, with Section F signed by the whistleblower, in my records. I further certify that I have obtained the whistleblower's nonwaiveable consent to provide the Commission with his or her original signed Form TCR upon request in the event that the Commission requests it due to concerns that the whistleblower may have knowingly and willfully made false, fictitious, or fraudulent statements or representations, or used any false writing or document knowing that the writing or document contains any false fictitious or fraudulent statement or entry; and that I consent to be legally obligated to do so within 7 calendar days of receiving such a request from the Commission.

**PRINT SUBMISSION**

# What is your complaint about?

**Please select the option that best describes your complaint.**
Other

**Is this supplemental information to a previous complaint?**
No

**In your own words, describe the conduct or situation you are complaining about.**
TCR / Whistleblower Submission Concerning Alibaba Group Holding Limited, Alibaba.com Marketplace, Trade Assurance Order No. 91906090501027582, Potential Securities Disclosure / Marketplace-Risk / Compliance Issues

**Are you having or have you had difficulty getting access to your funds or securities?**
No

**Did you suffer a loss?**
No

**When did you become aware of the conduct? (mm/dd/yyyy)**
03/09/2016

**When did the conduct begin? (mm/dd/yyyy)**
06/01/2025

**Is the conduct ongoing?**
Yes

**Has the individual or firm acknowledged the conduct?**
Yes

**How did you learn about the conduct? You may select more than one answer.**
Internal business documents

**Have you taken any action regarding your complaint? You may select more than one answer.**
Complained to firm, Complained to law enforcement, Complained to other, Legal action, Mediation, Arbitration

**Provide details.**
TCR / Whistleblower Submission Concerning Alibaba Group Holding Limited, Alibaba.com Marketplace, Trade Assurance Order No. 91906090501027582, Potential Securities Disclosure / Marketplace-Risk / Compliance Issues

# Who are you complaining about?

## Person or Firm 1

**Are you complaining about a person or a firm?**
Firm

**Select the title that best describes the firm the complaint is about.**
Publicly held company

**Are you or were you associated with the person or firm when the alleged conduct occurred?**
No

**Identifier Type**
Ticker Symbol

**Ticker Symbol**
BABA

**Are you a current or former Employee, Officer, Partner, or Employee Director of any entity you are complaining about?**
No

**Are you a current or former Non-Employee Director, Consultant, Contractor or Trustee of any entity you are complaining about?**
No

**Firm Name**
ALIBABA.COM

**Street Address**
400 S El Camino Real #400

**Country**
United States

**Zip / Postal Code**
94402

**City**
SAN MATEO

**State / Province**
CA

**Website**
www.alibaba.com

**If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?**
No

# Which investment products are involved?

**Select the type of product involved in your complaint.**
Equities (e.g., common stock, preferred stock)

**Please select the category that best describes the security product.**
Common stock (traded over-the-counter, including microcap and penny stock)

**Enter the ticker symbol, if known.**
BABA

# About you

**Are you filing this tip under the SEC's whistleblower program?**
Yes

**Are you an attorney filling out this form on behalf of an anonymous whistleblower client who is seeking an award?**
No

**Title**
Mr

**First Name**
BRADLEY

**Last Name**
BURCHFIELD

**Street Address**
300 3RD ST APT 1106

**Country**
United States

**Zip / Postal Code**
72201

**City**
LITTLE ROCK

**State / Province**
AR

**Home Telephone**
4792230038

**Email Address**
BURCHFIELDBRADLEY123@GMAIL.COM

**What is the best way to reach you?**
Email

**Are you represented by an attorney in connection with this matter, or would you like to provide your attorney's contact information?**
No

**Select the profession that best represents you.**
Other

**For Other, please specify.**
CONSULTANT

**Have you reported the matter at issue in this submission to your supervisor, compliance office, whistleblower hotline, ombudsman, or any other available mechanism for reporting possible violations at any entity you are complaining about?**
No

**Were you retaliated against for reporting the matter at issue in this submission either internally at the entity or to a regulator?**
Yes

**If you answered "Yes," please provide details.**
I WAS THREATENED IN AN EMAIL TO KEEP QUIET IF IT WASN'T LEGAL BUT IT'S NOT DUE TO THIS SUBMISSION. IT WAS ONE OF THE REASONS FOR FILING THE CASES.

**Has anyone taken steps to prevent you from reporting this violation to the SEC?**
No

**Are documents or other information being submitted that could potentially identify the whistleblower?**
Yes

**Identify with particularity any documents or other information in your submission that you believe could reasonably be expected to reveal your identity.**
COURT CASE FILINGS WITH MY NAME ON IT BUT I DON'T CARE IF THEY KNOW. CAUSE THEY KNOW ALREADY.

**Does the whistleblower want to be eligible to apply for a whistleblower award?**
Yes

**1. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer or employee of the Department of Justice; the Securities and Exchange Commission; the Comptroller of the Currency; the Board of Governors of the Federal Reserve System; the Federal Deposit Insurance Corporation; the Office of Thrift Supervision; the Public Company Accounting Oversight Board; any law enforcement organization; or any national securities exchange, registered securities association, registered clearing agency, or the Municipal Securities Rulemaking Board?**
No

**2. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer, or employee of a foreign government, any political subdivision, department, agency, or instrumentality of a foreign government, or any other foreign financial regulatory authority as that term is defined in Section 3(a)(52) of the Securities Exchange Act of 1934 (15 U.S.C. Section §78c(a)(52))?**
No

**3. Did you acquire the information being submitted to us through the performance of an engagement required under the federal securities laws by an independent public accountant?**
No

**4. Are you providing this information pursuant to a cooperation agreement with the SEC or another agency or organization?**
No

**5. Are you a spouse, parent, child, or sibling of a member or employee of the SEC, or do you reside in the same household as a member or employee of the SEC?**
No

**6. Have you or anyone representing you received any request, inquiry or demand that relates to the subject matter of your submission (i) from the SEC; (ii) in connection with an investigation, inspection or examination by the Public Company Accounting Oversight Board, or any self-regulatory organization; or (iii) in connection with an investigation by Congress, any other authority of the federal government, or a state Attorney General or securities regulatory authority?**
No

**7. Are you currently a subject or target of a criminal investigation, or have you been convicted of a criminal violation, in connection with the information you are submitting to the SEC?**
No

**8. Did you acquire the information being provided to us from any person described in Questions 1 through 7?**
No

**I declare under penalty of perjury under the laws of the United States that the information contained herein is true, correct and complete to the best of my knowledge, information, and belief. I fully understand that I may be subject to prosecution and ineligible for a whistleblower award if, in my submission of information, my other dealings with the SEC, or my dealings with another authority in connection with a related action, I knowingly and willfully make any false, fictitious, or fraudulent statements or representations, or use any false writing or document knowing that the writing or document contains any false, fictitious, or fraudulent statement or entry.**
Agree

## Attach Files

**Upload Document(s)**

- *FEDERAL CIVIL RICO FILED.pdf* (291.6 KB)
- *FEDERAL MOTION TO PIERCE CORPORATE VEIL.pdf* (403.43 KB)
- *SMALL CLAIMS COMPLAINT WITH SERVICE ADDRESSES.pdf* (686.3 KB)
- *PROOF OF SERVICE D1 SMALL CLAIMS.pdf* (209.95 KB)
- *PROOF OF SERVICE D2 SMALL CLAIMS.pdf* (215.69 KB)
- *PROOF OF SERVICE D3 SMALL CLAIMS.pdf* (190.89 KB)

Exhibit N

# Tips, Complaints, and Referrals

## Summary Page - After Submission

### This export was generated on Fri, June 26, 2026 at 10:59:14 AM EDT

The Complaint Form questions that you responded to, the answers you entered for those questions, and any documents that you have uploaded to this TCR are listed below.

### Submission Number: 17824-859-526-899

Thank you for contacting the United States Securities and Exchange Commission. This automated response with your Submission Number confirms that your submission has been received successfully. Please write down your Submission Number or print/save a copy of your submission for future reference. Once you navigate away from this page you will not be able to get back to your submission.

We are always interested in hearing from the public, and your submission will be given careful consideration in view of the Commission's overall responsibilities under the federal securities laws. Please note, however, that it is the Commission's policy to conduct its investigations on a non-public basis in order to preserve the integrity of its investigative process. Subject to the provisions of the Freedom of Information Act, we cannot disclose to you any information which we may gather, nor can we confirm the existence or nonexistence of an investigation, unless such information is made a matter of public record in proceedings brought before the Commission or the courts. Therefore, this may be the only response that you receive. If you want to learn more about how the Commission handles inquiries or complaints, please visit http://www.sec.gov/complaint/info_tipscomplaint.shtml.

Please note that if you selected an answer of "Yes" to the question indicating that you want to file this information under the SEC's Whistleblower program, you are agreeing to the following statement:

- I declare under penalty of perjury under the laws of the United States that the information contained herein is true, correct and complete to the best of my knowledge, information, and belief. I fully understand that I may be subject to prosecution and ineligible for a whistleblower award if, in my submission of information, my other dealings with the SEC, or my dealings with another authority in connection with a related action, I knowingly and willfully make any false, fictitious, or fraudulent statements or representations, or use any false writing or document knowing that the writing or document contains any false, fictitious, or fraudulent statement or entry.

If you are an attorney completing this form on behalf of your client, by selecting an answer of "Yes" to the question indicating that you want to file this information under the SEC's Whistleblower program, you are agreeing to the following statement:

- I certify that I have reviewed this form for completeness and accuracy and that the information contained herein is true, correct and complete to the best of my knowledge, information and belief. I further certify that I have verified the identity of the whistleblower on whose behalf this form is being submitted by viewing the whistleblower's valid, unexpired government issued identification (e.g., driver's license, passport) and will retain an original, signed copy of this form, with Section F signed by the whistleblower, in my records. I further certify that I have obtained the whistleblower's nonwaiveable consent to provide the Commission with his or her original signed Form TCR upon request in the event that the Commission requests it due to concerns that the whistleblower may have knowingly and willfully made false, fictitious, or fraudulent statements or representations, or used any false writing or document knowing that the writing or document contains any false fictitious or fraudulent statement or entry; and that I consent to be legally obligated to do so within 7 calendar days of receiving such a request from the Commission.

PRINT SUBMISSION

# What is your complaint about?

**Please select the option that best describes your complaint.**
Other

**Is this supplemental information to a previous complaint?**
Yes

**What is the Submission Number of the previous complaint?**
17824-845-629-788

**In your own words, describe the conduct or situation you are complaining about.**
TCR / Whistleblower Submission Concerning Alibaba Group Holding Limited, Alibaba.com Marketplace, Trade Assurance Order No. 91906090501027582, Potential Securities Disclosure / Marketplace-Risk / Compliance Issues

**Are you having or have you had difficulty getting access to your funds or securities?**
No

**Did you suffer a loss?**
No

**When did you become aware of the conduct? (mm/dd/yyyy)**
03/09/2016

**When did the conduct begin? (mm/dd/yyyy)**
06/01/2021

**Is the conduct ongoing?**
Yes

**Has the individual or firm acknowledged the conduct?**
Yes

**How did you learn about the conduct? You may select more than one answer.**
Internal business documents

**Have you taken any action regarding your complaint? You may select more than one answer.**
Complained to firm, Complained to SEC, Complained to law enforcement, Legal action, Mediation, Arbitration

**Provide details.**
TCR / Whistleblower Submission Concerning Alibaba Group Holding Limited, Alibaba.com Marketplace, Trade Assurance Order No. 91906090501027582, Potential Securities Disclosure / Marketplace-Risk / Compliance Issues

# Who are you complaining about?

## Person or Firm 1

**Are you complaining about a person or a firm?**
Firm

**Select the title that best describes the firm the complaint is about.**
Publicly held company

**Are you or were you associated with the person or firm when the alleged conduct occurred?**
No

**Identifier Type**
Ticker Symbol

**Ticker Symbol**
BABA

**Are you a current or former Employee, Officer, Partner, or Employee Director of any entity you are complaining about?**
No

**Are you a current or former Non-Employee Director, Consultant, Contractor or Trustee of any entity you are complaining about?**
No

**Firm Name**
ALIBABA.COM

**Street Address**
400 S El Camino Real #400

**Country**
United States

**Zip / Postal Code**
94402

**City**
SAN MATEO

**State / Province**
CA

**Website**
www.alibaba.com

**If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?**
No

# Which investment products are involved?

**Select the type of product involved in your complaint.**
Equities (e.g., common stock, preferred stock)

**Please select the category that best describes the security product.**
Common stock (traded over-the-counter, including microcap and penny stock)

**Enter the ticker symbol, if known.**
BABA

# About you

**Are you filing this tip under the SEC's whistleblower program?**
Yes

**Are you an attorney filling out this form on behalf of an anonymous whistleblower client who is seeking an award?**
No

**Title**
Mr

**First Name**
BRADLEY

**Last Name**
BURCHFIELD

**Street Address**
300 3RD ST APT 1106

**Country**
United States

**Zip / Postal Code**
72201

**City**
LITTLE ROCK

**State / Province**
AR

**Home Telephone**
4792230038

**Email Address**
BURCHFIELDBRADLEY123@GMAIL.COM

**What is the best way to reach you?**
Email

**Are you represented by an attorney in connection with this matter, or would you like to provide your attorney's contact information?**
No

**Select the profession that best represents you.**
Other

**For Other, please specify.**
CONSULTANT

**Have you reported the matter at issue in this submission to your supervisor, compliance office, whistleblower hotline, ombudsman, or any other available mechanism for reporting possible violations at any entity you are complaining about?**
No

**Were you retaliated against for reporting the matter at issue in this submission either internally at the entity or to a regulator?**
Yes

**If you answered "Yes," please provide details.**
I WAS THREATENED IN AN EMAIL TO KEEP QUIET IF IT WASN'T LEGAL BUT IT'S NOT DUE TO THIS SUBMISSION. IT WAS ONE OF THE REASONS FOR FILING THE CASES.

**Has anyone taken steps to prevent you from reporting this violation to the SEC?**
No

**Are documents or other information being submitted that could potentially identify the whistleblower?**
Yes

**Identify with particularity any documents or other information in your submission that you believe could reasonably be expected to reveal your identity.**
COURT CASE FILINGS WITH MY NAME ON IT BUT I DON'T CARE IF THEY KNOW. CAUSE THEY KNOW ALREADY.

**Does the whistleblower want to be eligible to apply for a whistleblower award?**
Yes

**1. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer or employee of the Department of Justice; the Securities and Exchange Commission; the Comptroller of the Currency; the Board of Governors of the Federal Reserve System; the Federal Deposit Insurance Corporation; the Office of Thrift Supervision; the Public Company Accounting Oversight Board; any law enforcement organization; or any national securities exchange, registered securities association, registered clearing agency, or the Municipal Securities Rulemaking Board?**
No

**2. Are you, or were you at the time you acquired the original information you are submitting to us, a member, officer, or employee of a foreign government, any political subdivision, department, agency, or instrumentality of a foreign government, or any other foreign financial regulatory authority as that term is defined in Section 3(a)(52) of the Securities Exchange Act of 1934 (15 U.S.C. Section §78c(a)(52))?**
No

**3. Did you acquire the information being submitted to us through the performance of an engagement required under the federal securities laws by an independent public accountant?**
No

**4. Are you providing this information pursuant to a cooperation agreement with the SEC or another agency or organization?**
No

**5. Are you a spouse, parent, child, or sibling of a member or employee of the SEC, or do you reside in the same household as a member or employee of the SEC?**
No

**6. Have you or anyone representing you received any request, Inquiry or demand that relates to the subject matter of your submission (i) from the SEC; (ii) in connection with an investigation, inspection or examination by the Public Company Accounting Oversight Board, or any self-regulatory organization; or (iii) in connection with an investigation by Congress, any other authority of the federal government, or a state Attorney General or securities regulatory authority?**
No

**7. Are you currently a subject or target of a criminal investigation, or have you been convicted of a criminal violation, in connection with the information you are submitting to the SEC?**
No

**8. Did you acquire the information being provided to us from any person described in Questions 1 through 7?**
No

**I declare under penalty of perjury under the laws of the United States that the information contained herein is true, correct and complete to the best of my knowledge, information, and belief. I fully understand that I may be subject to prosecution and ineligible for a whistleblower award if, in my submission of information, my other dealings with the SEC, or my dealings with another authority in connection with a related action, I knowingly and willfully make any false, fictitious, or fraudulent statements or representations, or use any false writing or document knowing that the writing or document contains any false, fictitious, or fraudulent statement or entry.**
Agree

# Attach Files

## Upload Document(s)

- *STATE REMOVAL TO CIRCUIT COURT.pdf* (6.2 MB)
- *SMALL CLAIMS COMPLAINT WITH SERVICE ADDRESSES.pdf* (662.78 KB)
- *alibaba monitoring 1000kg order.pdf* (620.76 KB)
- *TRADE ASSURANCE CONTRACT SMALL CLAIMS.pdf* (1.81 MB)



Get Benzinga Pro    DATA & APIS    EVENTS    PREMARKET    ADVERTISE        Contribute    LOGIN    REGISTER

# BENZINGA    Premium Services    Financial News        •••    ▢ Research    📊 My Stocks    🔧 Tools

| Recent Markets | SPY 748.23 | ▲ 0.2% | QQQ 728.68 | ▼ 1.05% | BTC/USD 60066.38 ▲ 2.6356% | DIA 524.26 | ▲ 0.36% | GLD 373.55 | ▲ 1.4% | TLT 85.68 | 🔍 Search Tickers, Companies or News... |

`EDGE`

July 1, 2026 11:01 AM    3 min read

# Insider Selling: J. Michael Evans Unloads $68.36M Of Alibaba Gr Hldgs Stock

by Benzinga Insights Benzinga Staff Writer    **Follow**

FOLLOW ON
Google News

**J. Michael Evans**, President at **Alibaba Gr Hldgs** (NYSE:BABA), reported an insider sell on July 1, according to a new SEC filing.

**What Happened:** Evans's decision to sell 720,000 shares of **Alibaba Gr Hldgs** was revealed in a Form 4 filing with the U.S. Securities and Exchange Commission on Wednesday. The total value of the sale is $68,360,495.



## Recommended Stories


**Anthropic Writes To Elizabeth Warren, Tim Scott, Accuses Alibaba...**


**Silver's Worst Month Since 2011: Why Wall Street's Favorite Trade...**


**What's Going on With Alibaba Stock Wednesday?**


**China's Tech Giants Alibaba, Baidu, BYD Face Fresh US Scrutiny As...**

Powered by Benzinga Newsdesk

Tracking the Wednesday's morning session, **Alibaba Gr Hldgs** shares are trading at $98.97, showing a up of 3.12%.

**Trending Now**

Join 300,000+ Investors



### Join 39,000+ Investors Betting on AI Restaurant Robotics at $5.48/Share

Promoted by Miso (17b disclosure)

Miso's Flippy robot has fried over 5M baskets across 200,000 hours for brands like White Castle, backed by nearly 30 patents. Investors can buy in at $5.48.

[ GET STARTED ]



### Own a Piece of a Fast-Growing Modular AI Data Center Company at $5/Share

Promoted by BluSky AI (17b disclosure)

BluSky AI's modular data centers deploy in months, not years. It targets 200MW+ across 6 states with clients signing. You can buy pre-IPO shares at $5.00.

[ GET STARTED ]

# Get to Know Alibaba Gr Hldgs Better

Alibaba is the world's largest online and mobile commerce company as measured by gross merchandise volume. It operates China's online marketplaces, including Taobao (consumer-to-consumer) and Tmall (business-to-consumer). The China retail e-commerce platform is the most valuable cash flow-generating business at Alibaba. Additional revenue sources include China wholesale e-commerce, international retail and wholesale e-commerce, local consumer services, travel services, cloud computing, digital media and entertainment, Cainiao logistics services, and other businesses.

AD



| Wading Through The Information Environment… | Drones Are Redefining The Battlefield: Kopin… | Ascent Solar Technologies CEO Talks About The. . | Sprott Rare Earths Ex-China ETF $REXC: Western-Aligned… | With Tung Demand Almonty's |

# Financial Insights: Alibaba Gr Hldgs

**Revenue Growth:** Alibaba Gr Hldgs's revenue growth over a period of 3 months has been noteworthy. As of 31 March, 2026, the company achieved a revenue growth rate of approximately **2.93%**. This indicates a substantial increase in the company's top-line earnings. When compared to others in the Consumer Discretionary sector, the company faces challenges, achieving a growth rate lower than the average among peers.

**Evaluating Earnings Performance:**

- **Gross Margin:** The company shows a low gross margin of **34.51%**, indicating concerns regarding cost management and overall profitability relative to its industry counterparts.

- **Earnings per Share (EPS):** Alibaba Gr Hldgs's EPS is significantly higher than the industry average. The company demonstrates a robust bottom-line performance with a current EPS of **10.96**.

**Debt Management:** With a below-average debt-to-equity ratio of **0.27**, Alibaba Gr Hldgs adopts a prudent financial strategy, indicating a balanced approach to debt management.

**Valuation Metrics:**

- **Price to Earnings (P/E) Ratio:** The Price to Earnings ratio of **14.83** is lower than the industry average, indicating potential undervaluation for the stock.

- **Price to Sales (P/S) Ratio:** With a lower-than-average P/S ratio of **1.53**, the stock presents an attractive valuation, potentially signaling a buying opportunity for investors interested in sales performance.

- **EV/EBITDA Analysis (Enterprise Value to its Earnings Before Interest, Taxes, Depreciation & Amortization):** With a below-average EV/EBITDA ratio of **8.11**, Alibaba Gr Hldgs presents an opportunity for value investors. This lower valuation may attract investors seeking undervalued opportunities.

**Market Capitalization Analysis:** With an elevated market capitalization, the company stands out above industry averages, showcasing substantial size and market acknowledgment.

## Why Insider Transactions Are Important

Emphasizing the importance of a comprehensive approach, considering insider transactions is valuable, but it's crucial to evaluate them in conjunction with other investment factors.

In the context of legal matters, the term "insider" refers to any officer, director, or beneficial owner holding more than ten percent of a company's equity securities, as outlined by Section 12 of the Securities Exchange Act of 1934. This includes executives in the c-suite and significant hedge funds. Such insiders are obligated to report their transactions through a Form 4 filing, which must be completed within two business days of the transaction.

Pointing towards optimism, a company insider's new purchase signals their positive anticipation for the stock to rise.

Despite insider sells not always signaling a bearish sentiment, they can be driven by various factors.

## Essential Transaction Codes Unveiled

In the domain of transactions, investors frequently turn their focus to those taking place in the open market, as meticulously outlined in Table I of the Form 4 filing. A **P** in Box 3 indicates a purchase, while **S** signifies a sale. Transaction code **C** signals the conversion of an option, and transaction code **A** denotes a grant, award, or other acquisition of securities from the company.

**Check Out The Full List Of Alibaba Gr Hldgs's Insider Trades.**

*This article was generated by Benzinga's automated content engine and reviewed by an editor.*

Market News and Data brought to you by Benzinga APIs

© 2026 Benzinga.com. Benzinga does not provide investment advice. All rights reserved.

To add **Benzinga News** as your preferred source on Google, click here.

in  X  f  🦋  ✉  🔗

**Posted In:** Insider Trades | Trading Ideas | News | BZI-IT

Discover Private Market Opportunities  ·  Join 400,000+ Investors

## Join 39,000+ Investors Betting on AI Restaurant Robotics at $5.48/Share

Promoted by Miso (17b disclosure)



Miso's Flippy robot has fried over 5M baskets across 200,000 hours for brands like White Castle, backed by nearly 30 patents. Investors can buy in at $5.48.

GET STARTED

## Own a Piece of a Fast-Growing Modular AI Data Center Company at $5/Share

Promoted by BluSky AI (17b disclosure)



BluSky AI's modular data centers deploy in months, not years. It targets 200MW+ across 6 states with clients signing. You can buy pre-IPO shares at $5.00, with a $1,000 minimum.

GET STARTED

## 1.5M People Already Work Inside This Platform — Invest at Just $0.79/Share

Promoted by Immersed (17b disclosure)

immersed

Immersed is the #1 app on Meta Quest, with 75,000+ on the Visor waitlist. Investors can buy pre-IPO shares at $0.79 and earn up to 20% bonus shares.

GET STARTED



## Buy Shares of Rental Properties Alongside 300,000+ Investors, Starting at $20

Promoted by Ark7  (17b disclosure)

Ark7 has funded $30M+ in property and paid $4M in dividends across 20 U.S. markets. Buy shares of curated rentals from $20. Invest $1,000 and receive a $50 bonus.

GET STARTED

## Own a Piece of Deloitte's #1 Fastest-Growing Software Company at $0.52/Share

Promoted by Mode  (17b disclosure)

Mode Mobile has 50M+ users earning money from their phones and grew revenue 32,481% in 3 years. Investors can buy pre-IPO shares at $0.52 right now.

GET STARTED

## Accredited Investors Can Access Institutional Real Estate from a $3.4B Firm

Promoted by Realberry  (17b disclosure)

Realberry's principals invest alongside clients in institutional real estate, bringing 35 years of experience, $3.4B in assets under management, and $481M in cumulative distributions paid to investors.

GET STARTED

## Connect With Us

   

 





## About Benzinga

About Us

Careers

Advertise

Contact Us

## Trading Tools & Education

Benzinga Pro Trading Platform

Options Trading Strategies and News

Stock Market Trading Ideas and Analysis

## Market Resources

Advanced Stock Screener Tools

Options Trading Chain Analysis

Comprehensive Earnings Calendar

Dividend Investor Calendar and Alerts

Economic Calendar and Market Events

IPO Calendar and New Listings

Market Outlook and Analysis

Wall Street Analyst Ratings and Targets

## Ring the Bell

A newsletter built for market enthusiasts by market enthusiasts. Top stories, top movers, and trade ideas delivered to your inbox every weekday before and after the market closes.

Technical Analysis Charts and Indicators

Your Email Address

Fundamental Analysis and Valuation

Subscribe

Day Trading Guides and Strategies

Live Investor Events

Pre-market Stock Analysis and News

Cryptocurrency Market Analysis and News

Terms & Conditions    Do Not Sell My Personal Data/Privacy Policy    Disclaimer    Service Status    Sitemap

© 2026 Benzinga I All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/business/alibaba-u-s-payment-processor-to-pay-600-million-in-doj-settlement-over-illegal-drug-sales-23c40942

Exhibit P

BUSINESS

# Alibaba, U.S. Payment Processor to Pay $600 Million in DOJ Settlement Over Illegal Drug Sales

The payment resolves allegations that Alibaba Group and AUS Merchant Services violated the Federal Food, Drug, and Cosmetics Act

**By Elias Schisgall**
Updated July 1, 2026 5:43 pm ET



Alibaba Group is the operator of Chinese e-commerce site Alibaba.com. ALY SONG/REUTERS

Alibaba Group  9988 **-0.16%** ▼  and a U.S.-based payment processor agreed to pay $600 million to resolve allegations from the Justice Department that they allowed merchants to sell and import illegal pharmaceuticals and other restricted items into the U.S.

The operator of Chinese e-commerce site Alibaba.com admitted that it failed to prevent merchants from engaging in around 80,000 sales that involved importing illegal items into the U.S. as part of a non-prosecution agreement, the DOJ said.

---

# Fourth of July Sale
## $2/Week

Already a subscriber? Sign in

Continue reading your article with
a WSJ subscription

# THE WALL STREET JOURNAL.

**Videos**

*Exhibit A*

**Latest News Feed**

Start the New Quarter with 70% Off Premium | **0** Days | **5** Hours | **34** Minutes | **13** Seconds | UPGRADE NOW    X

  Type Expert or Stock    70% OFF    Ideas    Tools    Screeners    Dividends    Experts    Portfolio    News    Private Companies    More    Plans

# Merchant to pay $600M in settlement tied to alleged illegal sales

**TheFly**
Jul 01, 2026, 01:45 PM

✦ Analyze    A+    A-    💬

Alibaba (BABA) and its U.S.-based payment processor AUS Merchant Services, formerly known as Alipay US, have entered a non-prosecution agreement to pay $600M to resolve the Justice Department's allegations that they violated the Federal Food, Drug, and Cosmetic Act by failing to prevent merchants from selling and importing illegal pharmaceuticals, controlled substances, listed chemicals, and pill presses into the United States through the

Gained $2T in Q2; Will the Stellar Rally i...
1h ago    MU    AMD

Tesla (TSLA) Retail Traders May Get Fired Up as Stock Crosses $420
2h ago    TSLA

Bloom Energy Stock (BE) Price Target Raised to a New Street-High – Here's Why
2h ago    BE    BAM

Stock Market Today: SPY, QQQ Lose Steam as AI Stocks Face Pressure ahea...
2h ago    DIA    QQQ

Robinhood (HOOD) Brings Crypto-Style 24/7 Trading to Commodities and...
2h ago    GLD    SLV

Paula Reid Is Expected to Depart CNN

**More Market News >**

✦ Ask Samuel AI

**More Articles**

Alibaba.com and AliExpress.com e-commerce platforms, the U.S. Attorney's Office District of Rhode Island said. "Alibaba admitted that, between January 2016 and December 2024, it failed to prevent merchants using its Alibaba.com and AliExpress.com platforms from engaging in approximately 80,000 product sales involving imports into the United States, including List I and II chemicals, pharmaceuticals, and pharmaceutical counterfeiting equipment... AUS admitted that, between January 2020 and December 2023, it accepted U.S. dollar-denominated payments through credit cards and wire transfers routed through U.S. bank accounts before transferring the funds offshore for settlement on behalf of its customers. When AUS implemented its own transaction-monitoring system for those transactions, it failed to fully incorporate certain wire-transfer data. As a result, its transaction monitoring did not always identify transactions involving payments from high-risk jurisdictions or multiple payors on a single invoice. Additionally, AUS admitted that its anti-money laundering compliance program failed to prevent some Alibaba merchants from using its payment processing and settlement services to facilitate the sale and importation of prohibited products into the United States."

End of Quarter Sale - 70% Off

- Unlock powerful investing tools and data-driven insights with TipRanks Premium for more confident investment decisions.
- Discover top stock picks and new investment opportunities through TipRanks' Smart Investor Newsletter.




**Market News**

**Bloom Energy Stock (BE) Price Target Raised to a...**

2h ago    (BE) (BAM)



**Market News**

**Stock Market Today: SPY, QQQ Lose Steam as AI...**

2h ago    (DIA) (QQQ)



**Market News**

**Robinhood (HOOD) Brings Crypto-Style 24/7 Trading t...**

2h ago    (GLD) (SLV)

More News >

## Stock Comparison



(Quantum Computing) (AI)
(Cryptocurrency) (Bitcoin Stocks)
(Dividend) (Value) (Biotech) (Oil)
(Chinese) (Chat GPT) (Banks) (Airline)
(Beer & Beverages) (Energy)

## Investment Ideas



(Analyst Top Stocks) (Smart Score Stocks)
(Stock Screener) (Top Wall Street Analysts)
(Insiders' Hot Stocks) (Top Penny Stocks)
(Unusual Options Activity)

*Published first on TheFly – the ultimate source for real-time, market-moving breaking financial news. Try Now>>*

Top ETFs by Upside Potential

**See Insiders' Hot Stocks on TipRanks >>**

**Read More on BABA:**

- Moderately bullish activity in Alibaba with shares up 3.09%
- Cboe data shows mixed options sentiment in Alibaba with shares up 0.96%
- Cboe data shows mixed options sentiment in Alibaba with shares down 0.2%
- Why Alibaba Stock (BABA) Is Still Wall Street's Favorite China E-Commerce Stock
- BABA, COIN, PLTR, SPCX: Cathie Wood Dumps $54 Million of Alibaba Stock, Buys More Coinbase, Palantir and SpaceX

Disclaimer & Disclosure      Report an Issue

**Conversation** 0 Comments                Sort by   Newest   ⌄

Your voice matters. Discussions are moderated for civility. Read our guidelines here.

B         Write your thoughts about Alibaba, AUS
          Merchant to pay $600M in settlement tied to

alleged illegal sales

0/2000

No comments yet. Be the first to share your thoughts!

# Why Alibaba Stock (BABA) Is Still Wall Street's Favorite China E-Commerce Stock



Shalu Saraf
Jun 29, 2026, 06:42 AM

A+   A-   ⊙

## Story Highlights

- Alibaba remained Daiwa's top China e-commerce pick even after the firm cut its price target.
- The firm downgraded JD.com and PDD to Hold as China's weak shopping season weighed on the sector.



China's 6.18 Shopping Festival, one of the country's biggest annual online sales events, delivered weaker-than-expected results this year. That has made Wall Street more cautious on China's e-commerce sector.


TIP

TipRanks is a comprehensive research tool that helps investors make better, data-driven investment decisions.

NEWSLETTER SUBSCRIPTION

Enter your email to receive our newsletter

Email address

I'm not a robot
reCAPTCHA is changing its terms of service.
Take action.
reCAPTCHA

✓ I agree to TipRanks Terms of use and Privacy Policy

Terms of Use    Privacy Policy    FAQ

### Education

How To l
TipRanks Labs
Glossary
FAQs

### About us

📄 **Continue Reading**

TipRanks Editorial Policy
Careers
Contact Us
Reviews

### Working With TipRanks

erprise Solutions
Top Online Brokers
Become an Affiliate
TipRanks News Wire

### Plans

Plans & Pricing
Smart Investor Newsletter
Smart Dividend Newsletter
API for Institutions
MCP for Agents

### Calendars

Earnings Calendar
Dividend Calendar
Economic Calendar
Stock Split Calendar

### Calculators

Dividend Calculator
Dividend Yield Calculator
Options Profit Calculator

### Screeners

Stock Screener
ETF Screener
Screener
Technical Analysis Screener

Find Us on

 

 App Store     Google Play

Disclaimer: The TipRanks Smart Score performance is based on backtested results. Backtested performance is not an indicator of future actual results. The results reflect performance of a strategy not historically offered to investors and does not represent returns that any investor actually attained. Backtested results are calculated by the retroactive application of a model constructed on the basis of historical data and based on assumptions integral to the model which may or may not be testable and are subject to losses. General assumptions include: XYZ firm would have been able to purchase the securities recommended by the model and the markets were sufficiently liquid to permit all trading. Changes in these assumptions may have a material impact on the backtested returns presented. Certain assumptions have been made for modeling purposes and are unlikely to be realized. No representations and warranties are made as to the reasonableness of the assumptions. This information is provided for illustrative purposes only. Backtested performance is developed with the benefit of hindsight and has inherent limitations. Specifically, backtested results do not reflect actual trading or the effect of material economic and market factors on the decision-making process. Since trades have not actually been executed, results may have under- or over-compensated for the impact, if any, of certain market factors, such as lack of liquidity, and may not reflect the impact that certain economic or market factors may have had on the decision-making process. Further, backtesting allows the security selection methodology to be adjusted until past returns are maximized. Actual performance may differ significantly from backtested performance. Backtested results are adjusted to reflect the reinvestment of dividends and other income and, except where otherwise indicated, are presented gross-of fees and do not include the effect of backtested transaction costs, management fees, performance fees or expenses, if applicable. Please note all regulatory considerations regarding the presentation of fees must be taken into account. No cash balance or cash flow is included in the calculation.



**PRESS RELEASE**

# Alibaba Group and AUS Merchant Services Agree to Pay $600 Million to Resolve Allegations that they Failed to Prevent Illegal Sales of Pharmaceuticals, Pharmaceutical Equipment, and Other Illegal Products

Wednesday, July 1, 2026

**For Immediate Release**

District of Rhode Island

PROVIDENCE- Alibaba Group Holding Limited (Alibaba) — one of China's largest companies — and its U.S.-based payment processor, AUS Merchant Services Inc. (AUS, and formerly known as Alipay US), have entered a non-prosecution agreement to pay $600 million to resolve the Justice Department's allegations that they violated the Federal Food, Drug, and Cosmetic Act (FDCA) by failing to prevent merchants from selling and importing illegal pharmaceuticals, controlled substances, listed chemicals, and pill presses into the United States through the Alibaba.com and AliExpress.com e-commerce platforms.

Alibaba operates e-commerce platform Alibaba.com, one of the world's largest business-to-business (B2B) online marketplaces, and e-commerce platform AliExpress.com, a global business-to-consumer online marketplace. AUS is a subsidiary of Ant International, which operates Alipay, one of the largest mobile and digital payment platforms in the world.

Alibaba admitted that, between January 2016 and December 2024, it failed to prevent merchants using its Alibaba.com and AliExpress.com platforms from engaging in approximately 80,000 product sales involving imports into the United States, including List I and II chemicals, pharmaceuticals, and pharmaceutical counterfeiting equipment. These sales violated the FDCA and other federal laws. The combined gross merchandise value of these transactions exceeded $200 million. During the investigation, federal law enforcement conducted over 40 undercover purchases of pharmaceuticals and counterfeiting equipment that were illegal to be imported into the United States.

Although Alibaba maintained policies restricting the sale of prohibited products on Alibaba.com and AliExpress.com, employees raised concerns that the company's compliance controls were inadequate and failed to prevent the sale and importation of illegal products. Alibaba also provided merchants and buyers with a private, in-platform messaging service that some merchants used to facilitate unlawful transactions. In some instances, merchants used Alibaba's messaging service to direct buyers to third-party encrypted messaging platforms to facilitate those unlawful transactions. Alibaba derived some profit related to those sellers' illegal activities on Alibaba.com by charging membership, marketing, advertising, shipping, and payment-processing fees.

AUS admitted that, between January 2020 and December 2023, it accepted U.S. dollar-denominated payments through credit cards and wire transfers routed through U.S. bank accounts before transferring the funds offshore for settlement on behalf of its customers. When AUS implemented its own transaction-monitoring system for those transactions, it failed to fully incorporate certain wire-transfer data. As a result, its transaction monitoring did not always identify transactions involving payments from high-risk jurisdictions or multiple payors on a single invoice. Additionally, AUS admitted that its anti-money laundering compliance program failed to prevent some Alibaba merchants from using its payment processing and settlement services to facilitate the sale and importation of prohibited products into the United States. In certain instances, rather than systematically restricting merchants identified as selling prohibited merchandise, AUS instead reported those merchants to Alibaba. In at least one instance, a merchant subsequently continued selling prohibited products to U.S. buyers after AUS had investigated and reported the merchant.

As part of the non-prosecution agreement, Alibaba and AUS accepted responsibility for the acts of their officers, directors, employees, and agents in connection with the above conduct. Alibaba agreed to pay a criminal monetary penalty of $125 million and to forfeit $200 million. AUS agreed to pay a criminal monetary penalty of $85 million and to forfeit $190 million. Alibaba and AUS also agreed to enhance their compliance programs and to continue cooperating with the department in any ongoing or future criminal investigation relating to this conduct.

The Justice Department reached this resolution with Alibaba and AUS based on several factors, including their good-faith efforts to implement and refine compliance measures, engagement in remedial measures, absence of prior criminal history, commitment to cooperation with federal agencies, and the nature and seriousness of the offense. Alibaba and AUS also received some credit for their cooperation with the department's investigation and affirmative acceptance of responsibility.

"This resolution reflects the Department of Justice's commitment to holding companies accountable when their platforms are used to facilitate the unlawful sale of illegal pharmaceuticals, related pharmaceutical equipment and other prohibited products in the United States," said First Assistant U.S. Attorney Charles C. Calenda for the District of Rhode Island. "The $600 million resolution with Alibaba Group and Alipay US, the largest monetary settlement in the history of the District of Rhode Island, achieves meaningful accountability while securing significant compliance measures designed to strengthen oversight, prevent future violations, and better protect American consumers. The outcome would not have been possible without the exceptional efforts of the dedicated prosecutors, investigators, and numerous federal, state, and local partners, whose collaboration and commitment were critical to the success of this investigation."

"Today's resolution reflects the Department of Justice's commitment to ensuring that companies operating e-commerce and digital payment platforms keep illegal, unapproved, misbranded, and dangerous foreign pharmaceuticals off their marketplaces," said Assistant Attorney General Brett A. Shumate of the Justice Department's Civil Division. "Companies operating online marketplaces — whether based in the United States or abroad — must implement appropriate safeguards to prevent bad actors from exploiting their platforms. If they fail to do so, the Department will hold them accountable."

"Without active compliance, criminals use e-commerce sites to carry on and profit from illicit activity," said Assistant Attorney General Tysen Duva of the Justice Department's Criminal Division. "Alibaba and AUS have documented steps taken to improve their screening and compliance and provided a commitment to ongoing cooperation with U.S. law enforcement in the future. As a result, another channel for illegal pharmaceuticals and associated equipment is now closed."

"Online platforms that facilitate the sale and distribution of counterfeit and other illegal pharmaceuticals, and equipment used to make counterfeit drugs, pose a grave threat to public health and safety," said Justin Green, Assistant Commissioner for Criminal Investigations, U.S. Food and Drug Administration (FDA). "The FDA remains committed to pursuing those who facilitate the distribution of counterfeit and other illegal pharmaceuticals and counterfeiting equipment into the United States, regardless of where they operate."

"AUS's Anti Money Laundering Compliance Program failed to prevent payments on behalf of bad actors, including Alibaba merchants associated with illegal goods," said Inspector General Jennifer L. Fain of the Federal Deposit Insurance Corporation (FDIC). "The FDIC OIG will continue to work with our law enforcement partners to investigate allegations of financial misconduct and ensure that financial institutions and other designated businesses fully comply with federal requirements to deter, detect, and prevent money laundering."

"As one of the world's largest online retailers, Alibaba has an obligation to safeguard consumers from dangerous and illegal products, and to maintain integrity throughout its payment processes including those carried out by AUS, a U.S.-licensed money services business," said Chief Jarod Koopman of IRS Criminal Investigation (IRS-CI). "This investigation revealed that the companies failed to meet those basic responsibilities. Today's resolution underscores IRS Criminal Investigation's commitment to following the money and ensuring that companies operating in the United States comply fully with federal law."

"This non-prosecution agreement, financial resolution, and required compliance reforms makes clear that global e-commerce companies must build systems that prevent the sale and distribution of illegal products before they reach the United States and the U.S. banking system," said Acting Executive Associate Director John A. Condon of Homeland Security Investigations (HSI). "Homeland Security Investigations, together with the broader law enforcement community, remains unflinchingly committed to identifying and dismantling schemes that allow criminal opportunists and other bad actors to exploit weaknesses in online marketplaces, payment services, and other digital spaces."

"The U.S. Postal Inspection Service is committed to ensuring the U.S. Postal Service is not used as a tool to distribute illegal pharmaceuticals and other dangerous goods to our communities," said Acting Inspector in Charge J. Buck Buckley of the U.S. Postal Inspection Service (USPIS)'s Boston Division. "Today's settlement should serve as a reminder that we will remain steadfast with our law enforcement partners to ensure the integrity of the U.S. Mail."

The FDA Office of Criminal Investigation's Rhode Island Task Force, FDIC Office of Inspector General's New York Field Office, IRS-CI's Global Illicit Financial Team, Homeland Security Task Force New York-Financial, and USPIS investigated the case.

The case was prosecuted by Executive Assistant U.S. Attorney Dulce Donovan and Assistant U.S. Attorney Julianne Klein for the District of Rhode Island; Assistant Director Patrick Runkle and Trial Attorneys Cadesby B. Cooper and Colin W. Trundle of the Civil Division's Enforcement and Affirmative Litigation Branch; and Trial Attorneys Rachel Agress and Elysa Wan of the Money Laundering, Narcotics and Forfeiture Section. Senior Counsel Sarah Hawkins of FDA's Office of the Chief Counsel provided critical assistance.

Alibaba NPA/AUS NPA:

Alibaba NPA.pdf AUS Merchant Services NPA.pdf

*Updated July 1, 2026*

**Component**

USAO - Rhode Island

Press Release Number: 26-67

# Related Content

**PRESS RELEASE**

## West Warwick Man Pleads Guilty to Steroid Distribution Charge

**Providence** - A West Warwick man has pleaded guilty in federal court in Rhode Island to possession with intent to distribute a Schedule III controlled substance.

**June 26, 2026**

**PRESS RELEASE**

## Massachusetts Man Charged with Attempting to Entice a Minor Following Operation "Red Card"

**Providence**-A Rehoboth, Massachusetts man has been charged federally for allegedly attempting to entice a person he believed to be a 15-year-old female to engage in sexual activity and...

June 26, 2026

**PRESS RELEASE**

## Four Charged in Scheme to Smuggle Contraband into Wyatt Detention Facility

**Providence**- A federal grand jury in Rhode Island has indicted a former Wyatt Detention Facility programs counselor, two former Wyatt detainees, and a Massachusetts woman for their alleged roles...

June 25, 2026

✉  **District of Rhode Island**

Main Office:

One Financial Plaza, 17th Floor

Providence, RI 02903

Email USAO-RI

☎  Telephone: (401) 709-5000

Fax Line: (401) 709-5001

*Exhibit S*



# U.S. Department of
# JUSTICE

The Department of Justice is posting this court document as a courtesy to the public. An official copy of this court document can be obtained (irrespective of any markings that may indicate that the document was filed under seal or otherwise marked as not available for public dissemination) on the Public Access to Court Electronic Records website at https://pacer.uscourts.gov. In some cases, the Department may have edited the document to redact personally identifiable information (PII) such as addresses, phone numbers, bank account numbers, or similar information, and to make the document accessible under Section 508 of the Rehabilitation Act of 1973, which requires federal agencies to make electronic information accessible to people with disabilities.



**United States Department of Justice**
*United States Attorney's Office*
*District of Rhode Island*

One Financial Plaza, 17th Floor
Providence, Rhode Island 02903

June 29, 2026

Samuel G. Williamson, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
2601 South Bayshore Dr, Ste 1550
Miami, FL 33133
*Counsel for Alibaba Group Holding Limited, Alibaba.com Singapore E-Commerce Pte.*
*Limited, AliExpress E-Commerce One Pte. Ltd., and Alibaba.com U.S. LLC*

**Re:    Alibaba.com U.S. LLC et al. Non-Prosecution Agreement**

Dear Counsel:

The Government and Alibaba enter into this Non-Prosecution Agreement ("Agreement") for misdemeanor violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, *et seq*. The Government agrees not to prosecute Alibaba during the term of this Agreement or thereafter for any violation related to the conduct described in the Statement of Facts, attached hereto as **Attachment A**. The Parties agree to certain terms and obligations as set forth below.

**A.    Definitions**

1.    In this Agreement, the following terms shall have the meanings provided below. Capitalized terms used but not defined in this Section have the meanings given elsewhere in this Agreement.

a.    **"Alibaba"** means Alibaba Group Holding Limited (an exempted company incorporated in the Cayman Islands with limited liability on June 28, 1999, the ADSs of which are listed on the New York Stock Exchange) and all of its subsidiaries and their officers, directors, employees, and agents acting within the scope of their employment and agency relationships with Alibaba Group Holding Limited, including Alibaba.com Singapore E-Commerce Pte. Limited, AliExpress E-Commerce One Pte. Ltd., Alibaba Group (U.S.) Inc., and Alibaba.com U.S. LLC, and includes the Alibaba Platforms, as defined in this Section.

b.    **"Alibaba Platforms"** mean ICBU and AliExpress, i.e., the business units that operate Alibaba's cross border international business-to-business (ICBU) which operates Alibaba.com and business-to-consumer (AliExpress) e-commerce platforms, respectively.

c.  **"AliExpress"** means the business unit within Alibaba that operates the AliExpress cross-border international business-to-consumer e-commerce platform, including the legal entities that house this unit Alibaba.com Singapore E-Commerce Pte. Ltd. and AliExpress E-Commerce One Pte. Ltd.

d.  **"Business Day"** means any day other than a Saturday, Sunday, or legal public holiday in the United States (as defined by 5 U.S.C. § 6103(a)).

e.  **"Drug, Device, and Importation Laws"** mean the following statutes: (a) the FDCA (21 U.S.C. § 301 *et seq.*); (b) the Controlled Substances Act ("CSA") (21 U.S.C. § 801 *et seq.*); and (c) Smuggling (18 U.S.C. § 545).

f.  **"Government"** means the United States Department of Justice, including the United States Attorney's Office for the District of Rhode Island, the United States Department of Justice's Enforcement & Affirmative Litigation Branch, and the United States Department of Justice's Money Laundering, Narcotics and Forfeiture Section.

g.  **"ICBU"** means Alibaba's International Commerce Business Unit, which is the business unit within Alibaba that operates Alibaba.com, the international business-to-business platform, including the legal entities that house this unit, Alibaba.com Singapore E-Commerce Pte. Limited, Alibaba.com U.S. LLC, and Alibaba.com U.S. e-Commerce Corp.

h.  **"Parties"** means the Government and Alibaba.

i.  **"Subject Merchandise"** means drugs (as defined in 21 U.S.C. § 321(g)), devices (as defined in 21 U.S.C. § 321(h)), equipment used to manufacture counterfeit drugs (including tableting and encapsulating machines, punches, dies, plates, stones, and other things referenced in 21 U.S.C. §§ 331(i)(2) and 843(a)(5)-(7)), controlled substances (as defined in 21 U.S.C. § 802(6)), listed chemicals or chemical mixtures (as defined in 21 U.S.C. §§ 802(33) and (40)), anabolic steroids (as defined in 21 U.S.C. § 802(41)(A) and (C)), and other items regulated by the CSA (21 U.S.C. § 801 *et seq.*), the FDCA (21 U.S.C. § 301 *et seq.*), and any other product whose importation into the United States is prohibited under federal law and where such importation would constitute a felony.

## B.  Acceptance of Responsibility

2.  The Alibaba Platforms admit, accept, and acknowledge that they are responsible under United States law for the acts of their officers, directors, employees, and agents as set forth in the Statement of Facts provided in **Attachment A** and incorporated by reference into this Agreement. Alibaba admits the facts described in **Attachment A** are true and accurate.

3.  In any prosecution or proceeding against Alibaba, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the Government in its case-in-chief and rebuttal

case; (b) impeachment evidence offered by the Government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. Additionally, Alibaba shall not assert any claim that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines"), or any other federal rule.

### C.    Term of the Agreement

4.    Alibaba's obligations under this Agreement shall have a term of three years from the date on which the Agreement is executed (the "Term"). Alibaba agrees, however, that in the event the Government determines, in its sole discretion, acting reasonably, that Alibaba has knowingly and materially violated any provision of this Agreement, or has failed to completely perform or fulfill its material obligations under this Agreement, an extension or extensions of the Term may be imposed by the Government, in its sole discretion, for up to a total aggregate additional time period of one year, without prejudice to the Government's rights to proceed as provided in the below breach provisions of this Agreement. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement for the Alibaba Platforms in **Attachment D** and any tolling periods for any applicable statutes of limitation, for an equivalent period. The Government will provide Alibaba with written notice specifying the alleged violation in reasonable detail no fewer than thirty (30) calendar days before any extension is imposed, and Alibaba will have thirty (30) calendar days following receipt of such written notice (the "**Extension Cure Period**") to respond to the Government in writing to explain the nature and circumstances of such breach, as well as the actions the Alibaba Platforms have taken to address and remediate the situation, which explanation the Government shall consider in determining whether to extend the Term. The Government shall provide Alibaba with a written determination specifying the violation upon which the extension is based and the duration of the extension to be imposed.

### D.    Relevant Considerations

5.    The Government enters into this Agreement based on the individual facts and circumstances of this case, including those presented by Alibaba. These facts and circumstances include, but are not limited to, the following:

    a.    The seriousness of the conduct described in the Statement of Facts, which involved advertisements and sales related to Subject Merchandise;

    b.    Alibaba's lack of voluntary disclosure credit based on their failure to timely and voluntarily disclose to the Government the conduct described in the Statement of Facts; The Alibaba Platforms' compliance failures that contributed to the offense conduct, including material compliance failures that occurred after the Alibaba Platforms implemented remedial measures;

    c.    Credit for the Alibaba's cooperation with the Government's investigation, which included:

Letter to Mr. Samuel G. Williamson, Esq.
June 29, 2026
Page 4 of 16

       i.      investigating facts and obtaining information as requested by the Government, which allowed the Government to preserve and obtain evidence as part of their own independent investigation;

       ii.     at the Government's request, collecting, organizing, and producing voluminous documents in ways that did not implicate foreign data privacy laws;

       iii.    assisting in making employees available to be interviewed;

       iv.    creating and producing to the Government certain information from the databases of the Alibaba Platforms regarding relevant e-commerce sales of Subject Merchandise to U.S. customers in ways that did not implicate foreign data privacy laws;

       v.     making factual presentations to the Government on a wide variety of topics; and

       vi.    providing separate counsel to witnesses to facilitate the Government's investigation, where appropriate.

d.     The Alibaba Platforms' good-faith efforts to implement and refine compliance measures designed to detect and prevent violations of the statutes, terminating business relationships with companies and persons known to have been involved in the conduct described in the Statement of Facts; terminating third-party sellers' abilities to use the Alibaba Platforms services to unlawfully advertise, sell, import or export, distribute, or smuggle Subject Merchandise; closing categories associated with high risk transactions; making investments in staffing and resources for its legal and compliance teams, including engaging third-party vendors to assist with daily monitoring; updating policies, procedures, and supervisory structures with an emphasis on preventing and detecting the unlawful advertisement, sale, import or export, distribution, and smuggling of Subject Merchandise; and expanding employee training;

e.     The Alibaba Platforms' agreements to enhance their corporate compliance programs and internal controls by adopting the minimum elements of a corporate compliance program provided in **Attachment C**;

f.     The Alibaba Platforms' agreement to continue to cooperate with the Government as described in Section E;

g.     Alibaba's lack of prior criminal history;

h.     Accordingly, after considering (a) through (g) above, the Government has determined that the appropriate resolution in this case is this Agreement with Alibaba, with a monetary penalty of $125,000,000 ("**Monetary Penalty**") for a

Letter to Mr. Samuel G. Williamson, Esq.
June 29, 2026
Page 5 of 16

misdemeanor violation of the Food, Drugs, and Cosmetics Act and a civil forfeiture of $200,000,000 ("**Forfeiture Amount**") assessed against Alibaba.

### E.    Cooperation Requirements

6.    The Alibaba Platforms shall fully cooperate with the Government on any matter that relates to: (1) the conduct described in this Agreement and the Statement of Facts and any individual or entity referred to therein, as well as any other related conduct under investigation by the Government in connection with Subject Merchandise at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term; (2) the advertisement, sale, import, export, distribution, or smuggling of Subject Merchandise into the United States transacted through the Alibaba Platforms that facilitate the advertisement, sale, import, export, distribution, or smuggling of Subject Merchandise into the United States; and (3) possible violations of Drug, Device, and Importation Laws by third-party sellers and U.S.-based buyers who use the Alibaba Platforms or any other e-commerce platforms owned or controlled by Alibaba. The Alibaba Platforms' obligation to cooperate with the Government under this Section shall end on the date that the investigations and prosecutions of all such matters conclude or the date that the Term ends, whichever date is later.

7.    The Alibaba Platforms' cooperation pursuant to this Section is subject to applicable law and regulations, including valid claims of federal attorney-client privilege and attorney work-product doctrine. If the Alibaba Platforms withhold information based on the assertion of any such law, regulation, or privilege, the entity shall provide the Government with a log that describes the withheld information and the foundation of the law, regulation or privilege within thirty (30) Business Days of making their determination to withhold the information; cooperation and disclosure obligations under this Section include, but are not limited to, the following:

a.    Each Alibaba Platform shall designate one or more agents to accept and process the Government's requests for cooperation within fifteen (15) Business Days of signing this Agreement. Each Alibaba Platform shall accept the Government's requests for cooperation via email through one or more dedicated email addresses.

b.    Within fifteen (15) Business Days of receiving a request for cooperation, the requested Alibaba Platform shall conduct a diligent search for, and inform the Government whether it has identified, responsive information. If the entity identifies responsive information, the entity shall provide the Government with an estimated timeframe within which it expects to produce the information. Unless otherwise agreed to by the Government, this timeframe shall not exceed sixty (60) calendar days from the date that the entity receives the Government's request.

c.    The Alibaba Platforms shall report within thirty (30) calendar days to the Government any evidence or allegation of a violation of federal law in connection with Subject Merchandise that the Alibaba Platforms learns was committed by the Alibaba Platforms' users of their e-commerce services in the United States, including buyers and sellers.

Letter to Mr. Samuel G. Williamson, Esq.
June 29, 2026
Page 6 of 16

d.      The Alibaba Platforms shall provide complete, truthful, and accurate information to the Government.

e.      In its sole discretion, the Government may share any information, testimony, documents, records, or other tangible evidence that the Alibaba Platforms provide to the Government with any federal, state, or foreign government authority.

### F.      Monetary Penalty

8.      Alibaba agrees that the Monetary Penalty in the amount of one hundred and twenty-five million dollars ("$125,000,000" or "$125 million") is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Section D. Alibaba agrees to pay the Monetary Penalty of $125 million to the U.S. Treasury no later than thirty (30) Business Days after the Effective Date of this Agreement in accordance with payment instructions provided by the Government in its sole discretion.

9.      Alibaba's payment of the Monetary Penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Government that the Monetary Penalty is the maximum penalty that may be imposed in any future prosecution, and the Government is not precluded from arguing in any future prosecution that a court should impose a higher fine, although the Government agrees that under those circumstances, the Government will recommend to a court that the Monetary Penalty paid by Alibaba pursuant to this Agreement be applied toward any fine that a court might impose as part of its judgment against Alibaba. Alibaba acknowledges that such a recommendation will not be binding in any court.

10.     Alibaba acknowledges that no U.S. tax deduction may be sought in connection with the payment of any part of the Monetary Penalty. Alibaba shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the Monetary Penalty amount that Alibaba pays pursuant to this Agreement.

### G.      Civil Forfeiture

11.     Alibaba admits that money and/or property is subject to civil forfeiture because of third-party transactions on Alibaba Platforms that violated Drug, Device, and Importation Laws. Pursuant to Title 18, U.S. Code, Section 981(a)(1)(C), Alibaba consents to civil forfeiture in the Forfeiture Amount of two hundred million dollars ($200,000,000 or "$200 million"). Alibaba agrees that this Forfeiture Amount constitutes gross merchandise value of certain transactions conducted by third-party sellers on Alibaba Platforms in violation of Title 18, United States Code, Section 545.

12.     Alibaba shall pay the Forfeiture Amount, plus any associated transfer fees, no later than thirty (30) Business Days after the Effective Date of this Agreement in accordance with payment instructions provided by the Government in its sole discretion. Alibaba hereby releases any and all claims that it may have to the Forfeiture Amount and agree that the forfeiture of such funds may be accomplished either administratively or judicially at the Government's election, and waive the requirements of any applicable laws, rules, or regulations governing the forfeiture of

Letter to Mr. Samuel G. Williamson, Esq.
June 29, 2026
Page 7 of 16

assets, including those requiring notice of forfeiture. If the Government seeks to forfeit the Forfeiture Amount judicially, Alibaba waives all requirements pertaining to forfeiture set forth in Title 18, U.S. Code, Section 983, including the filing of a civil forfeiture complaint as to its Forfeiture Amount and notice of the same, and consents to entry of an order of forfeiture directed to such funds. If the Government seeks to forfeit the Forfeiture Amount administratively, Alibaba consents to the entry of a declaration of forfeiture and waive the requirements of Title 18, U.S. Code, Section 983 regarding notice of seizure in non-judicial forfeiture matters.

13.     Alibaba agrees to sign any additional documents necessary to complete forfeiture of the Forfeiture Amount. Alibaba also agrees that they shall not file any petitions for remission, restoration, or any other assertion of ownership or request for return relating to the Forfeiture Amount, or any other action or motion seeking to collaterally attack the seizure, restraint, forfeiture, or conveyance of the Forfeiture Amount, nor shall it assist any others in filing any such claims, petitions, actions, or motions.

14.     Alibaba's payment of the Forfeiture Amount is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Government that the Forfeiture Amount surrendered by Alibaba is the maximum forfeiture that may be imposed in any future prosecution, and the Government is not precluded from arguing in any future prosecution that a court should impose a higher criminal forfeiture amount or substitute money judgment in a criminal proceeding, although the Government agrees that under those circumstances, the Government will recommend to a court that the Forfeiture Amount paid by Alibaba pursuant to this Agreement be applied toward any criminal forfeiture or substitute money judgment that a court might impose as part of its judgment. Alibaba acknowledges that such a recommendation will not be binding on any court.

15.     Alibaba agrees that they shall not claim, assert, or apply for, either directly or indirectly, any tax deduction, tax credit, or any other offset with regard to any U.S. federal, state, or local tax or taxable income in connection with the payment of any part of the Forfeiture Amount. Alibaba shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source with regard to the Forfeiture Amount that Alibaba pays pursuant to the Agreement.

### H.     Conditional Release from Liability

16.     Except as otherwise provided in this Agreement, the Government agrees that it will not bring any criminal or civil case against Alibaba relating to (i) any of the conduct described in the Statement of Facts of this Agreement, (ii) any of the information disclosed by Alibaba to the Government as part of this investigation prior to executing this Agreement, or (iii) any information known by the Government prior to the execution of this Agreement that relates to the conduct described in the Statement of Facts to this Agreement. However, the Government may use any information related to the conduct described in the Statement of Facts against Alibaba: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; or (c) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.  Nothing herein shall preclude Alibaba from presenting this Agreement, and the Government's agreement herein, to any other law enforcement, regulatory, or government authority as evidence of cooperation with, and resolution of claims by, the Government with

Letter to Mr. Samuel G. Williamson, Esq.
June 29, 2026
Page 8 of 16

respect to the conduct described herein.

17.    This Agreement does not provide any protection against prosecution for any future conduct by Alibaba. In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with Alibaba.

### I.    Corporate Compliance Program

18.    The Alibaba Platforms shall implement (or continue to the extent already implemented) a corporate compliance program that meets the minimum elements and standards provided in **Attachment C**. The Alibaba Platforms' corporate compliance program shall be designed to prevent and detect violations of Drug, Device, and Importation Laws involving Subject Merchandise. The Compliance Program shall cover the operations of the Alibaba Platforms' employees, contractors, and subcontractors whose responsibilities relate to the (a) advertisement, sale, import, export or distribution of Subject Merchandise; (b) review and moderation of product listings related to Subject Merchandise; and (c) review and moderation of licenses of buyers and sellers of Subject Merchandise who use the Alibaba Platforms' online services. No later than thirty (30) calendar days after the Term expires, each of the Alibaba Platforms, by their respective Chief Executive Officers and Chief Compliance Officers, will certify to the Government, in the form of executing the document attached as Attachment E to this Agreement, that each Alibaba Platform has met its compliance obligations pursuant to this Agreement. Such certification will be deemed a material statement and representation by the Alibaba Platform to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519.

19.    The Alibaba Platforms will periodically review their corporate compliance programs and correct any deficiencies in the programs' internal controls, policies, and procedures that prevent the programs from effectively detecting and deterring violations of Drug, Device, and Importation Laws through the purchase or sale of Subject Merchandise through their online platforms.

### J.    Compliance Monitoring

20.    For the purpose of assessing or determining compliance with this Agreement, the Government may, upon written notice to the Alibaba Platforms:

a.    require the Alibaba Platforms to submit written reports, certifications, or other information relating to compliance with any provision of this Agreement;

b.    interview, under oath or otherwise, officers, employees, or agents of the Alibaba Platforms who may have relevant knowledge; and

c.    require the Alibaba Platforms to produce documents, communications, data, and other information in their possession, custody, or control relating to compliance with any provision of this Agreement, subject to applicable laws and regulations, as well as valid claims of federal attorney-client privilege and attorney work-product doctrine.

Letter to Mr. Samuel G. Williamson, Esq.
June 29, 2026
Page 9 of 16

21.     The Alibaba Platforms shall designate one or more agents of the Alibaba Platforms to accept and process the Government's requests related to compliance monitoring within seven (7) Business Days of signing this Agreement. The Alibaba Platforms shall accept the Government's requests for compliance monitoring information via email through one or more dedicated email addresses maintained by each company. The Alibaba Platforms shall comply with the Government's compliance monitoring requests within thirty (30) calendar days of receiving the Government's written notice. In its sole discretion, the Government may grant extensions of time for the Alibaba Platforms to comply with the Government's requests for compliance monitoring information.

### K.     Non-Prosecution

22.     The Government agrees that if Alibaba complies with its obligations under this Agreement, (a) the Government will not bring any criminal case or other enforcement action against Alibaba, or any of its present or former subsidiaries or affiliates relating to any of the conduct described in the Statement of Facts, and (b) at the conclusion of the Term, this Agreement shall expire. In assessing Alibaba's compliance, the Government shall consider the totality of Alibaba's conduct under this Agreement  and shall not declare a failure to comply based solely on minor or promptly cured technical violations, which shall be determined at the Government's discretion, acting reasonably. To the extent there is conduct disclosed by Alibaba that is not set forth in this Agreement, such conduct shall not be exempt from further prosecution and is outside the scope of this Agreement. Alibaba expressly acknowledges and agrees that this Agreement does not preclude the filing of a case arising from conduct that is not described in this Agreement and the Statement of Facts.

### L.     Breach of the Agreement

23.     If, during the Term, either of the Alibaba Platforms (a) commits a felony under United States law; (b) knowingly provides in connection with this Agreement materially false, incomplete, or misleading information, including in connection with the disclosure of information about individual culpability; (c) knowingly and materially fails to cooperate as provided in Section E of this Agreement; (d) knowingly fails to implement compliance programs in all material respects as provided in Section I of this Agreement and **Attachment C**; or (e) otherwise knowingly and materially fails to perform or fulfill any term or condition of this Agreement, the relevant Alibaba Platform shall be in breach, and thereafter be subject to prosecution for violations of applicable federal law, including, but not limited to, for conduct described in the Attached Statement of Facts, regardless of whether the Government obtains knowledge of the breach after the Term expires if the breach occurred during the Term of the Agreement.  The notice-of-breach and cure provisions set forth in Paragraphs 26 through 28 shall apply to any such post-Term breach determination.

24.     Any prosecution resulting from a knowing and material breach of this Agreement, as defined in Section L, Paragraph 23, may be pursued by the Government in the United States District Court for the District of Rhode Island or any other appropriate venue.  As to the conduct described in the Statement of Facts, Alibaba knowingly waives any constitutional or statutory right

Letter to Mr. Samuel G. Williamson, Esq.
June 29, 2026
Page 10 of 16

to venue and to presentment to or indictment by a grand jury for felony crimes, and consents to the filing of an information or complaint for said crimes. Determination of whether Alibaba has breached this Agreement and whether to pursue prosecution shall be in the Government's sole discretion, acting reasonably, after good-faith consideration of any written response submitted by Alibaba pursuant to Paragraph 26. Any such prosecution may be premised on information provided by Alibaba.

25.     Any prosecution relating to the conduct described in this Agreement or relating to conduct of the Alibaba Platforms in connection with a violation of the Drug, Device, and Importation Laws known to the Government prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Alibaba notwithstanding the expiration of the statute of limitations, for the period between the signing of this Agreement and the expiration of the Term plus six months. Thus, by signing this Agreement, Alibaba agrees that the statute of limitations with respect to any such prosecution against Alibaba that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus six months. In addition, Alibaba agrees to toll the running of the statute of limitations as to any violation of Drug, Device, and Importation Laws that occurs during the Term for one year from the date upon which the violation occurs, and that this period shall be excluded from any calculation of time for purposes of the application of any applicable statute of limitations.

26.     In the event the Government determines that Alibaba has breached this Agreement, as defined in this Section L, the Government agrees to provide the entity with written notice of such breach prior to instituting any prosecution resulting from such breach. Written notice of breach shall include: (a) the provision breached; (b) the approximate date of the breach; and (c) a description of the breach sufficient to permit the respective company to cure. Within thirty (30) calendar days of receipt of such notice, the entity shall have the opportunity to respond to the Government in writing to explain the nature and circumstances of such breach, as well as the actions the entity has taken to address and remediate the breach, which explanation the Government shall consider in determining whether to pursue prosecution of Alibaba.

27.     In the event that the Government determines that Alibaba has knowingly and materially breached this Agreement, as defined in Section L, Paragraph 23: (a) all statements made by or on behalf of Alibaba to the Government, including the Statement of Facts, and any testimony given by Alibaba before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Government against Alibaba; and (b) Alibaba shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, Section 1B1.1(a) of the USSG, or any other federal rule that any such statements or testimony made by or on behalf of Alibaba prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current officer, director, or employee, or any person acting on behalf of, or at the direction of, the relevant Alibaba Platform, will be imputed to the relevant Alibaba Platform for the purpose of determining whether that entity has deliberately violated any provision

Letter to Mr. Samuel G. Williamson, Esq.
June 29, 2026
Page 11 of 16

of this Agreement as defined in Section L, Paragraph 23, and shall be in the sole discretion of the Government, acting reasonably.

28.     It is further understood that within thirty (30) calendar days after receiving a notice of breach, or to such longer period as the Government may agree in writing, Alibaba may cure the breach to the Government's reasonable satisfaction ("**Cure Period**").

29.     Alibaba acknowledges that the Government has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if any entity breaches this Agreement and this matter proceeds to judgment. Alibaba further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

30.     On the date that the period of non-prosecution specified in this Agreement expires, each of the Alibaba Platforms, by their respective Chief Executive Officers and the Chief Financial Officers, shall submit their respective certifications set forth in **Attachment D** and certify to the Government that they have met their obligations pursuant to this Agreement. Each certification will be deemed a material statement and representation by the Alibaba Platforms in a matter within the jurisdiction of the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the District of Rhode Island.

## M.     Applicability

31.     Except as may otherwise be agreed by the Government and Alibaba, in connection with a particular transaction, Alibaba agrees that in the event that, during the Term, they undertake any change in corporate form that directly involves Alibaba Platforms, including if Alibaba sells, merges, or transfers business operations that are material to Alibaba Platforms' operations, or to the operations of any of Alibaba's subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, Alibaba shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

32.     The purchaser or successor in interest must also agree in writing that the Government's ability to declare breach under this Agreement is applicable in full force as to that entity. Alibaba agrees that the failure to include these provisions in their transactions will make any such transactions null and void. Alibaba shall provide notice to the Government at least thirty (30) calendar days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Government shall notify Alibaba within fifteen (15) calendar days if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If, at any time during the Term, Alibaba engages in a transaction that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Government may deem it a breach of this Agreement pursuant to Section K of this Agreement. Nothing in this Agreement shall restrict Alibaba from indemnifying (or otherwise holding harmless) the purchaser

Letter to Mr. Samuel G. Williamson, Esq.
June 29, 2026
Page 12 of 16

or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Government, acting reasonably.

### N.   Public Statements by Alibaba

33.   Alibaba shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for Alibaba, make any public statement, contradicting in whole or in part the acceptance of responsibility by the Alibaba Platforms as set forth in this Agreement. Any such contradictory statement shall, subject to the cure rights of the Alibaba Platforms described in this paragraph, constitute a breach of this Agreement, and the relevant Alibaba Platform thereafter shall be subject to prosecution as set forth in this Agreement. The decision whether any public statement by any such person contradicting a fact contained in this Agreement will be imputed to the respective Alibaba Platform for the purpose of determining whether it has breached this Agreement shall be in the sole discretion of the Government, acting reasonably.

34.   If the Government determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Government shall notify Alibaba, and Alibaba may avoid a breach of this Agreement by publicly repudiating such statement(s) within ten (10) Business Days after notification. Alibaba shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in this Agreement provided that such defenses and claims do not contradict, in whole or in part, a statement contained in this Agreement. This paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of Alibaba in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of Alibaba. Any determination by the Government, acting reasonably, that a public statement constitutes a breach of this Agreement shall be subject to the 30-day written notice and opportunity to respond procedure set forth in Paragraph 26 before any prosecution may be initiated.

35.   If Alibaba issues a press release or holds any press conference in connection with this Agreement, Alibaba shall first consult with the Government to determine: (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Government and Alibaba; and (b) whether the Government has any objection to the release.

36.   The Government agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Alibaba Platforms' cooperation and remediation. By agreeing to provide this information to such authorities, the Government does not agree to advocate on behalf of Alibaba. Instead, the Government only agrees to provide facts to be evaluated independently by such authorities.

Letter to Mr. Samuel G. Williamson, Esq.
June 29, 2026
Page 13 of 16

### O.    Limitations on Binding Effect of Agreement

37.    This Agreement is binding on Alibaba, the United States Department of Justice, including the United States Attorney's Office for the District of Rhode Island, the United States Department of Justice's Enforcement & Affirmative Litigation Branch, and the United States Department of Justice's Money Laundering, Narcotics and Forfeiture Section. It does not bind any other federal agencies, or any state, local, or foreign law enforcement or regulatory agencies. The Government shall bring the cooperation of Alibaba and its compliance with its obligations under this Agreement to the attention of such agencies and authorities if requested to do so by Alibaba.

### P.    Notice

38.    Any notice to the Government under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

Chief, Criminal Division
U.S. Attorney's Office, District of Rhode Island
One Financial Plaza, 17th Floor
Providence, RI 02903

Director, Enforcement & Affirmative Litigation Branch, Civil Division
U.S. Department of Justice
450 5th Street NW, Room 6400 South
Washington, DC 20530

Chief, Bank Integrity Unit
Money Laundering, Narcotics and Forfeiture Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue NW
Washington DC 20005

39.    Any notice to Alibaba under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

Alibaba Group Holding Ltd.
26/F Tower One, Times Square
1 Matheson Street
Causeway Bay, Hong Kong
Attention: Legal Department

Alibaba.com U.S. LLC
525 Alamnor Ave, Suite 400
Sunnyvale, CA 94085
Attention: Chief Compliance Officer

Letter to Mr. Samuel G. Williamson, Esq.
June 29, 2026
Page 14 of 16

With a copy to:

Quinn Emanuel Urquhart & Sullivan LLP
2601 South Bayshore Dr, Ste 1550
Miami, FL 33133
Attention: Samuel G. Williamson

40.     Notice shall be effective upon actual receipt by the Government or Alibaba. Notice shall also be given by email to any email addresses designated by the Government or Alibaba.

### Q.     Complete Agreement

41.     The Government and Alibaba acknowledge that each party has had a full opportunity to negotiate the terms of this Agreement. The rule of construction that interprets contracts against the drafter, therefore, shall not apply to this Agreement. This Agreement, including its attachments, sets forth all the terms of the Agreement between Alibaba and the Government. No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Government, the attorneys for Alibaba, and a duly authorized representative of Alibaba. The following documents are attached to and incorporated into this Agreement:

**Attachment A**: The Alibaba Statement of Facts

**Attachment B**: The Alibaba Certificate of Corporate Resolutions

**Attachment C**: The Alibaba Corporate Compliance Program

**Attachment D**: The Alibaba Disclosure Certification

**Attachment E**: The Alibaba Compliance Certification

**AGREED AND CONSENTED TO:**

*The United States of America*

CHARLES C. CALENDA
First Assistant United States Attorney

Date: 6/29/2026          By: _____

Dulce Donovan
Executive Assistant U.S. Attorney

Date: 6/29/2026          By: _____

Julianne Klein
Assistant U.S. Attorney

Letter to Mr. Samuel G. Williamson, Esq.
June 29, 2026
Page 15 of 16

LISA K. HSIAO
Director
Enforcement and Affirmative Litigation Branch,
Civil Division

Date: 6/29/2026                By:

Patrick R. Runkle
Assistant Director

Date: 6/29/2026                By:

Colin W. Trundle
Trial Attorney

Date: 6/29/2026                By:

Cadesby B. Cooper
Trial Attorney

MARGARET A. MOESER
Chief
Money Laundering, Narcotics and Forfeiture
Section, Criminal Division

Date: 6/29/2026                By:

Rachel N. Agress
Trial Attorney

Date: 6/29/2026                By:

Elysa Wan
Trial Attorney

Letter to Mr. Samuel G. Williamson, Esq.

Page 16 of 16

**AGREED AND CONSENTED TO:**

*Alibaba Group Holding Limited and Alibaba.com Singapore E-Commerce Pte. Ltd.*

Date: June 29, 2026                    By:

Siying Yu
Authorized Officer and General Counsel
Alibaba Group Holding Limited

Date: June 29, 2026                    By:

Albert Liu
General Counsel
Alibaba.com Singapore E-Commerce Pte. Ltd.

Date: June 29, 2026                    By:

Samuel G. Williamson
Quinn Emanuel Urquhart & Sullivan, LLP
Counsel for Alibaba Group Holding Limited and
Alibaba.com Singapore E-Commerce Pte. Ltd.

**ATTACHMENT A**
**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Non-Prosecution Agreement (the "Agreement") between the Government and Alibaba (as defined in the Agreement). Alibaba agrees and stipulates that the following information is true and accurate. The Alibaba Platforms admit, accept, and acknowledge that they are responsible for the acts of their officers, directors, employees, and agents as set forth below. Should the Government later pursue the prosecution that is covered by this Agreement, Alibaba agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts describe events that occurred between approximately January 2016 and December 2024 (the "Relevant Period").

1.      During the Relevant Period, Alibaba Group (U.S.) Inc., and Alibaba.com US LLC were Delaware companies with a principal place of business at 400 South El Camino Real, Suite 400, San Mateo, California 94402. Alibaba Group (U.S.) Inc. and Alibaba.com US LLC were subsidiaries of Alibaba Group Holding Limited. Alibaba.com Singapore E-Commerce Pte. Limited and AliExpress E-Commerce One Pte. Limited were Singapore based subsidiaries of Alibaba Group Holding Limited. Alibaba Group Holding Limited was founded in 1999 in China and was listed on the New York Stock Exchange in 2014. Alibaba Group Holding Limited was organized and existed under the laws of the Cayman Islands, with its principal executive offices at 969 West Wen Yi Road, Yu Hang District, Hangzhou 31 1121, China.

2.      Alibaba.com was a global business-to-business ("B2B") e-commerce platform that connected buyers and sellers from around the world on a single platform, which facilitated wholesale distribution of a wide range of goods. The International Commerce Business Unit ("ICBU") was the business arm managed by Alibaba.com Singapore E-Commerce Pte. Limited, which managed Alibaba.com, including within the United States. A separate business unit within Alibaba Group Holding Limited, AliExpress, was a global business-to-customer ("B2C") e-commerce platform, which facilitated sales of a wide range of goods from sellers to individual customers. AliExpress was operated by Alibaba.com Singapore E-Commerce Pte. Limited and AliExpress E-Commerce One Pte. Limited. The B2B and B2C services were offered through the web domains Alibaba.com and AliExpress.com, respectively. During the Relevant Period, there were at any given time more than 200 million product listings available on Alibaba.com and over 50 billion product sales occurred on a yearly basis.

3.      ICBU was not an importer of record in connection with the transactions that are the subject of this resolution, nor did it take physical possession of goods. Instead, ICBU operated the Alibaba.com marketplace which linked third-party buyers and sellers to transact the sale of goods. During the Relevant Period, ICBU offered services to independent third-party sellers that were intended to enhance sales and facilitate transactions with buyers on Alibaba.com. These services included "Gold" and "Verified" supplier membership programs that promoted independent third-party sellers' products. Through April 2021, ICBU also offered a payment service on Alibaba.com called "trade assurance." Through this payment service, ICBU processed payments linked to e-commerce orders.

4. During the relevant period, ICBU had policies which governed what products could be sold on Alibaba.com. Sellers agreed to abide by those policies to access the platform. ICBU held the right to take enforcement actions against non-compliant sellers, including barring sellers from selling goods on Alibaba.com. ICBU maintained and periodically improved those policies throughout the Relevant Period.

5. During the Relevant Period, ICBU maintained a Rules Center, a centralized hub on which it published the various policies and penalty procedures which governed sellers and buyers using Alibaba.com. ICBU's rules expressly prohibited the use of Alibaba.com to sell and import pharmaceuticals that were non-compliant with U.S. Food and Drug Administration ("FDA") regulations. ICBU's listing policies also expressly prohibited the sale of pill presses and other illegal products. In addition, ICBU's policies and terms of use required all users to comply with the laws of the jurisdictions within which the users operated. Despite its policies to the contrary, ICBU failed to prevent some third-party sellers from circumventing controls and measures implemented by Alibaba.com and using Alibaba.com to sell and import goods into the United States that violated the Federal Food, Drug, and Cosmetic Act ("FDCA"), as well as other Drug, Device, and Importation Laws through Alibaba.com.

6. ICBU further offered proprietary, built-in messenger platforms that allowed real-time, private chat interactions, requests for price quotes, and management of orders by buyers and merchants. Some third-party merchants at times used ICBU's private messaging platform to discuss, among other things, the arrangement of shipments with U.S. buyers in a manner that would evade US customs laws or to provide buyers with contact information for encrypted messaging platforms unaffiliated with ICBU to evade restrictions imposed by the FDCA, as well as other Drug, Device, and Importation Laws. ICBU had the capability to monitor and moderate seller and buyer use of its own messaging platforms and implemented monitoring measures at some points during the Relevant Period, but those measures were not sufficient to prevent the product sales that gave rise to this Agreement. For example, the Alibaba Platforms generally did not penalize merchants unless they publicly posted prohibited goods on the platform.

7. During the Relevant Period, ICBU's systems, policies, and procedures failed to prevent the sale and importation of certain controlled substances, List I chemicals, List II chemicals, prescription drugs, active pharmaceutical ingredients, and pharmaceutical equipment by independent third-party sellers who were not qualified to distribute such products into the United States. Because of this, some third-party sellers used Alibaba.com to sell and import these products into the United States in violation of the FDCA, FDA regulations, and other Drug, Device, and Importation Laws and in violation of ICBU policies. However, since ICBU charged membership, marketing, advertising, shipping, and transaction processing fees to users of the Alibaba.com marketplace, ICBU derived some profit related to those sellers' illegal activities.

8. During the Relevant Period, similar sales also occurred on AliExpress' B2C platform. The transaction value of these sales tended to be lower, as AliExpress is a B2C platform (in contrast to Alibaba.com's B2B platform).

9. Through the Alibaba Platforms, the Government conducted over 40 undercover purchases of drugs and equipment that were illegal to be imported into the United States under the

2

FDCA as well as other Drug, Device, and Importation Laws. These products were ultimately shipped to the District of Rhode Island by third-party sellers.

10.    At times, Alibaba employees raised concerns that the ICBU platform was used to sell improper products into the United States. The Alibaba employees also raised concerns that ICBU's compliance measures and filtering systems were inadequate to prevent the sale of the products that are the subject of this resolution to buyers in the United States. ICBU was not sufficiently reactive or proactive in following up on these concerns.

11.    Approximately 80,000 product sales on the Alibaba Platforms took place during the Relevant Period and involved product sales from overseas countries to the United States that lacked the requisite approvals under the FDCA as well as other Drug, Device, and Importation Laws. The combined gross merchandise value of these transactions was greater than $200 million. The value of these transactions represents the prices charged by third-party merchants, and not revenues or profits received by the Alibaba Platforms. These funds are subject to civil forfeiture pursuant to Title 18, U.S. Code, Section 981(a)(1)(C) as property which constitutes or is derived from proceeds traceable to smuggling goods by independent third-party sellers in violation of Title 18, U.S. Code, Section 545.

3

**ALIBABA GROUP HOLDING LIMITED**
(Incorporated in the Cayman Islands)
(the "Company")

Certified Extract of Minutes of a Meeting of the Board of Directors (the "Board") of the
Company held at Times Square, Hong Kong and via Video Conference on
March 18, 2026, Beginning at 9:35 a.m., Hong Kong Time
(the "Board Minutes")

---

A. Extract of the relevant definition in the Board Minutes:

"Authorized Officers": "the officers named in Schedule A hereto."

"Company Secretary": "the Company Secretary of the Company."

"Proposed Settlement": "a settlement proposal offered by the DOJ including (1) a non-prosecution agreement (the "Agreement"), (2) a characterization of certain conduct as misdemeanor and (3) a penalty of US$325 million."

B. Extract of the relevant Board Minutes:

**After due and careful consideration, IT WAS UNANIMOUSLY RESOLVED BY THE INDEPENDENT DIRECTORS PRESENT,**

**THAT the Proposed Settlement, on terms substantively as described herein be and hereby is approved;**

**THAT the Company agrees to pay a monetary penalty amount of $125,000,000 and a civil forfeiture of $200,000,000 pursuant to the Agreement;**

**The Company accepts the terms and conditions of the Agreement, including, but not limited to: (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to indictment and venue and consents to the filing of an information, as provided under the terms of the Agreement, in the United States District Court for the District of Rhode Island, or any other appropriate venue; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the DOJ prior to the date on which the Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement;**

**THAT the Authorized Officers, acting together or singly, be and hereby are authorized, approved and directed, on behalf of the Company, to further negotiate with the DOJ to finalize the terms of the Proposed Settlement and the Agreement, and to approve, execute and deliver the Agreement, in such form and with such terms and conditions as any such Authorized Officer shall approve, such Authorized Officer's execution thereof**

to be conclusive evidence of such Authorized Officer's approval of the terms of the Agreement;

THAT the Authorized Officers, acting together or singly, be and hereby are authorized, approved and directed, on behalf of the Company, to take such further actions and to approve, execute and deliver such further agreements or documents as such Authorized Officer shall in his or her reasonable discretion deem necessary, appropriate or advisable in order to carry out the intent and purposes of the foregoing resolutions (including without limitation making any public announcements and/or filings); *provided*, in each case, that such documents, actions, announcements and filings are consistent with and within the scope of the foregoing resolutions; and

THAT any and all actions previously taken by any Authorized Officer or designee thereof relating to and within the scope of these resolutions be and hereby are adopted, approved and ratified and confirmed as valid acts and deeds taken on behalf of the Company.

## Schedule A

### Authorized Officers

Joseph C. TSAI, Chairman, or his successor

Eddie Yongming WU, Chief Executive Officer, or his successor

Toby Hong XU, Chief Financial Officer, or his successor

Sara Siying YU, General Counsel, or her successor

Certified as a true extract of the Board Minutes:

ZHANG Jinwei
Company Secretary
Date: June 25, 2026

**ATTACHMENT C**

**THE ALIBABA CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in internal controls and compliance policies and procedures as they relate to prevention, detection and deterrence of violations of the Drug, Device and Importation Laws in connection with the Subject Merchandise (collectively, the "Compliance Program"), each of the Alibaba Platforms agree to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its Compliance Program and to implement enhancements as warranted. At a minimum, the Compliance Programs should include the following elements, to the extent they are not already present:

*Commitment to Compliance*

1.      Each of the Alibaba Platforms will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to compliance with its Compliance Program and demonstrate rigorous support for compliance principles via their actions and words.

2.      Each of the Alibaba Platforms will ensure that mid-level management throughout its organization reinforces leadership's commitment to compliance policies and principles and encourages employees to abide by them. Each of the Alibaba Platforms will create and foster a culture of ethics and compliance with the laws of the United States in its day-to-day operations at all levels of the company.

*Periodic Risk Assessment and Review*

3.      Each of the Alibaba Platforms will independently implement a risk management process to identify, analyze, and address the individual circumstances of its e-commerce platform, and in particular the compliance risks it faces relating to the potential advertisement, sale, importation, and distribution of Subject Merchandise in the United States through its e-commerce services and potential violations of Drug, Device, and Importation Laws.

4.      On the basis of its periodic risk assessment, each of the Alibaba Platforms shall take appropriate steps to design, implement, or modify each element of its Compliance Program to reduce the risk of violations of Drug, Device, and Importation Laws and associated compliance policies.

*Policies and Procedures*

5.      Each of the Alibaba Platforms will independently develop and promulgate a clearly articulated and visible corporate policy against violations of Drug, Device, and Importation Laws, which shall be memorialized in a written compliance policy or policies, such as the Platform's existing Prohibited and Restricted Items Policy.

6.      Each of the Alibaba Platforms will enhance its respective Prohibited and Restricted Items Policy and other applicable elements of its Compliance Program to reduce the risk of violations of Drug, Device, and Importation Laws. Each of the Alibaba Platforms will take

appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violations of Drug, Device, and Importation Laws under the Compliance Program by personnel at all levels of the company. These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the applicable Alibaba Platform, including, but not limited to, agents, consultants, and joint venture partners (collectively, "agents and business partners"). Each of the Alibaba Platforms shall notify all employees that compliance with the Compliance Program is the duty of individuals at all levels of the company. Such enhancements to the Compliance Program shall include continued prohibition of the use of any e-commerce Internet services on the applicable Alibaba Platform to list, advertise the sale of, or otherwise facilitate offers to sell, distribute, or dispense to customers in the U.S. any of the following products to the extent that the sale of such products would violate the Controlled Substances Act ("CSA") and the Federal Food, Drug, and Cosmetic Act ("FDCA"), including as part of a new Controlled Substance, Drug and Pill Press Policy:

a.      drugs (as defined in 21 U.S.C. § 321(g)(1));

b.      any Class III medical "device" (as defined in 21 U.S.C. § 321(h) and 21 U.S.C. § 360c(a)(1)(C));

c.      equipment used to manufacture counterfeit drugs (including tableting and encapsulating machines, punches, dies, plates, stones, and other things referenced in 21 U.S.C. §§ 331(i)(2) and 843(a)(5)-(7));

d.      any "controlled substance" (as defined in 21 U.S.C. § 802(6) and included on Schedules I through V, 21 C.F.R. § 1308.11 through .15, subject to the exclusions and exceptions in 21 C.F.R. § 1308.21 through .35);

e.      listed chemicals or chemical mixtures (as defined in 21 U.S.C. §§ 802(33) and (40)); and

f.      anabolic steroids (as defined in 21 U.S.C. § 802(41)(A) and (C));

7.      Each of the Alibaba Platforms will maintain, or where necessary establish, effective, risk-based transaction monitoring systems capable of detecting conduct that violates the CSA and the FDCA. The adequacy of the systems shall be evaluated in light of the state of available commercial technology and existing industry practices and standards at the time of assessment.

8.      If, through its Compliance Program, an Alibaba Platform determines that there are reasonable grounds to believe that a user of its e-commerce services is knowingly engaged in the unlawful solicitation, advertisement, sale, importation or exportation, distribution, or smuggling of counterfeit prescription die molds, Schedule I-V controlled substances, or List I and II chemicals into or within the United States, the relevant Alibaba Platform shall suspend the user and initiate an internal investigation. Upon completion of the investigation, if the Alibaba Platform concludes that the grounds for initiating the investigation are substantiated by the information reviewed, the relevant Alibaba Platform will permanently ban that user from using its e-commerce services. Each of the Alibaba Platforms shall take reasonable steps to ensure the permanent ban cannot be readily

2

circumvented, and such steps shall include, but shall not be limited to, measures to prevent banned parties from re-utilizing the Alibaba Platforms in different forms.

9.      Each of the Alibaba Platforms shall evaluate, periodically reassess, and, where appropriate, apply and expand its respective artificial intelligence-based technologies to prevent the sale and advertisement of products on the Alibaba Platforms whose sale or importation into the United States would violate that the CSA and the FDCA.

10.      Each of the Alibaba Platforms shall ensure that its Compliance Program includes risk-based measures designed to prevent the advertisement, sale, import or export, distribution, and smuggling of counterfeit die molds, Schedule I-V controlled substances, or List I and II chemicals to Mexico and Canada, where such materials are commonly used by drug traffickers to manufacture controlled substances which are then smuggled into the United States.

11.      Within ninety (90) calendar days of the execution of the Agreement, each of the Alibaba Platforms shall implement an online, fast-track law enforcement request intake and processing system ("Law Enforcement Green Channel" or "Green Channel") designed to facilitate timely receipt and processing of valid U.S. subpoenas, court orders, and /or search warrants seeking information related to United States-based users of the Alibaba Platforms as well as information regarding purchases and sales to/from the United States. The Law Enforcement Green Channel shall be available to federal, state, and local law enforcement agencies in the United States. Each of the Alibaba Platforms agrees to waive any federal or state statutory right to personal service of United States-based legal process that is related to a United States-based criminal investigation relating to alleged use of the Alibaba Platforms to violate the Drug, Device and Importation Laws. Each of the Alibaba Platforms will comply with such legal process unless it receives relief from doing so by a court of competent jurisdiction in the United States.

12.      Within the same period, each of the Alibaba Platforms shall develop and publish a guidebook that provides notice to United States-based law enforcement of what information is readily available and for how long it is stored by the company. The guidebook shall also provide notice to United-States based law enforcement of how to operate the Law Enforcement Green Channel, including how to create an account, if applicable, and how to serve United States-based legal process on the Alibaba Platforms through the Green Channel. Each of the Alibaba Platforms shall periodically update the guidebook to reflect updates to the Law Enforcement Green Channel when appropriate.

13.      Each of the Alibaba Platforms will ensure that it has a system of internal controls, reasonably designed to ensure the completeness and accuracy of records pertaining to the advertisement, sale, importation, and distribution of Subject Merchandise to customers in the United States.

14.      The Alibaba Platforms will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure (i) the accuracy of records pertaining to the advertisement, sale, importation, or distribution of Subject Merchandise into the U.S. through that Alibaba Platform's e-commerce services; and (ii) the prevention and detection of violations of the CSA and FDCA on that Alibaba Platform.

3

15.    Each of the Alibaba Platforms shall review its Compliance Program as necessary to address changing and emerging risks and update the Compliance Program as appropriate to ensure its continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

### *Independent, Autonomous, and Empowered Oversight*

16.    Each of the Alibaba Platforms will assign responsibility to one or more senior corporate executives of the company for the implementation and oversight of the Compliance Program. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including the applicable Alibaba Platform's internal audit function, or the applicable Alibaba Platform's Board of Directors and any appropriate committee thereof, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

### *Training and Guidance*

17.    Each of the Alibaba Platforms will implement mechanisms designed to ensure that the Compliance Program is effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, any positions that require such training (e.g., internal audit, sales, legal, compliance, finance), and, where necessary and appropriate, agents and business partners; (b) metrics for measuring knowledge retention and effectiveness of the training; and (c) corresponding certifications by all such directors, officers, employees, agents and business partners, certifying compliance with the training requirements. Each of the Alibaba Platforms will conduct training in a manner tailored to the audience's size, sophistication, and subject-matter expertise and, where appropriate, will discuss prior compliance incidents.

18.    Each of the Alibaba Platforms will maintain, or, where necessary, establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Controlled Substance and Pill Press Policy and other compliance policies and procedures regarding Subject Merchandise under the Compliance Program, including when such individuals need advice on an urgent basis, or need advice in any foreign jurisdiction in which that Alibaba Platform operates.

### *Confidential Reporting Structure and Investigation of Misconduct*

19.    Each of the Alibaba Platforms will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of that Alibaba Platform's Compliance Program. This system will provide protection for directors, officers, employees, and, where appropriate, agents and business partners who make such reports.

4

20.    Each of the Alibaba Platforms will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the CSA and the FDCA. Each of the Alibaba Platforms will handle the investigations into such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

*Compensation and Consequence Management*

21.    Each of the Alibaba Platforms will implement clear mechanisms amongst all directors, officers, employees, and, where necessary and appropriate, parties acting on behalf of that Alibaba Platform, to incentivize behavior that complies with that Alibaba Platform's Compliance Program. These incentives shall include, but shall not be limited to, the implementation of criteria related to compliance in that Alibaba Platform's compensation and bonus system.

22.    Each of the Alibaba Platforms will institute appropriate disciplinary procedures to address, among other things, violations of its Compliance Program, the CSA, or the FDCA by that Alibaba Platform's directors, officers, and employees. Such procedures will be applied consistently and fairly, and in a manner consistent with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee. Each of the Alibaba Platforms shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent similar misconduct in the future, including assessing its internal controls and compliance policies and procedures, and making modifications necessary to ensure that Alibaba Platform's overall Compliance Program is effective.

*Third-Party Management*

23.    Each of the Alibaba Platforms will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents, business partners, and sellers who use that Alibaba Platform's ecommerce services in connection with Subject Merchandise, including:

      a.    properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

      b.    informing agents and business partners of that Alibaba Platform's commitment to abiding by the Drug, Device, and Importation Laws, and of the company's Compliance Program; and

      c.    seeking a reciprocal commitment from agents and business partners.

24.    Where necessary and appropriate, each of the Alibaba Platforms will include standard provisions in agreements, contracts, and renewals thereof with all agents, business partners, and e-commerce sellers that are reasonably calculated to prevent violations of the CSA (21 U.S.C. § 801 et seq.) and the FDCA (21 U.S.C. § 301 et seq.), which may, depending on the

5

circumstances, include: (a) representations and undertakings relating to compliance with such laws; (b) rights to conduct audits of the books and records of the agent, business partner, or e-commerce seller in support of efforts to ensure compliance with such laws; and (c) rights to suspend or terminate an agent, business partner, or e-commerce seller as a result of any violation of such laws, Alibaba Platform's Compliance Policy, or relevant representations and undertakings related to such matters.

*Mergers and Acquisitions*

25.    Each of the Alibaba Platforms will develop and implement policies and procedures for mergers and acquisitions requiring that the applicable Alibaba Platform conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence regarding compliance with the CSA and the FDCA by legal, accounting, and compliance personnel associated with those new business entities.

26.    Each of the Alibaba Platforms will ensure that its Compliance Program, including procedures regarding compliance with the CSA and the FDCA, applies as quickly as is practicable to newly-acquired businesses or entities that are merged with that Alibaba Platform, and will promptly (a) train the directors, officers, employees, agents, and business partners consistent with Paragraph 17; (b) where warranted, conduct an audit of all newly acquired or merged businesses as quickly as is practicable concerning compliance with the CSA and the FDCA; and (c) where warranted, based on the nature and scale of the acquired business, each Alibaba Platform will ensure that it establishes a plan to implement the compliance program systems and controls described in this Attachment C into its newly-acquired businesses or entities as quickly as practicable, with priority given to implementing the transaction monitoring system, Law Enforcement Green Channel access, and seller due diligence procedures described herein.

*Monitoring and Testing*

27.    Each of the Alibaba Platforms will conduct periodic reviews and testing of all elements of its Compliance Program to evaluate and improve their effectiveness in preventing and detecting violations of the CSA and the FDCA; and related policies and procedures, taking into account relevant developments in the field and evolving international and industry standards.

28.    Each of the Alibaba Platforms will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and testing of platform transactions.

*Analysis and Remediation of Misconduct*

29.    In the event an Alibaba Platform identifies material misconduct related to violations of the CSA and the FDCA, it will conduct a root cause analysis of that misconduct, including any prior misconduct such as any prior misconduct relating to this investigation, to identify any systemic issues and any control failures. That Alibaba Platform will timely and appropriately remediate the root causes of the identified misconduct. That Alibaba Platform will ensure that root causes, including systemic issues and controls failures, and relevant remediation are shared with management as appropriate.

6

Exhibit T



# U.S. Department of JUSTICE

The Department of Justice is posting this court document as a courtesy to the public. An official copy of this court document can be obtained (irrespective of any markings that may indicate that the document was filed under seal or otherwise marked as not available for public dissemination) on the Public Access to Court Electronic Records website at https://pacer.uscourts.gov. In some cases, the Department may have edited the document to redact personally identifiable information (PII) such as addresses, phone numbers, bank account numbers, or similar information, and to make the document accessible under Section 508 of the Rehabilitation Act of 1973, which requires federal agencies to make electronic information accessible to people with disabilities.



**United States Department of Justice**
*United States Attorney's Office*
*District of Rhode Island*

One Financial Plaza, 17th Floor
Providence, Rhode Island 02903

June 29, 2026

Sharon Cohen Levin, Esq.
Sullivan & Cromwell LLP
125 Broad St
New York, NY 10004
***Counsel for AUS Merchant Services, Inc.***

Re:    **AUS Merchant Services, Inc. et al. Non-Prosecution Agreement**

Dear Counsel:

The Government and AUS Merchant Services, Inc. ("AUS" or the "Company") enter into this Non-Prosecution Agreement ("Agreement") for misdemeanor violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 3 0 1*et seq.* The Government agrees not to prosecute AUS during the term of this Agreement or thereafter for any violation related to the conduct described in the Statement of Facts, attached hereto as **Attachment A**. The Parties agree to certain terms and obligations as set forth below.

A.    **Definitions**

1.    In this Agreement, the following terms shall have the meanings provided below. Capitalized terms used but not defined in this Section have the meanings given elsewhere in this Agreement.

a.    **"AUS"** means AUS Merchant Services, Inc. (formerly known as Alipay U.S., Inc. and Alipay U.S. Escrow, Inc.), a Delaware company with its principal place of business at 525 Almanor Avenue, Sunnyvale, California 94085.

b.    **"Business Day"** means any day other than a Saturday, Sunday, or legal public holiday in the United States (as defined by 5 U.S.C. § 6103(a)).

c.    **"Government"** means the United States Department of Justice, including the United States Attorney's Office for the District of Rhode Island, the United States Department of Justice's Enforcement & Affirmative Litigation Branch, and the United States Department of Justice's Money Laundering, Narcotics and Forfeiture Section.

d.    **"Parties"** means the Government and AUS.

1

Letter to Ms. Sharon Cohen Levin, Esq.
June 29, 2026
Page 2 of 14

e.    **"Subject Merchandise"** means drugs (as defined in 21 U.S.C. § 321(g)), devices (as defined in 21 U.S.C. § 321(h)), equipment used to manufacture counterfeit drugs (including tableting and encapsulating machines, punches, dies, plates, stones, and other things referenced in 21 U.S.C. §§ 331(i)(2) and 843(a)(5)-(7)), controlled substances (as defined in 21 U.S.C. § 802(6)), listed chemicals or chemical mixtures (as defined in 21 U.S.C. §§ 802(33) and (40)), anabolic steroids (as defined in 21 U.S.C. § 802(41)(A) and (C)), and other items regulated by the FDCA.

## B.    Acceptance of Responsibility

2.    AUS admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as set forth in the Statement of Facts provided in **Attachment A** and incorporated by reference into this Agreement, and that the facts described in **Attachment A** are true and accurate.

3.    In any prosecution or proceeding against AUS, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the Government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the Government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. Additionally, AUS shall not assert any claim that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines"), or any other federal rule.

## C.    Term of the Agreement

4.    AUS's obligations under this Agreement shall have a term of three years from the date on which the Agreement is executed (the "Term"). AUS agrees, however, that in the event the Government determines, in its sole discretion, acting reasonably, that AUS has knowingly and materially violated any provision of this Agreement as defined in Section L, Paragraph 23, or has failed to completely perform or fulfill its material obligations under this Agreement, an extension or extensions of the Term may be imposed by the Government, in its sole discretion, for up to a total aggregate additional time period of one year, without prejudice to the Government's rights to proceed as provided in the below breach provisions of this Agreement. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in **Attachment D** and any tolling periods for any applicable statutes of limitation, for an equivalent period. The Government will provide AUS with written notice specifying the alleged violation in reasonable detail no fewer than thirty (30) calendar days before any extension is imposed, and AUS will have thirty (30) calendar days following receipt of such written notice (the "Extension Cure Period") to respond to the Government in writing to explain the nature and circumstances of such breach, as well as the actions AUS has taken to address and remediate the situation, which explanation the Government shall consider in determining whether to extend the Term. The Government shall provide AUS with a written determination specifying the violation upon which the extension is based and the duration of the extension to be imposed.

Letter to Ms. Sharon Cohen Levin, Esq.
June 29, 2026
Page 3 of 14

**D.    Relevant Considerations**

5.    The Government enters into this Agreement based on the individual facts and circumstances of this case, including those presented by AUS. These facts and circumstances include, but are not limited to, the following:

a.    The nature of the conduct described in the Statement of Facts, which involved payment processing related to Subject Merchandise;

b.    AUS's acknowledgement that unlawful activities related to Subject Merchandise were committed by third-party actors on the e-commerce platforms that were owned and operated by Alibaba Group Holding Limited and its relevant subsidiaries ("Alibaba"), including Alibaba.com, and whose payments were processed through AUS;

c.    AUS's lack of voluntary disclosure credit based on its failure to timely and voluntarily disclose to the Government the conduct described in the Statement of Facts;

d.    Gaps in AUS's compliance program that contributed to the offense conduct, including gaps that occurred before the Company finished implementing remedial measures;

e.    AUS's credit for its cooperation with the Government's investigation, which included:

i.    investigating facts and obtaining information as requested by the Government, which allowed the Government to preserve and obtain evidence as part of their own independent investigation;

ii.    at the Government's request, collecting, organizing, and producing voluminous documents in ways that did not implicate foreign data privacy laws;

iii.    assisting in making employees available to be interviewed;

iv.    creating and producing to the Government certain information from its databases of AUS's payment processing related to Subject Merchandise in ways that did not implicate foreign data privacy laws;

v.    making factual presentations to the Government on a wide variety of topics; and

vi.    providing separate counsel to witnesses to facilitate the Government's investigation, where appropriate.

Letter to Ms. Sharon Cohen Levin, Esq.
June 29, 2026
Page 4 of 14

f.  AUS's engagement in remedial measures, including terminating business relationships with companies and persons known to have been involved in the conduct described in the Statement of Facts; terminating AUS's customers' and users' abilities to use AUS's services to unlawfully advertise, sell, import or export, distribute, or smuggle Subject Merchandise; making investments in staffing and resources for AUS's legal and compliance teams; updating policies, procedures, and supervisory structures with an emphasis on preventing and detecting the unlawful advertisement, sale, import or export, distribution, and smuggling of Subject Merchandise; strengthening controls and enhancing compliance-related documentation; and expanding employee training;

g.  AUS's recognition that ongoing commitments to its compliance program protects U.S.-based consumers and merchants as well as the integrity of the financial system;

h.  AUS's agreement to further enhance its corporate compliance programs and internal controls with respect to BSA/AML and FDCA compliance —including risk assessment and review, customer and third-party relationships, transaction monitoring, and suspicious activity reporting—as set forth in **Attachment C**;

i.  AUS's agreements to continue to cooperate with the Government as described in Section E; and

j.  AUS's lack of prior criminal history.

Accordingly, after considering (a) through (j) above, the Government has determined that the appropriate resolution in this case is this Agreement with AUS with a monetary penalty of $85,000,000 ("Monetary Penalty") assessed against AUS for a misdemeanor violation of the FDCA and a civil forfeiture of $190,000,000 ("Forfeiture Amount").

### E.    Cooperation Requirements

6.  AUS shall fully cooperate with the Government on any matter that relates to the: (1) conduct described in this Agreement and the Statement of Facts and any individual or entity referred to therein, as well as any other related conduct under investigation by the Government in connection with Subject Merchandise at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term; (2) advertisement, sale, import, export, distribution, or smuggling of Subject Merchandise through AUS's payment-processing services; (3) possible violations of the FDCA by buyers and sellers who use AUS's payment-processing services; and (4) compliance with the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311 *et seq.*, and AML laws and regulations. AUS's obligations to cooperate with the Government under this Section shall end on the date that the investigations and prosecutions of all such matters conclude or the date that the Term ends, whichever date is later.

Letter to Ms. Sharon Cohen Levin, Esq.
June 29, 2026
Page 5 of 14

7.      AUS's cooperation pursuant to this Section is subject to applicable laws and regulations, including valid claims of federal attorney-client privilege and attorney work-product doctrine. If AUS withholds information based on the assertion of any such law, regulation, or privilege, AUS shall provide the Government with a log that describes the withheld information and the foundation of the law, regulation, or privilege within thirty (30) Business Days of making their determination to withhold the information; AUS's cooperation and disclosure obligations under this Section include, but are not limited to, the following:

a.      AUS shall designate one or more agents to accept and process the Government's requests for cooperation within fifteen (15) Business Days of signing this Agreement. AUS shall accept the Government's requests for cooperation via email through one or more dedicated email addresses.

b.      Within fifteen (15) Business Days of receiving a request for cooperation, AUS shall conduct a diligent search for, and inform the Government whether it has identified, responsive information. If AUS identifies responsive information, AUS shall provide the Government with an estimated timeframe within which it expects to produce the information. Unless otherwise agreed to by the Government, this timeframe shall not exceed sixty (60) calendar days from the date that AUS receives the Government's request.

c.      AUS shall provide quarterly reports listing: (1) all Suspicious Activity Reports filed; and (2) any credible allegations of FDCA or Controlled Substances Act violations that AUS learns was committed by users of AUS's payment-processing services in the United States.

d.      AUS shall provide complete, truthful, and accurate information to the Government.

e.      In its sole discretion, the Government may share any information, testimony, documents, records, or other tangible evidence that AUS provides to the Government with any federal, state, or foreign government authority.

**F.      Monetary Penalty**

8.      AUS agrees that the Monetary Penalty in the amount of eighty-five million dollars ("$85,000,000" or "$85 million") is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Section D. AUS agrees to pay the Monetary Penalty of $85 million to the U.S. Treasury no later than thirty (30) Business Days after the Effective Date of this Agreement in accordance with payment instructions provided by the Government in its sole discretion.

9.      AUS's payment of the Monetary Penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Government that the Monetary Penalty is the maximum penalty that may be imposed in any future prosecution, and the Government is not precluded from arguing in any future prosecution that a court should impose a higher fine, although the Government agrees that under those circumstances, the Government will

Letter to Ms. Sharon Cohen Levin, Esq.
June 29, 2026
Page 6 of 14

recommend to a court that the Monetary Penalty paid by AUS pursuant to this Agreement be applied toward any fine that a court might impose as part of its judgment against AUS. AUS acknowledges that such a recommendation will not be binding in any court.

10.     AUS acknowledges that no U.S. tax deduction may be sought in connection with the payment of any part of the Monetary Penalty. AUS shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source with regard to the penalty amount that AUS pays pursuant to this Agreement.

### G.     Civil Forfeiture

11.     AUS acknowledges that money and/or property is subject to civil forfeiture because of overseas merchants' and their United States-based buyers' violations of the FDCA transacted through Alibaba's online platforms, including Alibaba.com. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), AUS consents to civil forfeiture of one hundred ninety million dollars ("$190,000,000 or "$190 million") ("Forfeiture Amount").

12.     AUS shall pay the Forfeiture Amount, plus any associated transfer fees, no later than thirty (30) Business Days after the Effective Date of this Agreement in accordance with payment instructions provided by the Government in its sole discretion. AUS hereby releases any and all claims that it may have to the Forfeiture Amount and agrees that the forfeiture of such funds may be accomplished either administratively or judicially at the Government's election, and waives the requirements of any applicable laws, rules, or regulations governing the forfeiture of assets, including those requiring notice of forfeiture. If the Government seeks to forfeit the Forfeiture Amount judicially, AUS waives all requirements pertaining to forfeiture set forth in Title 18, United States Code, Section 983, including the filing of a civil forfeiture complaint as to the Forfeiture Amount and notice of the same, and consent to entry of an order of forfeiture directed to such funds. If the Government seeks to forfeit AUS's Forfeiture Amount administratively, AUS consents to the entry of a declaration of forfeiture and waives the requirements of Title 18, United States Code, Section 983 regarding notice of seizure in non-judicial forfeiture matters.

13.     AUS agrees to sign any additional documents necessary to complete forfeiture of the Forfeiture Amount. AUS also agrees that it shall not file any petitions for remission, restoration, or any other assertion of ownership or request for return relating to the Forfeiture Amount, or any other action or motion seeking to collaterally attack the seizure, restraint, forfeiture, or conveyance of the Forfeiture Amount, nor shall AUS assist any others in filing any such claims, petitions, actions, or motions.

14.     AUS's payment of the Forfeiture Amount is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Government that the Forfeiture Amount surrendered by AUS is the maximum forfeiture that may be imposed in any future prosecution, and the Government is not precluded from arguing in any future prosecution that a court should impose a higher criminal forfeiture amount or substitute money judgment in a criminal proceeding, although the Government agrees that under those circumstances, the Government will recommend to a court that the Forfeiture Amount paid by AUS pursuant to this Agreement be applied toward any criminal forfeiture or substitute money judgment that a court

Letter to Ms. Sharon Cohen Levin, Esq.
June 29, 2026
Page 7 of 14

might impose as part of its judgment. AUS acknowledges that such a recommendation will not be binding on any court.

15.     AUS acknowledges that it shall not claim, assert, or apply for, either directly or indirectly, any tax deduction, tax credit, or any other offset with regard to any U.S. federal, state, or local tax or taxable income in connection with the payment of any part of the Forfeiture Amount. AUS shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source with regard to the Forfeiture Amount that AUS pays pursuant to the Agreement.

### H.     Conditional Release from Liability

16.     Except as otherwise provided in this Agreement, the Government agrees that it will not bring any criminal or civil case against AUS relating to (i) any of the conduct described in the Statement of Facts of this Agreement; (ii) any of the information disclosed by AUS to the Government as part of this investigation prior to executing this Agreement; or (iii) any information known by the Government prior to the execution of this Agreement that relates to the conduct described in the Statement of Facts to this Agreement. However, the Government may use any information related to the conduct described in the Statement of Facts against AUS: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; or (c) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.  Nothing herein shall preclude AUS from presenting this Agreement, and the Government's agreement herein, to any other law enforcement, regulatory, or government authority as evidence of cooperation with, and resolution of claims by, the Government with respect to the conduct described herein.

17.     This Agreement does not provide any protection against prosecution for any future conduct by AUS. In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with AUS.

### I.     Corporate Compliance Program

18.     AUS shall implement (or continue to the extent already implemented) a corporate compliance program that meets the minimum elements and standards provided in **Attachment C**. AUS's corporate compliance program shall be designed (or continue to the extent already implemented) to detect and prevent violations of the BSA, laws prohibiting money laundering and unlicensed money transmission, other laws prohibiting illicit finance, and violations of the FDCA through AUS's payment processing services.  No later than thirty (30) calendar days after the Term expires, AUS, through its Chief Executive Officer and Chief Compliance Officer, will certify to the Government, in the form of executing the document attached as **Attachment E** to this Agreement, that AUS has met its compliance obligations pursuant to this Agreement.  Such certification will be deemed a material statement and representation by AUS to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519.

19.     AUS will periodically review its corporate compliance program and correct any deficiencies within AUS's ethics programs, policies, procedures, systems, and internal controls

Letter to Ms. Sharon Cohen Levin, Esq.
June 29, 2026
Page 8 of 14

regarding compliance with the BSA, laws prohibiting money laundering, and other laws prohibiting illicit finance.

### J.   Compliance Monitoring

20.   For the purpose of assessing or determining compliance with this Agreement, the Government may, upon written notice to AUS:

a.   require AUS to submit written reports, certifications, or other information relating to compliance with any provision of this Agreement;

b.   interview, under oath or otherwise, any of AUS's officers, employees, or agents who may have relevant knowledge; and

c.   require AUS to produce documents, communications, data, and other information in its possession, custody, or control relating to compliance with any provision of this Agreement, subject to applicable laws and regulations.

21.   AUS shall designate one or more agents of AUS to accept and process the Government's requests related to compliance monitoring within seven (7) Business Days of signing this Agreement. AUS shall accept the Government's requests for compliance monitoring information via email through one or more dedicated email addresses maintained by each company. AUS shall comply with the Government's compliance monitoring requests within thirty (30) calendar days of receiving the Government's written notice. In its sole discretion, the Government may grant extensions of time for AUS to comply with the Government's requests for compliance monitoring information.

### K.   Non-Prosecution

22.   The Government agrees that if AUS complies with its obligations under this Agreement, (a) the Government will not bring any criminal case or other enforcement action against AUS or any of its present or former subsidiaries or affiliates relating to any of the conduct described in the Statement of Facts; and (b) at the conclusion of the Term, this Agreement shall expire. In assessing AUS's compliance, the Government shall consider the totality of AUS's conduct under this Agreement and shall not declare a failure to comply based solely on minor, or promptly cured technical violations, which shall be determined at the Government's discretion, acting reasonably. To the extent there is conduct disclosed by AUS that is not set forth in this Agreement, such conduct shall not be exempt from further prosecution and is outside the scope of this Agreement. AUS expressly acknowledges and agrees that this Agreement does not preclude the filing of a case arising from conduct that is not described in this Agreement and the Statement of Facts.

### L.   Breach of the Agreement

Letter to Ms. Sharon Cohen Levin, Esq.
June 29, 2026
Page 9 of 14

23.    If, during the Term, AUS (a) commits any felony under United States law; (b) knowingly and willfully provides in connection with this Agreement materially false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) knowingly and materially fails to cooperate as provided in Section E of this Agreement; (d) knowingly fails to implement compliance programs in all material respects as provided in Section I of this Agreement and **Attachment C**; or (e) otherwise knowingly and materially fails to perform or fulfill any term or condition of this Agreement, AUS shall be in breach, and thereafter be subject to prosecution for violations of applicable federal law, including, but not limited to, for conduct described in the attached Statement of Facts, regardless of whether the Government obtains knowledge of the breach after the Term expires.

24.    Any prosecution resulting from a knowing and material breach of this Agreement, as defined in Section L, Paragraph 23, may be pursued by the Government in the United States District Court for the District of Rhode Island or any other appropriate venue.  As to the conduct described in the Statement of Facts, AUS knowingly waives any constitutional or statutory right to venue and to presentment to or indictment by a grand jury for felony crimes, and consents to the filing of an information or complaint for said crimes. Determination of whether AUS has breached this Agreement and whether to pursue prosecution shall be in the Government's sole discretion, acting reasonably, after good-faith consideration of any written response submitted by AUS pursuant to Paragraph 26. Any such prosecution may be premised on information provided by AUS.

25.    Any prosecution relating to the conduct described in this Agreement or relating to the conduct of AUS in connection with a violation of the FDCA known to the Government prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against AUS notwithstanding the expiration of the statute of limitations, for the period between the signing of this Agreement and the expiration of the Term plus six months. Thus, by signing this Agreement, AUS agrees that the statute of limitations with respect to any such prosecution against AUS that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus six months. In addition, AUS agrees to toll the running of the statute of limitations as to any violation that occurs during the Term for one year from the date upon which the violation occurs, and that this period shall be excluded from any calculation of time for purposes of the application of any applicable statute of limitations.

26.    In the event the Government determines that AUS has knowingly and materially breached this Agreement, as defined in Section L, Paragraph 23, the Government agrees to provide AUS with written notice of such breach prior to instituting any prosecution resulting from such breach. Written notice of breach shall include: (a) the provision breached; (b) the approximate date of the breach; and (c) a description of the breach sufficient to permit AUS to cure. Within thirty (30) calendar days of receipt of such notice, AUS shall have the opportunity to respond to the Government in writing to explain the nature and circumstances of such breach, as well as the actions AUS has taken to address and remediate the breach, which explanation the Government shall consider in determining whether to pursue prosecution of AUS.

Letter to Ms. Sharon Cohen Levin, Esq.
June 29, 2026
Page 10 of 14

27.    In the event that the Government determines that AUS has knowingly and materially breached this Agreement, as defined in Section L, Paragraph 23: (a) all statements made by or on behalf of AUS to the Government, including the Statement of Facts, and any testimony given by AUS before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Government against AUS; and (b) AUS shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, Section 1B1.1(a) of the USSG, or any other federal rule that any such statements or testimony made by or on behalf of AUS prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current officer, director, or employee, or any person acting on behalf of, or at the direction of, AUS will be imputed to AUS for the purpose of determining whether AUS has knowingly and materially violated any provision of this Agreement as defined in Section L, Paragraph 23 shall be in the sole discretion of the Government, acting reasonably.

28.    It is further understood that within thirty (30) calendar days after receiving a notice of breach, or to such longer period as the Government may agree in writing, AUS may cure the breach to the Government's reasonable satisfaction ("Cure Period").

29.    AUS acknowledges that the Government has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if AUS breaches this Agreement and this matter proceeds to judgment. AUS further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

30.    On the date that the period of non-prosecution specified in this Agreement expires, AUS, by its respective Chief Executive Officer and the Chief Compliance Officer, shall submit their certification set forth in **Attachment D** and certify to the Government that AUS has met its obligations pursuant to this Agreement. Each certification will be deemed a material statement and representation by AUS in a matter within the jurisdiction of the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the District of Rhode Island.

## M.    Applicability to AUS's Related Business Entities

31.    Except as may otherwise be agreed by the Government and AUS in connection with a particular transaction, AUS agrees that in the event that, during the Term, AUS undertakes any change in corporate form, including if AUS sells, merges, or transfers business operations that are material to AUS's consolidated operations, or to the operations of any of its subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, AUS shall include in any contract for sale, merger, transfer, or other

Letter to Ms. Sharon Cohen Levin, Esq.
June 29, 2026
Page 11 of 14

change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

32.     The purchaser or successor in interest must also agree in writing that the Government's ability to declare breach under this Agreement is applicable in full force as to that entity. AUS agrees that the failure to include these provisions in the transaction will make any such transaction null and void. AUS shall provide notice to the Government at least thirty (30) calendar days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Government shall notify AUS within fifteen (15) calendar days if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If, at any time during the Term, AUS engages in a transaction that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Government may deem it a breach of this Agreement pursuant to Section L, paragraph 23 of this Agreement. Nothing in this Agreement shall restrict AUS from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Government, acting reasonably.

### N.     Public Statements by AUS

33.     AUS shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for AUS, make any public statement, contradicting in whole or in part the acceptance of responsibility by AUS as set forth in this Agreement. Any such contradictory statement shall, subject to cure rights of the Company described in this paragraph, constitute a knowing and material breach of this Agreement, as defined in Section L, Paragraph 23, and AUS thereafter shall be subject to prosecution as set forth in this Agreement. The decision whether any public statement by any such person contradicting a fact contained in this Agreement will be imputed to AUS for the purpose of determining whether it has knowingly and materially breached this Agreement, as defined in Section L, Paragraph 23, shall be in the sole discretion of the Government, acting reasonably.

34.     If the Government determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Government shall notify AUS, and AUS may avoid a breach of this Agreement by publicly repudiating such statement(s) within ten (10) Business Days after notification. AUS shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in this Agreement provided that such defenses and claims do not contradict, in whole or in part, a statement contained in this Agreement. This paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of AUS in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of AUS. Any determination by the Government, acting reasonably, that a public statement constitutes a knowing and material breach of this Agreement shall be subject to the 30-day written notice and opportunity to respond procedure set forth in Paragraph 26 before any prosecution may be initiated.

Letter to Ms. Sharon Cohen Levin, Esq.
June 29, 2026
Page 12 of 14

35. If AUS issues a press release or holds any press conference in connection with this Agreement, AUS shall first consult with the Government to determine: (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Government and AUS; and (b) whether the Government has any objection to the release.

36. The Government agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of AUS's cooperation and remediation. By agreeing to provide this information to such authorities, the Government does not agree to advocate on behalf of AUS. Instead, the Government only agrees to provide facts to be evaluated independently by such authorities.

## O.    Limitations on Binding Effect of Agreement

37. This Agreement is binding on AUS and the United States Department of Justice, including the United States Attorney's Office for the District of Rhode Island, the United States Department of Justice's Enforcement & Affirmative Litigation Branch, and the United States Department of Justice's Money Laundering, Narcotics and Forfeiture Section. It does not bind any other federal agencies, or any state, local, or foreign law enforcement or regulatory agencies. The Government shall bring the cooperation of AUS and its compliance with its obligations under this Agreement to the attention of such agencies and authorities if requested to do so by AUS.

## P.    Notice

38. Any notice to the Government under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

Chief, Criminal Division
U.S. Attorney's Office
District of Rhode Island
One Financial Plaza, 17th Floor
Providence, RI 02903

Director, Enforcement & Affirmative Litigation Branch, Civil Division
U.S. Department of Justice
450 5th Street NW, Room 6400 South
Washington, DC 20001

Chief, Bank Integrity Unit
Money Laundering, Narcotics, and Forfeiture Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue NW
Washington, DC 20005

Letter to Ms. Sharon Cohen Levin, Esq.
June 29, 2026
Page 13 of 14

39.    Any notice to AUS under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

AUS Merchant Services, Inc.
525 Almanor Avenue
Sunnyvale, CA 94085

40.    Notice shall be effective upon actual receipt by the Government or AUS. Notice shall also be given by email to any email addresses designed by the Government or AUS.

## Q.    **Complete Agreement**

41.    The Government and AUS acknowledge that each party has had a full opportunity to negotiate the terms of this Agreement. The rule of construction that interprets contracts against the drafter, therefore, shall not apply to this Agreement. This Agreement, including its attachments, sets forth all the terms of the Agreement between AUS and the Government. No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Government, the attorneys for AUS, and a duly authorized representative of AUS. The following documents are attached to and incorporated into this Agreement:

**Attachment A:** The AUS Merchant Services, Inc. Statement of Facts

**Attachment B:** The AUS Merchant Services, Inc. Certificate of Corporate Resolutions

**Attachment C:** The AUS Merchant Services, Inc. Corporate Compliance Program

**Attachment D:** The AUS Merchant Services, Inc. Disclosure Certification

**Attachment E:** The AUS Merchant Services, Inc. Compliance Certification

**AGREED AND CONSENTED TO:**

*The United States of America*

CHARLES C. CALENDA
First Assistant United States Attorney

Date: 6/29/2026        By:    _____

Dulce Donovan
Executive Assistant U.S. Attorney

Date: 6/29/2026        By:    _____

Julianne Klein
Assistant U.S. Attorney

Letter to Ms. Sharon Cohen Levin, Esq.
June 29, 2026
Page 14 of 14

LISA K. HSIAO
Director
Enforcement and Affirmative Litigation Branch,
Civil Division

Date: 6/29/2026                By:

Patrick R. Runkle
Assistant Director

Date: 6/29/2026                By:

Colin W. Trundle
Trial Attorney

Date: 6/29/2026                By:

Cadesby B. Cooper
Trial Attorney

MARGARET A. MOESER
Chief
Money Laundering, Narcotics and Forfeiture
Section, Criminal Division

Date: 6/29/2026                By:

Rachel N. Agress
Trial Attorney

Date: 6/29/2026                By:

Elysa Wan
Trial Attorney

**AGREED AND CONSENTED TO:**

*AUS Merchant Services, Inc.*

Date: June 29, 2026            By:

Roseate Wagner
Chief Executive Officer and President
AUS Merchant Services, Inc.

Date: June 29, 2026            By:

Sharon Cohen Levin, Esq.
Counsel for AUS Merchant Services, Inc.

**ATTACHMENT A**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Non-Prosecution Agreement (the "Agreement") between the Government and AUS (as defined in the Agreement). AUS agrees and stipulates that the following information is true and accurate. AUS admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees and agents as set forth below. Should the Government later pursue the prosecution that is covered by this Agreement, AUS agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts describe events that occurred between approximately January 2020 and December 2023.

**A.     AUS Background and Business Model**

1.     AUS (formerly known as Alipay U.S., Inc. and Alipay U.S. Escrow, Inc.) was registered in Delaware and maintained its principal place of business at 525 Almanor Avenue, Sunnyvale, California 94085.

2.     Partnering with certain of its affiliates, AUS offered payment processing services to the e-commerce platforms that were owned and operated by Alibaba Group Holding Limited and its relevant subsidiaries ("Alibaba"), including Alibaba.com. Alibaba Group Holding Limited was organized and existed under the laws of the Cayman Islands, with its principal executive offices in Hangzhou, China.

3.     AUS's business model included, but was not limited to, providing payment processing and settlement services to enable overseas sellers on Alibaba.com to accept payments from United States-based buyers. When AUS facilitated payment processing and settlement services for Alibaba's merchants selling to United States-based buyers, it received certain information about transactions. The information generally included the merchant's and buyer's identities as well as a description of the product ordered ("sale order") through Alibaba.com. AUS commenced payment processing and settlement services for Alibaba.com transactions in 2020.

4.     AUS's payment processing and settlement services included accepting United States Dollar-denominated payments on behalf of overseas merchants linked to sales orders on Alibaba.com.

5.     Payors could make payments linked to Alibaba's e-commerce transactions in multiple ways, including through credit card payments, other alternative payment methods, or, solely for Alibaba.com, wire transfer. The United States Dollar-denominated wire transfer payments directed to overseas merchants on Alibaba.com were accepted by AUS into one of two United States based-bank accounts of AUS. When Alibaba.com buyers paid via wire transfer in U.S. dollars, the checkout page instructed buyers to include in the wire transfer instructions what was identified as the overseas merchant's "beneficiary account number" as well as the Alibaba.com order number.

1

6.     The "beneficiary account number" was a unique routable identification number, which caused the deposits to be transferred to one of AUS's United States-based bank accounts, and for AUS or its affiliate to associate that credit with a specific merchant. Once payments were deposited into AUS's United States-based bank accounts, AUS transferred the funds to offshore accounts held by an AUS affiliate. The AUS affiliate then handled settlement of the transaction to the overseas merchant associated with that particular "beneficiary account number."

7.     Beginning in July 2021, AUS also offered settlement services to support payments to merchants using the Alibaba.com Pay service ("Alibaba.com Pay"), which was separate from the Alibaba.com e-commerce platform. Unlike the global payment processing and settlement services for orders made on the Alibaba.com e-commerce site, merchants uploaded supporting documentation into a portal for sales consummated outside of the e-commerce site. Such transactions were higher risk because the Alibaba e-commerce platform did not electronically monitor data in real time as to the nature and purpose of the transaction.

## B.     Legal and Regulatory Background

8.     Congress enacted the Bank Secrecy Act ("BSA") to address an increase in criminal money laundering activity utilizing financial institutions. The BSA requires financial institutions to establish, implement, and maintain risk-based anti-money laundering ("AML") programs to combat money laundering and the financing of terrorism through financial institutions.

9.     AUS is a "financial institution" as defined in the BSA. 31 U.S.C. § 5312(a)(2); 31 C.F.R. § 1010.100. As a financial institution and money services business ("MSB"), AUS is required to establish, implement, and maintain an effective AML compliance program that, at a minimum, provides for: (a) internal policies, procedures, and controls reasonably designed to prevent money laundering; (b) a program design commensurate with the risks posed by the location, size, nature, and volume of the financial services provided by the MSB; (c) an individual to coordinate and monitor day-to-day compliance with the BSA and AML requirements; (d) an ongoing employee training program; (e) independent review of programs; and (f) procedures reasonably designed to assure compliance with BSA and AML requirements when conducting operations via data processing systems. 31 U.S.C. § 5318(h); 31 C.F.R. § 1022.210.

10.     To satisfy the BSA's requirements, an MSB must maintain a risk-based AML program, tailor its systems for identifying suspicious activity to effectively monitor its customer base and the products and services it offers, and report suspicious activity. Moreover, an MSB's AML policies, procedures, and controls must be calibrated to address emerging and evolving risk, including risk associated with new products and services and new patterns of suspicious activity.

11.     The BSA authorizes the United States Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") to "require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1).

12.     At all times relevant to this case, by regulation, FinCEN required MSBs to file a Suspicious Activity Report ("SAR") on any transaction involving or aggregating at least $2,000

2

where the MSB "knows, suspects, or has reason to suspect." 31 C.F.R. § 1022.320(a)(2). These requirements apply to a transaction that:

a.  involves funds derived from illegal activities or is intended or conducted in order to hide or disguise funds or assets derived from illegal activities (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any federal law or regulation or to avoid any transaction reporting requirement under federal law or regulation;

b.  is designed to evade any requirements of the BSA or of any other regulations promulgated under the BSA;

c.  has no business or apparent lawful purpose, and the MSB knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or

d.  involves use of the MSB to facilitate criminal activity.

13.   MSBs have an obligation to file a SAR "no later than 30 calendar days after the date of initial detection . . . of facts that may constitute a basis for filing a SAR." *Id.* § 1022.320(b)(3).

**C.   AUS's Risk Function and AML Compliance Program Did Not Prevent Federal Food, Drug, and Cosmetic Act ("FDCA") Violations by Alibaba Merchants and Other Bad Actors.**

14.   With respect to AUS's U.S.-based customers, AUS conducted "Know Your Customer" protocols and due diligence. With respect to AUS's affiliates' overseas customers, AUS relied upon AUS's overseas affiliates to conduct certain functions of its AML compliance program for overseas merchants, including those customers using AUS for wire transfers. Until 2022, AUS relied upon AUS's overseas affiliates to monitor transactions involving overseas merchants selling goods on Alibaba.com, including those using AUS's unique routable identification numbers for wire transfers. In 2022, AUS also began using its own transaction monitoring system, previously used for other products—for transactions originating on Alibaba.com, rather than continuing to rely on its overseas affiliates. However, when implementing this change, AUS failed to fully incorporate wire data from its United States-based bank accounts to supplement the sales order data that it used to monitor. As a result, AUS's monitoring did not always show that some of these wire transfer transactions were funded by payments originating from high-risk jurisdictions or from multiple payors on a single invoice.

15.   AUS and its affiliates would, in certain instances, report merchants who sold Subject Merchandise on Alibaba's e-commerce platforms, including Alibaba.com, to Alibaba, rather than systematically restricting those merchants themselves.

3

16.     At times, Alibaba.com's overseas merchants used AUS's payment processing and settlement services to facilitate the sale and importation of Subject Merchandise, including pharmaceutical products, into the United States, in violation of the FDCA.

17.     In October 2022, AUS created a case investigating Merchant A, an Alibaba overseas merchant who used AUS's payment processing and settlement services. An AUS employee reviewed the sales order information and noted that Merchant A had sold prohibited Subject Merchandise to United States customers using AUS's payment processing services. AUS filed a regulatory report in connection with Merchant A's transaction in October 2022 and relevant prior activity. In January 2023, Merchant A sold additional prohibited Subject Merchandise to a United States customer. In July 2023, an AUS employee reviewed the transaction and sales order and noted that the product was "prohibited" and could not "be sold online without prescription," but concluded that the activity was below the regulatory reporting requirements.

18.     AUS acknowledges that it processed transactions for sales between overseas merchants for Alibaba.com and United States-based buyers, which involved Subject Merchandise that was imported into the United States in violation of law. AUS agrees not to contest the forfeiture of the Forfeiture Amount of $190 million pursuant to Title 18, U.S. Code, Section 545.

4

**ATTACHMENT B**

## THE AUS MERCHANT SERVICES, INC. CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, AUS Merchant Services, Inc. ("AUS") has been engaged in discussions with the United States Attorney's Office for the District of Rhode Island, the United States Department of Justice's Enforcement & Affirmative Litigation Branch, and the United States Department of Justice's Money Laundering, Narcotics and Forfeiture Section (collectively, the "Government"); and

WHEREAS, in order to resolve such discussions, it is proposed that AUS enters into a certain non-prosecution agreement with the Government (the "Agreement"); and

WHEREAS, AUS's internal counsel, together with outside counsel for AUS (collectively, "AUS Counsel"), have advised AUS's Board of Directors of its rights, possible defenses, the provisions of the U.S. Sentencing Guidelines, and the consequences of entering into such Agreement with the Government;

Therefore, the Board of Directors has RESOLVED that:

1.      AUS agrees to pay a monetary penalty in the amount of $85,000,000 and consents to a civil forfeiture of $190,000,000 pursuant to Sections F and G of the Agreement;

2.      AUS accepts the terms and conditions of this Agreement, including, but not limited to: (a) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts in **Attachment A** of the Agreement of any objection with respect to indictment and venue and consents to the filing of a civil forfeiture complaint, as provided under the terms of the Agreement, in the United States District Court for the District of Rhode Island, or any other appropriate venue; and (b) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Government prior to the date on which the Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement;

3.      Roseate Wagner, Chief Executive Officer and President of AUS, is hereby authorized, empowered, and directed, on behalf of AUS, to execute the Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as AUS Counsel may approve;

4.      Roseate Wagner, Chief Executive Officer and President of AUS, is hereby authorized, empowered, and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement, or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

1

5.    All of the actions of AUS Counsel, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of AUS.

Date:    June 29, 2026

By:    Richard Chih-Chiu Lin
Board of Directors
AUS Merchant Services, Inc.

2

**ATTACHMENT C**

**THE AUS MERCHANT SERVICES, INC. CORPORATE COMPLIANCE PROGRAM**

In order to ensure the adequacy of its internal controls, policies, and procedures regarding compliance with the Bank Secrecy Act, Title 31, United States Code, Section 5311, *et seq.* ("BSA") and anti-money laundering ("AML") laws and regulations, which include but are not limited to Title 31, Code of Federal Regulations, Part 1022 (collectively, "BSA and AML Laws"), and the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.) ("FDCA"), AUS Merchant Services, Inc. ("AUS"), a payment processor operating in the United States, agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

AUS has taken steps to remediate and enhance its BSA/AML and other compliance programs to prevent violations of the FDCA and other federal laws. These efforts included the hiring of additional staff and retaining the support of outside compliance consultants and counsel.

Where necessary and appropriate, AUS agrees to ensure that its compliance program, including internal controls, compliance policies, and procedures, complies with BSA and AML Laws and other federal laws. AUS further agrees to ensure that its compliance program is designed to detect, deter, investigate, and report violations of the FDCA and other federal laws, where required. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of AUS's existing internal controls, compliance program, policies, and procedures:

*Commitment to Compliance*

1.    AUS will ensure that its directors and management provide strong, explicit, and visible support for compliance with BSA/AML Laws, the FDCA, and the Controlled Substances Act ("CSA"). AUS directors and management will demonstrate this commitment through their actions and communications with employees.

2.    AUS will continue to ensure that management reinforces AUS's commitment to compliance policies and principles related to BSA/AML, the FDCA, and prevention of federal criminal statutory violations. Management will enforce adherence to those policies and principles. AUS will continue to foster a culture of ethics and compliance with the laws of the United States in its day-to-day operations at all levels of AUS.

*Risk Assessment and Review*

3.    AUS will continue to utilize a risk management process to identify, analyze, and address the individual circumstances of AUS, in particular the risks facing AUS from the potential sale of Subject Merchandise in the United States through its payment processing for e-commerce services and from violations of BSA and AML Laws.

1

4.      On the basis of its risk assessment, AUS shall continue to take appropriate steps to re-design, enhance, implement, or modify its compliance program to reduce the risk of violations of BSA and AML Laws, and the FDCA.

*Policies and Procedures*

5.      AUS will continue to maintain a clearly articulated and visible corporate policy against violations of BSA and AML Laws and the FDCA. These policies shall be memorialized in written compliance policies.

6.      AUS will continue to maintain and appropriately enhance compliance policies and procedures designed to reduce the prospect of violations of BSA and AML Laws and the FDCA, including addressing any systemic issues. AUS will continue to take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violations of BSA and AML Laws and the FDCA by personnel at all levels of AUS. These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of AUS in the United States or foreign jurisdictions, including, but not limited to, agents, intermediaries, consultants, representatives, distributors, contractors, suppliers, and joint venture partners (collectively, "agents and business partners"). AUS shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of AUS.

7.      Within ninety (90) calendar days of the execution of the Agreement, AUS shall implement an electronic portal or mailbox ("Law Enforcement Mailbox" or "Mailbox") that is dedicated to producing information related to United States-based users of AUS's online services in response to United States-based legal process, including valid U.S. subpoenas, court orders, and search warrants, that is related to United States-based criminal investigations. The Law Enforcement Mailbox shall be available to federal, state, and local law enforcement agencies in the United States. AUS agrees to waive any federal or state statutory right to personal service of United States-based legal process that is related to United States-based criminal investigations. AUS will comply with such legal process unless it receives relief from doing so by a court of competent jurisdiction in the United States. AUS will provide appropriate instructions on how to use the Law Enforcement Mailbox. The Mailbox is for the exclusive use of U.S.-based law enforcement agencies conducting criminal investigations.

8.      AUS will continue to maintain a system of internal controls reasonably designed to ensure the completeness and accuracy of records to the extent required by applicable laws and regulations.

9.      AUS will continue to maintain a system to retain books and records, including a system of internal controls, reasonably designed to ensure the prevention and detection of violations of BSA/AML Laws, the FDCA, and the CSA.

10.     AUS will continue to review its compliance policies and procedures regarding BSA, AML, FDCA, and other applicable federal laws as needed, to address changing and emerging risks.

2

*Suspicious Activity Reports*

11.     AUS has created and will continue to maintain and appropriately enhance policies and procedures to ensure that it will continue to follow all laws and regulations concerning the filing of Suspicious Activity Reports ("SARs") in the United States for any suspicious activity, as defined by the BSA and its implementing regulations. This includes, but is not limited to, filing SARs identifying: suspicious activity identified by AUS related to transactions or attempted transactions that involve $2,000 or more in funds or in aggregate funds and are to, from, or through the United States, regardless of where in the world the suspicious transactions originate or are received, and regardless of where in the world the data relating to such transactions is located.

*Transaction Monitoring and Reporting*

12.     As part of its compliance program, AUS has instituted and will continue to maintain and appropriately enhance its transaction monitoring program. The transaction monitoring program operated by AUS will be adaptive to identified risks, including risks identified internally by AUS, by regulators, and in written findings, including review of publicly available information and law enforcement referrals or inquiries. AUS will continue to ensure the transaction monitoring program is informed by its risk profile and appropriately accounts for the areas of greatest risk, with particular emphasis on higher-risk products, services, customers, and geographies. AUS will continue to regularly review its transaction monitoring program, including its scope, resources, and coverage. AUS will continue to test and update the transaction monitoring program as needed to ensure it appropriately addresses risk areas.

13.     As part of its compliance program, AUS has instituted and will continue to maintain and appropriately enhance procedures for monitoring transactions settled or cleared on behalf of any other money services business or e-commerce businesses that AUS provides services to, which includes collection, transmission, and monitoring of transactions and counterparty information for all transactions processed through AUS. Transaction monitoring will conform with applicable laws and regulations. AUS will maintain clear records of the data it utilizes to conduct transaction monitoring, including a description of the categories of data used by AUS for transaction monitoring that is made available upon request to U.S. regulators.

14.     AUS has instituted and will continue to maintain and appropriately enhance its policies, procedures, and processes for managing alerts identified by its transaction monitoring program. This includes, but is not limited to, making decisions on SARs, and completing and filing SARs. AUS will continue to ensure adequate staff are assigned to the identification, research, and reporting of suspicious activities.

15.     AUS will continue to maintain and appropriately enhance its policies, procedures, and processes for identifying subjects of law enforcement requests, monitoring the transaction activity of those subjects when appropriate, identifying suspicious activity related to those subjects, and filing, as appropriate, SARs related to those subjects.

16.     AUS has and will continue to generate reports for its BSA Officer's review which includes patterns or outliers in transaction activity that may be indicative of illicit conduct. AUS's BSA Officer or their designee, who shall be located in the United States, will continue to review

3

patterns or outliers in transaction activity and shall consider those reports in enhancing AUS's compliance with BSA and AML Laws, including the reporting of potential FDCA violations and other federal criminal statutes. AUS's management and AUS's BSA officer will continue to select filtering criteria and thresholds to produce such transaction reports, subject to review and approval, that will continue to enable AUS to detect potential patterns and typologies of unusual activity and for AUS management to receive reports of that activity.

17.     AUS's transaction monitoring systems have been and will continue to be independently tested and reviewed for reasonable filtering criteria and thresholds, and such reviews are included in independent audits of AUS's compliance program and function.

*Third-Party Relationships*

18.     As part of its compliance program, AUS will continue to institute and enhance appropriate, risk-based policies and procedures related to third-party money services business or e-commerce businesses who utilize AUS payment processing or settlement services in accordance with applicable laws and regulations.

*Independent, Autonomous, and Empowered Oversight*

19.     AUS has assigned and will continue to assign responsibility to one or more senior corporate executives of AUS for the implementation and oversight of AUS's compliance policies and procedures regarding BSA and AML Laws and the FDCA. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, AUS's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

20.     AUS has implemented and will continue to enhance and maintain mechanisms designed to ensure that its policies and procedures regarding BSA and AML Laws and the FDCA are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) training for all directors and officers, all employees in positions of leadership or trust, any positions that require such training (*e.g.*, internal audit, sales, legal, compliance, finance), and, where necessary and appropriate, agents and business partners; (b) metrics for measuring knowledge retention and effectiveness of the training; and (c) corresponding certifications by all such directors, officers, employees, agents and business partners, certifying compliance with the training requirements. AUS will continue to conduct training in a manner tailored to the audience's size, sophistication, and subject-matter expertise and, where appropriate, will continue to discuss prior compliance incidents.

21.     AUS will continue to maintain or, where necessary, establish an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with its policies and procedures regarding

4

BSA and AML Laws and the FDCA, including when such individuals need advice on an urgent basis, or need advice in any foreign jurisdiction in which AUS operates.

*Confidential Reporting Structure and Investigation of Misconduct*

22.    AUS will continue to maintain or, where necessary, establish an adequate system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of AUS's policies and procedures regarding BSA and AML Laws and the FDCA.

23.    AUS will continue to maintain or, where necessary, establish an effective process and sufficient resources for responding to, investigating, and documenting allegations of violations of BSA and AML Laws, its compliance policies, and the FDCA.  AUS will continue to handle the investigations into such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

24.    AUS will conduct a root cause analysis of any shortcomings related to compliance with BSA and AML Laws, the FDCA, or AUS's compliance policies, which shall include the review of any prior failures during the time period covered in the Agreement. This root cause analysis shall identify whether there are any systemic issues and/or any control failures.  AUS will timely and appropriately remediate any identified issues related to compliance with BSA and AML Laws, the FDCA, or AUS's compliance policies. AUS will ensure that root causes, including systemic issues and control failures, and relevant remediation are shared with management as appropriate.

*Mergers and Acquisitions*

25.    AUS will continue to develop and implement policies and procedures for mergers and acquisitions requiring that AUS conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence regarding compliance with BSA and AML Laws and the FDCA by legal, accounting, and compliance personnel associated with those new business entities.

26.    AUS will continue to ensure its compliance policies and procedures regarding BSA and AML Laws and the FDCA apply as quickly as is practicable to newly-acquired businesses or entities merged with AUS, and will promptly (a) train the directors, officers, employees, agents, and business partners consistent with Paragraph 20; (b) where warranted, conduct an audit of all newly acquired or merged businesses as quickly as is practicable concerning compliance with BSA and AML Laws and the FDCA; and (c) where warranted, establish a plan to integrate the acquired businesses or entities into AUS's enterprise resource planning systems as quickly as practicable.

5