FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
JUL 23 2026
TAMMY H. DOWNS, CLERK
By: DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

BRADLEY BURCHFIELD,

Plaintiff,

**No. 4:26-cv-00611-DPM**

v.

ALIBABA.COM SINGAPORE E-COMMERCE PRIVATE LIMITED, et al.,

Defendants.

# COMPLETE EXHIBITS A-S COMPENDIUM

*A complete contents list begins on the next page.*

*Prepared July 22, 2026 | Working copy*

# CONTENTS

*Complete Exhibits A-S Compendium*

1. Exhibit A - Alibaba.com U.S. LLC et al. Non-Prosecution Agreement (Alibaba Agreement)

2. Exhibit B - AUS Merchant Services, Inc. et al. Non-Prosecution Agreement (AUS Agreement)

3. Exhibit C - ECF No. 14 - Order Denying Initial Early-Discovery Motion Without Prejudice

4. Exhibit D - ECF No. 15 - Appearance of Counsel for AGHL and Alibaba.com US E-Commerce Corp.

5. Exhibit E - June 18, 2026 Alibaba Customer-Service Response Concerning Order 91906090501027582

6. Exhibit F - Proof of Service of Amended Complaint on Alibaba.com US E-Commerce Corp.

7. Exhibit G - CHS Properties Docket Screenshot Showing Notice of Plaintiff's Videotaped Deposition

8. Exhibit H - Permanently Redacted Invoice for Expert-Witness Testimony in CHS Properties

9. Exhibit I - Declaration of Jieyun Li (ECF No. 17-7)

10. Exhibit J - Declaration of Xingjian Zhao (ECF No. 17-8)

11. Exhibit K - Nonparty Document Subpoena Directed to CSC

12. Exhibit L - Notice of Intent to Serve the CSC Nonparty Document Subpoena on Counsel of Record

13. Exhibit M - Trade Assurance Purchase Contract

14. Exhibit N - Receipt for Trade Assurance Order 91906090501027582

15. Exhibit O - Email Referred to by Plaintiff as the 'Keep Silent' Email

16. Exhibit P - January 2016 Haihangchem Email Chain

17. Exhibit Q - Platform Monitoring / 1000kg Order Record Supplied by Plaintiff

18. Exhibit R - November 21, 2025 Axis Notice of Oral and Videotaped Deposition of Bradley Burchfield

19. Exhibit S - Bradley Burchfield Declaration Regarding Personal Funding and LLC Status

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT A

## Alibaba.com U.S. LLC et al. Non-Prosecution Agreement (Alibaba Agreement)

The reproduced source document follows this cover page.

U.S. Department of
JUSTICE

The Department of Justice is posting this court document as a courtesy to the public. An official copy of this court document can be obtained (irrespective of any markings that may indicate that the document was filed under seal or otherwise marked as not available for public dissemination) on the Public Access to Court Electronic Records website at https://pacer.uscourts.gov. In some cases, the Department may have edited the document to redact personally identifiable information (PII) such as addresses, phone numbers, bank account numbers, or similar information, and to make the document accessible under Section 508 of the Rehabilitation Act of 1973, which requires federal agencies to make electronic information accessible to people with disabilities.

**United States Department of Justice**
*United States Attorney's Office*
*District of Rhode Island*

One Financial Plaza, 17th Floor
Providence, Rhode Island 02903

June 29, 2026

Samuel G. Williamson, Esq.
Quinn Emanuel Urquhart & Sullivan, LLP
2601 South Bayshore Dr, Ste 1550
Miami, FL 33133
***Counsel for Alibaba Group Holding Limited, Alibaba.com Singapore E-Commerce Pte. Limited, AliExpress E-Commerce One Pte. Ltd., and Alibaba.com U.S. LLC***

**Re: Alibaba.com U.S. LLC et al. Non-Prosecution Agreement**

Dear Counsel:

The Government and Alibaba enter into this Non-Prosecution Agreement ("Agreement") for misdemeanor violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, *et seq.* The Government agrees not to prosecute Alibaba during the term of this Agreement or thereafter for any violation related to the conduct described in the Statement of Facts, attached hereto as **Attachment A**. The Parties agree to certain terms and obligations as set forth below.

## A. Definitions

1. In this Agreement, the following terms shall have the meanings provided below. Capitalized terms used but not defined in this Section have the meanings given elsewhere in this Agreement.

   a. **"Alibaba"** means Alibaba Group Holding Limited (an exempted company incorporated in the Cayman Islands with limited liability on June 28, 1999, the ADSs of which are listed on the New York Stock Exchange) and all of its subsidiaries and their officers, directors, employees, and agents acting within the scope of their employment and agency relationships with Alibaba Group Holding Limited, including Alibaba.com Singapore E-Commerce Pte. Limited, AliExpress E-Commerce One Pte. Ltd., Alibaba Group (U.S.) Inc., and Alibaba.com U.S. LLC, and includes the Alibaba Platforms, as defined in this Section.

   b. **"Alibaba Platforms"** mean ICBU and AliExpress, i.e., the business units that operate Alibaba's cross border international business-to-business (ICBU) which operates Alibaba.com and business-to-consumer (AliExpress) e-commerce platforms, respectively.

c. **"AliExpress"** means the business unit within Alibaba that operates the AliExpress cross-border international business-to-consumer e-commerce platform, including the legal entities that house this unit Alibaba.com Singapore E-Commerce Pte. Ltd. and AliExpress E-Commerce One Pte. Ltd.

d. **"Business Day"** means any day other than a Saturday, Sunday, or legal public holiday in the United States (as defined by 5 U.S.C. § 6103(a)).

e. **"Drug, Device, and Importation Laws"** mean the following statutes: (a) the FDCA (21 U.S.C. § 301 *et seq.*); (b) the Controlled Substances Act ("CSA") (21 U.S.C. § 801 *et seq.*); and (c) Smuggling (18 U.S.C. § 545).

f. **"Government"** means the United States Department of Justice, including the United States Attorney's Office for the District of Rhode Island, the United States Department of Justice's Enforcement & Affirmative Litigation Branch, and the United States Department of Justice's Money Laundering, Narcotics and Forfeiture Section.

g. **"ICBU"** means Alibaba's International Commerce Business Unit, which is the business unit within Alibaba that operates Alibaba.com, the international business-to-business platform, including the legal entities that house this unit, Alibaba.com Singapore E-Commerce Pte. Limited, Alibaba.com U.S. LLC, and Alibaba.com U.S. e-Commerce Corp.

h. **"Parties"** means the Government and Alibaba.

i. **"Subject Merchandise"** means drugs (as defined in 21 U.S.C. § 321(g)), devices (as defined in 21 U.S.C. § 321(h)), equipment used to manufacture counterfeit drugs (including tableting and encapsulating machines, punches, dies, plates, stones, and other things referenced in 21 U.S.C. §§ 331(i)(2) and 843(a)(5)-(7)), controlled substances (as defined in 21 U.S.C. § 802(6)), listed chemicals or chemical mixtures (as defined in 21 U.S.C. §§ 802(33) and (40)), anabolic steroids (as defined in 21 U.S.C. § 802(41)(A) and (C)), and other items regulated by the CSA (21 U.S.C. § 801 *et seq.*), the FDCA (21 U.S.C. § 301 *et seq.*), and any other product whose importation into the United States is prohibited under federal law and where such importation would constitute a felony.

**B. <u>Acceptance of Responsibility</u>**

2. The Alibaba Platforms admit, accept, and acknowledge that they are responsible under United States law for the acts of their officers, directors, employees, and agents as set forth in the Statement of Facts provided in **Attachment A** and incorporated by reference into this Agreement. Alibaba admits the facts described in **Attachment A** are true and accurate.

3. In any prosecution or proceeding against Alibaba, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the Government in its case-in-chief and rebuttal

case; (b) impeachment evidence offered by the Government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. Additionally, Alibaba shall not assert any claim that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines"), or any other federal rule.

**C. Term of the Agreement**

4. Alibaba's obligations under this Agreement shall have a term of three years from the date on which the Agreement is executed (the "Term"). Alibaba agrees, however, that in the event the Government determines, in its sole discretion, acting reasonably, that Alibaba has knowingly and materially violated any provision of this Agreement, or has failed to completely perform or fulfill its material obligations under this Agreement, an extension or extensions of the Term may be imposed by the Government, in its sole discretion, for up to a total aggregate additional time period of one year, without prejudice to the Government's rights to proceed as provided in the below breach provisions of this Agreement. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement for the Alibaba Platforms in **Attachment D** and any tolling periods for any applicable statutes of limitation, for an equivalent period. The Government will provide Alibaba with written notice specifying the alleged violation in reasonable detail no fewer than thirty (30) calendar days before any extension is imposed, and Alibaba will have thirty (30) calendar days following receipt of such written notice (the "**Extension Cure Period**") to respond to the Government in writing to explain the nature and circumstances of such breach, as well as the actions the Alibaba Platforms have taken to address and remediate the situation, which explanation the Government shall consider in determining whether to extend the Term. The Government shall provide Alibaba with a written determination specifying the violation upon which the extension is based and the duration of the extension to be imposed.

**D. Relevant Considerations**

5. The Government enters into this Agreement based on the individual facts and circumstances of this case, including those presented by Alibaba. These facts and circumstances include, but are not limited to, the following:

a. The seriousness of the conduct described in the Statement of Facts, which involved advertisements and sales related to Subject Merchandise;

b. Alibaba's lack of voluntary disclosure credit based on their failure to timely and voluntarily disclose to the Government the conduct described in the Statement of Facts; The Alibaba Platforms' compliance failures that contributed to the offense conduct, including material compliance failures that occurred after the Alibaba Platforms implemented remedial measures;

c. Credit for the Alibaba's cooperation with the Government's investigation, which included:

i. investigating facts and obtaining information as requested by the Government, which allowed the Government to preserve and obtain evidence as part of their own independent investigation;

ii. at the Government's request, collecting, organizing, and producing voluminous documents in ways that did not implicate foreign data privacy laws;

iii. assisting in making employees available to be interviewed;

iv. creating and producing to the Government certain information from the databases of the Alibaba Platforms regarding relevant e-commerce sales of Subject Merchandise to U.S. customers in ways that did not implicate foreign data privacy laws;

v. making factual presentations to the Government on a wide variety of topics; and

vi. providing separate counsel to witnesses to facilitate the Government's investigation, where appropriate.

d. The Alibaba Platforms' good-faith efforts to implement and refine compliance measures designed to detect and prevent violations of the statutes, terminating business relationships with companies and persons known to have been involved in the conduct described in the Statement of Facts; terminating third-party sellers' abilities to use the Alibaba Platforms services to unlawfully advertise, sell, import or export, distribute, or smuggle Subject Merchandise; closing categories associated with high risk transactions; making investments in staffing and resources for its legal and compliance teams, including engaging third-party vendors to assist with daily monitoring; updating policies, procedures, and supervisory structures with an emphasis on preventing and detecting the unlawful advertisement, sale, import or export, distribution, and smuggling of Subject Merchandise; and expanding employee training;

e. The Alibaba Platforms' agreements to enhance their corporate compliance programs and internal controls by adopting the minimum elements of a corporate compliance program provided in **Attachment C**;

f. The Alibaba Platforms' agreement to continue to cooperate with the Government as described in Section E;

g. Alibaba's lack of prior criminal history;

h. Accordingly, after considering (a) through (g) above, the Government has determined that the appropriate resolution in this case is this Agreement with Alibaba, with a monetary penalty of $125,000,000 ("**Monetary Penalty**") for a

misdemeanor violation of the Food, Drugs, and Cosmetics Act and a civil forfeiture of $200,000,000 ("**Forfeiture Amount**") assessed against Alibaba.

**E. <u>Cooperation Requirements</u>**

6. The Alibaba Platforms shall fully cooperate with the Government on any matter that relates to: (1) the conduct described in this Agreement and the Statement of Facts and any individual or entity referred to therein, as well as any other related conduct under investigation by the Government in connection with Subject Merchandise at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term; (2) the advertisement, sale, import, export, distribution, or smuggling of Subject Merchandise into the United States transacted through the Alibaba Platforms that facilitate the advertisement, sale, import, export, distribution, or smuggling of Subject Merchandise into the United States; and (3) possible violations of Drug, Device, and Importation Laws by third-party sellers and U.S.-based buyers who use the Alibaba Platforms or any other e-commerce platforms owned or controlled by Alibaba. The Alibaba Platforms' obligation to cooperate with the Government under this Section shall end on the date that the investigations and prosecutions of all such matters conclude or the date that the Term ends, whichever date is later.

7. The Alibaba Platforms' cooperation pursuant to this Section is subject to applicable law and regulations, including valid claims of federal attorney-client privilege and attorney work-product doctrine. If the Alibaba Platforms withhold information based on the assertion of any such law, regulation, or privilege, the entity shall provide the Government with a log that describes the withheld information and the foundation of the law, regulation or privilege within thirty (30) Business Days of making their determination to withhold the information; cooperation and disclosure obligations under this Section include, but are not limited to, the following:

a. Each Alibaba Platform shall designate one or more agents to accept and process the Government's requests for cooperation within fifteen (15) Business Days of signing this Agreement. Each Alibaba Platform shall accept the Government's requests for cooperation via email through one or more dedicated email addresses.

b. Within fifteen (15) Business Days of receiving a request for cooperation, the requested Alibaba Platform shall conduct a diligent search for, and inform the Government whether it has identified, responsive information. If the entity identifies responsive information, the entity shall provide the Government with an estimated timeframe within which it expects to produce the information. Unless otherwise agreed to by the Government, this timeframe shall not exceed sixty (60) calendar days from the date that the entity receives the Government's request.

c. The Alibaba Platforms shall report within thirty (30) calendar days to the Government any evidence or allegation of a violation of federal law in connection with Subject Merchandise that the Alibaba Platforms learns was committed by the Alibaba Platforms' users of their e-commerce services in the United States, including buyers and sellers.

d. The Alibaba Platforms shall provide complete, truthful, and accurate information to the Government.

e. In its sole discretion, the Government may share any information, testimony, documents, records, or other tangible evidence that the Alibaba Platforms provide to the Government with any federal, state, or foreign government authority.

**F. <u>Monetary Penalty</u>**

8. Alibaba agrees that the Monetary Penalty in the amount of one hundred and twenty-five million dollars ("$125,000,000" or "$125 million") is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Section D. Alibaba agrees to pay the Monetary Penalty of $125 million to the U.S. Treasury no later than thirty (30) Business Days after the Effective Date of this Agreement in accordance with payment instructions provided by the Government in its sole discretion.

9. Alibaba's payment of the Monetary Penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Government that the Monetary Penalty is the maximum penalty that may be imposed in any future prosecution, and the Government is not precluded from arguing in any future prosecution that a court should impose a higher fine, although the Government agrees that under those circumstances, the Government will recommend to a court that the Monetary Penalty paid by Alibaba pursuant to this Agreement be applied toward any fine that a court might impose as part of its judgment against Alibaba. Alibaba acknowledges that such a recommendation will not be binding in any court.

10. Alibaba acknowledges that no U.S. tax deduction may be sought in connection with the payment of any part of the Monetary Penalty. Alibaba shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the Monetary Penalty amount that Alibaba pays pursuant to this Agreement.

**G. <u>Civil Forfeiture</u>**

11. Alibaba admits that money and/or property is subject to civil forfeiture because of third-party transactions on Alibaba Platforms that violated Drug, Device, and Importation Laws. Pursuant to Title 18, U.S. Code, Section 981(a)(1)(C), Alibaba consents to civil forfeiture in the Forfeiture Amount of two hundred million dollars ($200,000,000 or "$200 million"). Alibaba agrees that this Forfeiture Amount constitutes gross merchandise value of certain transactions conducted by third-party sellers on Alibaba Platforms in violation of Title 18, United States Code, Section 545.

12. Alibaba shall pay the Forfeiture Amount, plus any associated transfer fees, no later than thirty (30) Business Days after the Effective Date of this Agreement in accordance with payment instructions provided by the Government in its sole discretion. Alibaba hereby releases any and all claims that it may have to the Forfeiture Amount and agree that the forfeiture of such funds may be accomplished either administratively or judicially at the Government's election, and waive the requirements of any applicable laws, rules, or regulations governing the forfeiture of

assets, including those requiring notice of forfeiture. If the Government seeks to forfeit the Forfeiture Amount judicially, Alibaba waives all requirements pertaining to forfeiture set forth in Title 18, U.S. Code, Section 983, including the filing of a civil forfeiture complaint as to its Forfeiture Amount and notice of the same, and consents to entry of an order of forfeiture directed to such funds. If the Government seeks to forfeit the Forfeiture Amount administratively, Alibaba consents to the entry of a declaration of forfeiture and waive the requirements of Title 18, U.S. Code, Section 983 regarding notice of seizure in non-judicial forfeiture matters.

13. Alibaba agrees to sign any additional documents necessary to complete forfeiture of the Forfeiture Amount. Alibaba also agrees that they shall not file any petitions for remission, restoration, or any other assertion of ownership or request for return relating to the Forfeiture Amount, or any other action or motion seeking to collaterally attack the seizure, restraint, forfeiture, or conveyance of the Forfeiture Amount, nor shall it assist any others in filing any such claims, petitions, actions, or motions.

14. Alibaba's payment of the Forfeiture Amount is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Government that the Forfeiture Amount surrendered by Alibaba is the maximum forfeiture that may be imposed in any future prosecution, and the Government is not precluded from arguing in any future prosecution that a court should impose a higher criminal forfeiture amount or substitute money judgment in a criminal proceeding, although the Government agrees that under those circumstances, the Government will recommend to a court that the Forfeiture Amount paid by Alibaba pursuant to this Agreement be applied toward any criminal forfeiture or substitute money judgment that a court might impose as part of its judgment. Alibaba acknowledges that such a recommendation will not be binding on any court.

15. Alibaba agrees that they shall not claim, assert, or apply for, either directly or indirectly, any tax deduction, tax credit, or any other offset with regard to any U.S. federal, state, or local tax or taxable income in connection with the payment of any part of the Forfeiture Amount. Alibaba shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source with regard to the Forfeiture Amount that Alibaba pays pursuant to the Agreement.

**H. <u>Conditional Release from Liability</u>**

16. Except as otherwise provided in this Agreement, the Government agrees that it will not bring any criminal or civil case against Alibaba relating to (i) any of the conduct described in the Statement of Facts of this Agreement, (ii) any of the information disclosed by Alibaba to the Government as part of this investigation prior to executing this Agreement, or (iii) any information known by the Government prior to the execution of this Agreement that relates to the conduct described in the Statement of Facts to this Agreement. However, the Government may use any information related to the conduct described in the Statement of Facts against Alibaba: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; or (c) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. Nothing herein shall preclude Alibaba from presenting this Agreement, and the Government's agreement herein, to any other law enforcement, regulatory, or government authority as evidence of cooperation with, and resolution of claims by, the Government with

respect to the conduct described herein.

17. This Agreement does not provide any protection against prosecution for any future conduct by Alibaba. In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with Alibaba.

**I. <u>Corporate Compliance Program</u>**

18. The Alibaba Platforms shall implement (or continue to the extent already implemented) a corporate compliance program that meets the minimum elements and standards provided in **Attachment C**. The Alibaba Platforms' corporate compliance program shall be designed to prevent and detect violations of Drug, Device, and Importation Laws involving Subject Merchandise. The Compliance Program shall cover the operations of the Alibaba Platforms' employees, contractors, and subcontractors whose responsibilities relate to the (a) advertisement, sale, import, export or distribution of Subject Merchandise; (b) review and moderation of product listings related to Subject Merchandise; and (c) review and moderation of licenses of buyers and sellers of Subject Merchandise who use the Alibaba Platforms' online services. No later than thirty (30) calendar days after the Term expires, each of the Alibaba Platforms, by their respective Chief Executive Officers and Chief Compliance Officers, will certify to the Government, in the form of executing the document attached as Attachment E to this Agreement, that each Alibaba Platform has met its compliance obligations pursuant to this Agreement. Such certification will be deemed a material statement and representation by the Alibaba Platform to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519.

19. The Alibaba Platforms will periodically review their corporate compliance programs and correct any deficiencies in the programs' internal controls, policies, and procedures that prevent the programs from effectively detecting and deterring violations of Drug, Device, and Importation Laws through the purchase or sale of Subject Merchandise through their online platforms.

**J. <u>Compliance Monitoring</u>**

20. For the purpose of assessing or determining compliance with this Agreement, the Government may, upon written notice to the Alibaba Platforms:

a. require the Alibaba Platforms to submit written reports, certifications, or other information relating to compliance with any provision of this Agreement;

b. interview, under oath or otherwise, officers, employees, or agents of the Alibaba Platforms who may have relevant knowledge; and

c. require the Alibaba Platforms to produce documents, communications, data, and other information in their possession, custody, or control relating to compliance with any provision of this Agreement, subject to applicable laws and regulations, as well as valid claims of federal attorney-client privilege and attorney work-product doctrine.

21. The Alibaba Platforms shall designate one or more agents of the Alibaba Platforms to accept and process the Government's requests related to compliance monitoring within seven (7) Business Days of signing this Agreement. The Alibaba Platforms shall accept the Government's requests for compliance monitoring information via email through one or more dedicated email addresses maintained by each company. The Alibaba Platforms shall comply with the Government's compliance monitoring requests within thirty (30) calendar days of receiving the Government's written notice. In its sole discretion, the Government may grant extensions of time for the Alibaba Platforms to comply with the Government's requests for compliance monitoring information.

**K. <u>Non-Prosecution</u>**

22. The Government agrees that if Alibaba complies with its obligations under this Agreement, (a) the Government will not bring any criminal case or other enforcement action against Alibaba, or any of its present or former subsidiaries or affiliates relating to any of the conduct described in the Statement of Facts, and (b) at the conclusion of the Term, this Agreement shall expire. In assessing Alibaba's compliance, the Government shall consider the totality of Alibaba's conduct under this Agreement and shall not declare a failure to comply based solely on minor or promptly cured technical violations, which shall be determined at the Government's discretion, acting reasonably. To the extent there is conduct disclosed by Alibaba that is not set forth in this Agreement, such conduct shall not be exempt from further prosecution and is outside the scope of this Agreement. Alibaba expressly acknowledges and agrees that this Agreement does not preclude the filing of a case arising from conduct that is not described in this Agreement and the Statement of Facts.

**L. <u>Breach of the Agreement</u>**

23. If, during the Term, either of the Alibaba Platforms (a) commits a felony under United States law; (b) knowingly provides in connection with this Agreement materially false, incomplete, or misleading information, including in connection with the disclosure of information about individual culpability; (c) knowingly and materially fails to cooperate as provided in Section E of this Agreement; (d) knowingly fails to implement compliance programs in all material respects as provided in Section I of this Agreement and **Attachment C**; or (e) otherwise knowingly and materially fails to perform or fulfill any term or condition of this Agreement, the relevant Alibaba Platform shall be in breach, and thereafter be subject to prosecution for violations of applicable federal law, including, but not limited to, for conduct described in the Attached Statement of Facts, regardless of whether the Government obtains knowledge of the breach after the Term expires if the breach occurred during the Term of the Agreement. The notice-of-breach and cure provisions set forth in Paragraphs 26 through 28 shall apply to any such post-Term breach determination.

24. Any prosecution resulting from a knowing and material breach of this Agreement, as defined in Section L, Paragraph 23, may be pursued by the Government in the United States District Court for the District of Rhode Island or any other appropriate venue. As to the conduct described in the Statement of Facts, Alibaba knowingly waives any constitutional or statutory right

to venue and to presentment to or indictment by a grand jury for felony crimes, and consents to the filing of an information or complaint for said crimes. Determination of whether Alibaba has breached this Agreement and whether to pursue prosecution shall be in the Government's sole discretion, acting reasonably, after good-faith consideration of any written response submitted by Alibaba pursuant to Paragraph 26. Any such prosecution may be premised on information provided by Alibaba.

25. Any prosecution relating to the conduct described in this Agreement or relating to conduct of the Alibaba Platforms in connection with a violation of the Drug, Device, and Importation Laws known to the Government prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Alibaba notwithstanding the expiration of the statute of limitations, for the period between the signing of this Agreement and the expiration of the Term plus six months. Thus, by signing this Agreement, Alibaba agrees that the statute of limitations with respect to any such prosecution against Alibaba that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus six months. In addition, Alibaba agrees to toll the running of the statute of limitations as to any violation of Drug, Device, and Importation Laws that occurs during the Term for one year from the date upon which the violation occurs, and that this period shall be excluded from any calculation of time for purposes of the application of any applicable statute of limitations.

26. In the event the Government determines that Alibaba has breached this Agreement, as defined in this Section L, the Government agrees to provide the entity with written notice of such breach prior to instituting any prosecution resulting from such breach. Written notice of breach shall include: (a) the provision breached; (b) the approximate date of the breach; and (c) a description of the breach sufficient to permit the respective company to cure. Within thirty (30) calendar days of receipt of such notice, the entity shall have the opportunity to respond to the Government in writing to explain the nature and circumstances of such breach, as well as the actions the entity has taken to address and remediate the breach, which explanation the Government shall consider in determining whether to pursue prosecution of Alibaba.

27. In the event that the Government determines that Alibaba has knowingly and materially breached this Agreement, as defined in Section L, Paragraph 23: (a) all statements made by or on behalf of Alibaba to the Government, including the Statement of Facts, and any testimony given by Alibaba before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Government against Alibaba; and (b) Alibaba shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, Section 1B1.1(a) of the USSG, or any other federal rule that any such statements or testimony made by or on behalf of Alibaba prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current officer, director, or employee, or any person acting on behalf of, or at the direction of, the relevant Alibaba Platform, will be imputed to the relevant Alibaba Platform for the purpose of determining whether that entity has deliberately violated any provision

of this Agreement as defined in Section L, Paragraph 23, and shall be in the sole discretion of the Government, acting reasonably.

28. It is further understood that within thirty (30) calendar days after receiving a notice of breach, or to such longer period as the Government may agree in writing, Alibaba may cure the breach to the Government's reasonable satisfaction ("**Cure Period**").

29. Alibaba acknowledges that the Government has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if any entity breaches this Agreement and this matter proceeds to judgment. Alibaba further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

30. On the date that the period of non-prosecution specified in this Agreement expires, each of the Alibaba Platforms, by their respective Chief Executive Officers and the Chief Financial Officers, shall submit their respective certifications set forth in **Attachment D** and certify to the Government that they have met their obligations pursuant to this Agreement. Each certification will be deemed a material statement and representation by the Alibaba Platforms in a matter within the jurisdiction of the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the District of Rhode Island.

**M. <u>Applicability</u>**

31. Except as may otherwise be agreed by the Government and Alibaba, in connection with a particular transaction, Alibaba agrees that in the event that, during the Term, they undertake any change in corporate form that directly involves Alibaba Platforms, including if Alibaba sells, merges, or transfers business operations that are material to Alibaba Platforms' operations, or to the operations of any of Alibaba's subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, Alibaba shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

32. The purchaser or successor in interest must also agree in writing that the Government's ability to declare breach under this Agreement is applicable in full force as to that entity. Alibaba agrees that the failure to include these provisions in their transactions will make any such transactions null and void. Alibaba shall provide notice to the Government at least thirty (30) calendar days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Government shall notify Alibaba within fifteen (15) calendar days if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If, at any time during the Term, Alibaba engages in a transaction that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Government may deem it a breach of this Agreement pursuant to Section K of this Agreement. Nothing in this Agreement shall restrict Alibaba from indemnifying (or otherwise holding harmless) the purchaser

or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Government, acting reasonably.

**N. Public Statements by Alibaba**

33. Alibaba shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for Alibaba, make any public statement, contradicting in whole or in part the acceptance of responsibility by the Alibaba Platforms as set forth in this Agreement. Any such contradictory statement shall, subject to the cure rights of the Alibaba Platforms described in this paragraph, constitute a breach of this Agreement, and the relevant Alibaba Platform thereafter shall be subject to prosecution as set forth in this Agreement. The decision whether any public statement by any such person contradicting a fact contained in this Agreement will be imputed to the respective Alibaba Platform for the purpose of determining whether it has breached this Agreement shall be in the sole discretion of the Government, acting reasonably.

34. If the Government determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Government shall notify Alibaba, and Alibaba may avoid a breach of this Agreement by publicly repudiating such statement(s) within ten (10) Business Days after notification. Alibaba shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in this Agreement provided that such defenses and claims do not contradict, in whole or in part, a statement contained in this Agreement. This paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of Alibaba in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of Alibaba. Any determination by the Government, acting reasonably, that a public statement constitutes a breach of this Agreement shall be subject to the 30-day written notice and opportunity to respond procedure set forth in Paragraph 26 before any prosecution may be initiated.

35. If Alibaba issues a press release or holds any press conference in connection with this Agreement, Alibaba shall first consult with the Government to determine: (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Government and Alibaba; and (b) whether the Government has any objection to the release.

36. The Government agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Alibaba Platforms' cooperation and remediation. By agreeing to provide this information to such authorities, the Government does not agree to advocate on behalf of Alibaba. Instead, the Government only agrees to provide facts to be evaluated independently by such authorities.

**O. Limitations on Binding Effect of Agreement**

37. This Agreement is binding on Alibaba, the United States Department of Justice, including the United States Attorney's Office for the District of Rhode Island, the United States Department of Justice's Enforcement & Affirmative Litigation Branch, and the United States Department of Justice's Money Laundering, Narcotics and Forfeiture Section. It does not bind any other federal agencies, or any state, local, or foreign law enforcement or regulatory agencies. The Government shall bring the cooperation of Alibaba and its compliance with its obligations under this Agreement to the attention of such agencies and authorities if requested to do so by Alibaba.

**P. Notice**

38. Any notice to the Government under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

Chief, Criminal Division
U.S. Attorney's Office, District of Rhode Island
One Financial Plaza, 17th Floor
Providence, RI 02903

Director, Enforcement & Affirmative Litigation Branch, Civil Division
U.S. Department of Justice
450 5th Street NW, Room 6400 South
Washington, DC 20530

Chief, Bank Integrity Unit
Money Laundering, Narcotics and Forfeiture Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue NW
Washington DC 20005

39. Any notice to Alibaba under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

Alibaba Group Holding Ltd.
26/F Tower One, Times Square
1 Matheson Street
Causeway Bay, Hong Kong
Attention: Legal Department

Alibaba.com U.S. LLC
525 Alamnor Ave, Suite 400
Sunnyvale, CA 94085
Attention: Chief Compliance Officer

With a copy to:

Quinn Emanuel Urquhart & Sullivan LLP
2601 South Bayshore Dr, Ste 1550
Miami, FL 33133
Attention: Samuel G. Williamson

40. Notice shall be effective upon actual receipt by the Government or Alibaba. Notice shall also be given by email to any email addresses designated by the Government or Alibaba.

**Q. Complete Agreement**

**41.** The Government and Alibaba acknowledge that each party has had a full opportunity to negotiate the terms of this Agreement. The rule of construction that interprets contracts against the drafter, therefore, shall not apply to this Agreement. This Agreement, including its attachments, sets forth all the terms of the Agreement between Alibaba and the Government. No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Government, the attorneys for Alibaba, and a duly authorized representative of Alibaba. The following documents are attached to and incorporated into this Agreement:

**Attachment A**: The Alibaba Statement of Facts

**Attachment B**: The Alibaba Certificate of Corporate Resolutions

**Attachment C**: The Alibaba Corporate Compliance Program

**Attachment D**: The Alibaba Disclosure Certification

**Attachment E**: The Alibaba Compliance Certification

**AGREED AND CONSENTED TO:**

***The United States of America***

CHARLES C. CALENDA
First Assistant United States Attorney

Date: 6/29/2026 By: [signature]
Dulce Donovan
Executive Assistant U.S. Attorney

Date: 6/29/2026 By: Julianne Klein
Julianne Klein
Assistant U.S. Attorney

LISA K. HSIAO
Director
Enforcement and Affirmative Litigation Branch,
Civil Division

Date: 6/29/2026 By: ______________________
Patrick R. Runkle
Assistant Director

Date: 6/29/2026 By: ______________________
Colin W. Trundle
Trial Attorney

Date: 6/29/2026 By: ______________________
Cadesby B. Cooper
Trial Attorney

MARGARET A. MOESER
Chief
Money Laundering, Narcotics and Forfeiture
Section, Criminal Division

Date: 6/29/2026 By: ______________________
Rachel N. Agress
Trial Attorney

Date: 6/29/2026 By: ______________________
Elysa Wan
Trial Attorney

**AGREED AND CONSENTED TO:**

***Alibaba Group Holding Limited and Alibaba.com Singapore E-Commerce Pte. Ltd.***

Date: June 29, 2026 By: ______________________
Siying Yu
Authorized Officer and General Counsel
Alibaba Group Holding Limited

Date: June 29, 2026 By: ______________________
Albert Liu
General Counsel
Alibaba.com Singapore E-Commerce Pte. Ltd.

Date: June 29, 2026 By: ______________________
Samuel G. Williamson
Quinn Emanuel Urquhart & Sullivan, LLP
Counsel for Alibaba Group Holding Limited and
Alibaba.com Singapore E-Commerce Pte. Ltd.

**ATTACHMENT A**
**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Non-Prosecution Agreement (the "Agreement") between the Government and Alibaba (as defined in the Agreement). Alibaba agrees and stipulates that the following information is true and accurate. The Alibaba Platforms admit, accept, and acknowledge that they are responsible for the acts of their officers, directors, employees, and agents as set forth below. Should the Government later pursue the prosecution that is covered by this Agreement, Alibaba agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts describe events that occurred between approximately January 2016 and December 2024 (the "Relevant Period").

1. During the Relevant Period, Alibaba Group (U.S.) Inc., and Alibaba.com US LLC were Delaware companies with a principal place of business at 400 South El Camino Real, Suite 400, San Mateo, California 94402. Alibaba Group (U.S.) Inc. and Alibaba.com US LLC were subsidiaries of Alibaba Group Holding Limited. Alibaba.com Singapore E-Commerce Pte. Limited and AliExpress E-Commerce One Pte. Limited were Singapore based subsidiaries of Alibaba Group Holding Limited. Alibaba Group Holding Limited was founded in 1999 in China and was listed on the New York Stock Exchange in 2014. Alibaba Group Holding Limited was organized and existed under the laws of the Cayman Islands, with its principal executive offices at 969 West Wen Yi Road, Yu Hang District, Hangzhou 31 1121, China.

2. Alibaba.com was a global business-to-business ("B2B") e-commerce platform that connected buyers and sellers from around the world on a single platform, which facilitated wholesale distribution of a wide range of goods. The International Commerce Business Unit ("ICBU") was the business arm managed by Alibaba.com Singapore E-Commerce Pte. Limited, which managed Alibaba.com, including within the United States. A separate business unit within Alibaba Group Holding Limited, AliExpress, was a global business-to-customer ("B2C") e-commerce platform, which facilitated sales of a wide range of goods from sellers to individual customers. AliExpress was operated by Alibaba.com Singapore E-Commerce Pte. Limited and AliExpress E-Commerce One Pte. Limited. The B2B and B2C services were offered through the web domains Alibaba.com and AliExpress.com, respectively. During the Relevant Period, there were at any given time more than 200 million product listings available on Alibaba.com and over 50 billion product sales occurred on a yearly basis.

3. ICBU was not an importer of record in connection with the transactions that are the subject of this resolution, nor did it take physical possession of goods. Instead, ICBU operated the Alibaba.com marketplace which linked third-party buyers and sellers to transact the sale of goods. During the Relevant Period, ICBU offered services to independent third-party sellers that were intended to enhance sales and facilitate transactions with buyers on Alibaba.com. These services included "Gold" and "Verified" supplier membership programs that promoted independent third-party sellers' products. Through April 2021, ICBU also offered a payment service on Alibaba.com called "trade assurance." Through this payment service, ICBU processed payments linked to e-commerce orders.

4. During the relevant period, ICBU had policies which governed what products could be sold on Alibaba.com. Sellers agreed to abide by those policies to access the platform. ICBU held the right to take enforcement actions against non-compliant sellers, including barring sellers from selling goods on Alibaba.com. ICBU maintained and periodically improved those policies throughout the Relevant Period.

5. During the Relevant Period, ICBU maintained a Rules Center, a centralized hub on which it published the various policies and penalty procedures which governed sellers and buyers using Alibaba.com. ICBU's rules expressly prohibited the use of Alibaba.com to sell and import pharmaceuticals that were non-compliant with U.S. Food and Drug Administration ("FDA") regulations. ICBU's listing policies also expressly prohibited the sale of pill presses and other illegal products. In addition, ICBU's policies and terms of use required all users to comply with the laws of the jurisdictions within which the users operated. Despite its policies to the contrary, ICBU failed to prevent some third-party sellers from circumventing controls and measures implemented by Alibaba.com and using Alibaba.com to sell and import goods into the United States that violated the Federal Food, Drug, and Cosmetic Act ("FDCA"), as well as other Drug, Device, and Importation Laws through Alibaba.com.

6. ICBU further offered proprietary, built-in messenger platforms that allowed real-time, private chat interactions, requests for price quotes, and management of orders by buyers and merchants. Some third-party merchants at times used ICBU's private messaging platform to discuss, among other things, the arrangement of shipments with U.S. buyers in a manner that would evade US customs laws or to provide buyers with contact information for encrypted messaging platforms unaffiliated with ICBU to evade restrictions imposed by the FDCA, as well as other Drug, Device, and Importation Laws. ICBU had the capability to monitor and moderate seller and buyer use of its own messaging platforms and implemented monitoring measures at some points during the Relevant Period, but those measures were not sufficient to prevent the product sales that gave rise to this Agreement. For example, the Alibaba Platforms generally did not penalize merchants unless they publicly posted prohibited goods on the platform.

7. During the Relevant Period, ICBU's systems, policies, and procedures failed to prevent the sale and importation of certain controlled substances, List I chemicals, List II chemicals, prescription drugs, active pharmaceutical ingredients, and pharmaceutical equipment by independent third-party sellers who were not qualified to distribute such products into the United States. Because of this, some third-party sellers used Alibaba.com to sell and import these products into the United States in violation of the FDCA, FDA regulations, and other Drug, Device, and Importation Laws and in violation of ICBU policies. However, since ICBU charged membership, marketing, advertising, shipping, and transaction processing fees to users of the Alibaba.com marketplace, ICBU derived some profit related to those sellers' illegal activities.

8. During the Relevant Period, similar sales also occurred on AliExpress' B2C platform. The transaction value of these sales tended to be lower, as AliExpress is a B2C platform (in contrast to Alibaba.com's B2B platform).

9. Through the Alibaba Platforms, the Government conducted over 40 undercover purchases of drugs and equipment that were illegal to be imported into the United States under the

FDCA as well as other Drug, Device, and Importation Laws. These products were ultimately shipped to the District of Rhode Island by third-party sellers.

10. At times, Alibaba employees raised concerns that the ICBU platform was used to sell improper products into the United States. The Alibaba employees also raised concerns that ICBU's compliance measures and filtering systems were inadequate to prevent the sale of the products that are the subject of this resolution to buyers in the United States. ICBU was not sufficiently reactive or proactive in following up on these concerns.

11. Approximately 80,000 product sales on the Alibaba Platforms took place during the Relevant Period and involved product sales from overseas countries to the United States that lacked the requisite approvals under the FDCA as well as other Drug, Device, and Importation Laws. The combined gross merchandise value of these transactions was greater than $200 million. The value of these transactions represents the prices charged by third-party merchants, and not revenues or profits received by the Alibaba Platforms. These funds are subject to civil forfeiture pursuant to Title 18, U.S. Code, Section 981(a)(1)(C) as property which constitutes or is derived from proceeds traceable to smuggling goods by independent third-party sellers in violation of Title 18, U.S. Code, Section 545.

**ALIBABA GROUP HOLDING LIMITED**
(Incorporated in the Cayman Islands)
(the "Company")

Certified Extract of Minutes of a Meeting of the Board of Directors (the "Board") of the Company held at Times Square, Hong Kong and via Video Conference on March 18, 2026, Beginning at 9:35 a.m., Hong Kong Time
(the "Board Minutes")

---

A. Extract of the relevant definition in the Board Minutes:

"Authorized Officers": "the officers named in Schedule A hereto."

"Company Secretary": "the Company Secretary of the Company."

"Proposed Settlement": "a settlement proposal offered by the DOJ including (1) a non-prosecution agreement (the "Agreement"), (2) a characterization of certain conduct as misdemeanor and (3) a penalty of US$325 million."

B. Extract of the relevant Board Minutes:

**After due and careful consideration, IT WAS UNANIMOUSLY RESOLVED BY THE INDEPENDENT DIRECTORS PRESENT,**

**THAT the Proposed Settlement, on terms substantively as described herein be and hereby is approved;**

**THAT the Company agrees to pay a monetary penalty amount of $125,000,000 and a civil forfeiture of $200,000,000 pursuant to the Agreement;**

**The Company accepts the terms and conditions of the Agreement, including, but not limited to: (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to indictment and venue and consents to the filing of an information, as provided under the terms of the Agreement, in the United States District Court for the District of Rhode Island, or any other appropriate venue; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the DOJ prior to the date on which the Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement;**

**THAT the Authorized Officers, acting together or singly, be and hereby are authorized, approved and directed, on behalf of the Company, to further negotiate with the DOJ to finalize the terms of the Proposed Settlement and the Agreement, and to approve, execute and deliver the Agreement, in such form and with such terms and conditions as any such Authorized Officer shall approve, such Authorized Officer's execution thereof**

**to be conclusive evidence of such Authorized Officer's approval of the terms of the Agreement;**

**THAT the Authorized Officers, acting together or singly, be and hereby are authorized, approved and directed, on behalf of the Company, to take such further actions and to approve, execute and deliver such further agreements or documents as such Authorized Officer shall in his or her reasonable discretion deem necessary, appropriate or advisable in order to carry out the intent and purposes of the foregoing resolutions (including without limitation making any public announcements and/or filings);** ***provided*****, in each case, that such documents, actions, announcements and filings are consistent with and within the scope of the foregoing resolutions; and**

**THAT any and all actions previously taken by any Authorized Officer or designee thereof relating to and within the scope of these resolutions be and hereby are adopted, approved and ratified and confirmed as valid acts and deeds taken on behalf of the Company.**

## Schedule A

**Authorized Officers**

Joseph C. TSAI, Chairman, or his successor

Eddie Yongming WU, Chief Executive Officer, or his successor

Toby Hong XU, Chief Financial Officer, or his successor

Sara Siying YU, General Counsel, or her successor

Certified as a true extract of the Board Minutes:

ZHANG Jinwei
Company Secretary
Date: June 25, 2026

## ATTACHMENT C

## THE ALIBABA CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in internal controls and compliance policies and procedures as they relate to prevention, detection and deterrence of violations of the Drug, Device and Importation Laws in connection with the Subject Merchandise (collectively, the "Compliance Program"), each of the Alibaba Platforms agree to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its Compliance Program and to implement enhancements as warranted. At a minimum, the Compliance Programs should include the following elements, to the extent they are not already present:

*Commitment to Compliance*

1. Each of the Alibaba Platforms will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to compliance with its Compliance Program and demonstrate rigorous support for compliance principles via their actions and words.

2. Each of the Alibaba Platforms will ensure that mid-level management throughout its organization reinforces leadership's commitment to compliance policies and principles and encourages employees to abide by them. Each of the Alibaba Platforms will create and foster a culture of ethics and compliance with the laws of the United States in its day-to-day operations at all levels of the company.

*Periodic Risk Assessment and Review*

3. Each of the Alibaba Platforms will independently implement a risk management process to identify, analyze, and address the individual circumstances of its e-commerce platform, and in particular the compliance risks it faces relating to the potential advertisement, sale, importation, and distribution of Subject Merchandise in the United States through its e-commerce services and potential violations of Drug, Device, and Importation Laws.

4. On the basis of its periodic risk assessment, each of the Alibaba Platforms shall take appropriate steps to design, implement, or modify each element of its Compliance Program to reduce the risk of violations of Drug, Device, and Importation Laws and associated compliance policies.

*Policies and Procedures*

5. Each of the Alibaba Platforms will independently develop and promulgate a clearly articulated and visible corporate policy against violations of Drug, Device, and Importation Laws, which shall be memorialized in a written compliance policy or policies, such as the Platform's existing Prohibited and Restricted Items Policy.

6. Each of the Alibaba Platforms will enhance its respective Prohibited and Restricted Items Policy and other applicable elements of its Compliance Program to reduce the risk of violations of Drug, Device, and Importation Laws. Each of the Alibaba Platforms will take

appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violations of Drug, Device, and Importation Laws under the Compliance Program by personnel at all levels of the company. These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the applicable Alibaba Platform, including, but not limited to, agents, consultants, and joint venture partners (collectively, "agents and business partners"). Each of the Alibaba Platforms shall notify all employees that compliance with the Compliance Program is the duty of individuals at all levels of the company. Such enhancements to the Compliance Program shall include continued prohibition of the use of any e-commerce Internet services on the applicable Alibaba Platform to list, advertise the sale of, or otherwise facilitate offers to sell, distribute, or dispense to customers in the U.S. any of the following products to the extent that the sale of such products would violate the Controlled Substances Act ("CSA") and the Federal Food, Drug, and Cosmetic Act ("FDCA"), including as part of a new Controlled Substance, Drug and Pill Press Policy:

a. drugs (as defined in 21 U.S.C. § 321(g)(1));

b. any Class III medical "device" (as defined in 21 U.S.C. § 321(h) and 21 U.S.C. § 360c(a)(1)(C));

c. equipment used to manufacture counterfeit drugs (including tableting and encapsulating machines, punches, dies, plates, stones, and other things referenced in 21 U.S.C. §§ 331(i)(2) and 843(a)(5)-(7));

d. any "controlled substance" (as defined in 21 U.S.C. § 802(6) and included on Schedules I through V, 21 C.F.R. § 1308.11 through .15, subject to the exclusions and exceptions in 21 C.F.R. § 1308.21 through .35);

e. listed chemicals or chemical mixtures (as defined in 21 U.S.C. §§ 802(33) and (40)); and

f. anabolic steroids (as defined in 21 U.S.C. § 802(41)(A) and (C));

7. Each of the Alibaba Platforms will maintain, or where necessary establish, effective, risk-based transaction monitoring systems capable of detecting conduct that violates the CSA and the FDCA. The adequacy of the systems shall be evaluated in light of the state of available commercial technology and existing industry practices and standards at the time of assessment.

8. If, through its Compliance Program, an Alibaba Platform determines that there are reasonable grounds to believe that a user of its e-commerce services is knowingly engaged in the unlawful solicitation, advertisement, sale, importation or exportation, distribution, or smuggling of counterfeit prescription die molds, Schedule I-V controlled substances, or List I and II chemicals into or within the United States, the relevant Alibaba Platform shall suspend the user and initiate an internal investigation. Upon completion of the investigation, if the Alibaba Platform concludes that the grounds for initiating the investigation are substantiated by the information reviewed, the relevant Alibaba Platform will permanently ban that user from using its e-commerce services. Each of the Alibaba Platforms shall take reasonable steps to ensure the permanent ban cannot be readily

circumvented, and such steps shall include, but shall not be limited to, measures to prevent banned parties from re-utilizing the Alibaba Platforms in different forms.

9. Each of the Alibaba Platforms shall evaluate, periodically reassess, and, where appropriate, apply and expand its respective artificial intelligence-based technologies to prevent the sale and advertisement of products on the Alibaba Platforms whose sale or importation into the United States would violate that the CSA and the FDCA.

10. Each of the Alibaba Platforms shall ensure that its Compliance Program includes risk-based measures designed to prevent the advertisement, sale, import or export, distribution, and smuggling of counterfeit die molds, Schedule I-V controlled substances, or List I and II chemicals to Mexico and Canada, where such materials are commonly used by drug traffickers to manufacture controlled substances which are then smuggled into the United States.

11. Within ninety (90) calendar days of the execution of the Agreement, each of the Alibaba Platforms shall implement an online, fast-track law enforcement request intake and processing system ("Law Enforcement Green Channel" or "Green Channel") designed to facilitate timely receipt and processing of valid U.S. subpoenas, court orders, and /or search warrants seeking information related to United States-based users of the Alibaba Platforms as well as information regarding purchases and sales to/from the United States. The Law Enforcement Green Channel shall be available to federal, state, and local law enforcement agencies in the United States. Each of the Alibaba Platforms agrees to waive any federal or state statutory right to personal service of United States-based legal process that is related to a United States-based criminal investigation relating to alleged use of the Alibaba Platforms to violate the Drug, Device and Importation Laws. Each of the Alibaba Platforms will comply with such legal process unless it receives relief from doing so by a court of competent jurisdiction in the United States.

12. Within the same period, each of the Alibaba Platforms shall develop and publish a guidebook that provides notice to United States-based law enforcement of what information is readily available and for how long it is stored by the company. The guidebook shall also provide notice to United-States based law enforcement of how to operate the Law Enforcement Green Channel, including how to create an account, if applicable, and how to serve United States-based legal process on the Alibaba Platforms through the Green Channel. Each of the Alibaba Platforms shall periodically update the guidebook to reflect updates to the Law Enforcement Green Channel when appropriate.

13. Each of the Alibaba Platforms will ensure that it has a system of internal controls, reasonably designed to ensure the completeness and accuracy of records pertaining to the advertisement, sale, importation, and distribution of Subject Merchandise to customers in the United States.

14. The Alibaba Platforms will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure (i) the accuracy of records pertaining to the advertisement, sale, importation, or distribution of Subject Merchandise into the U.S. through that Alibaba Platform's e-commerce services; and (ii) the prevention and detection of violations of the CSA and FDCA on that Alibaba Platform.

15. Each of the Alibaba Platforms shall review its Compliance Program as necessary to address changing and emerging risks and update the Compliance Program as appropriate to ensure its continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Independent, Autonomous, and Empowered Oversight*

16. Each of the Alibaba Platforms will assign responsibility to one or more senior corporate executives of the company for the implementation and oversight of the Compliance Program. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including the applicable Alibaba Platform's internal audit function, or the applicable Alibaba Platform's Board of Directors and any appropriate committee thereof, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

17. Each of the Alibaba Platforms will implement mechanisms designed to ensure that the Compliance Program is effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, any positions that require such training (e.g., internal audit, sales, legal, compliance, finance), and, where necessary and appropriate, agents and business partners; (b) metrics for measuring knowledge retention and effectiveness of the training; and (c) corresponding certifications by all such directors, officers, employees, agents and business partners, certifying compliance with the training requirements. Each of the Alibaba Platforms will conduct training in a manner tailored to the audience's size, sophistication, and subject-matter expertise and, where appropriate, will discuss prior compliance incidents.

18. Each of the Alibaba Platforms will maintain, or, where necessary, establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Controlled Substance and Pill Press Policy and other compliance policies and procedures regarding Subject Merchandise under the Compliance Program, including when such individuals need advice on an urgent basis, or need advice in any foreign jurisdiction in which that Alibaba Platform operates.

*Confidential Reporting Structure and Investigation of Misconduct*

19. Each of the Alibaba Platforms will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of that Alibaba Platform's Compliance Program. This system will provide protection for directors, officers, employees, and, where appropriate, agents and business partners who make such reports.

20. Each of the Alibaba Platforms will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the CSA and the FDCA. Each of the Alibaba Platforms will handle the investigations into such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

*Compensation and Consequence Management*

21. Each of the Alibaba Platforms will implement clear mechanisms amongst all directors, officers, employees, and, where necessary and appropriate, parties acting on behalf of that Alibaba Platform, to incentivize behavior that complies with that Alibaba Platform's Compliance Program. These incentives shall include, but shall not be limited to, the implementation of criteria related to compliance in that Alibaba Platform's compensation and bonus system.

22. Each of the Alibaba Platforms will institute appropriate disciplinary procedures to address, among other things, violations of its Compliance Program, the CSA, or the FDCA by that Alibaba Platform's directors, officers, and employees. Such procedures will be applied consistently and fairly, and in a manner consistent with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee. Each of the Alibaba Platforms shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent similar misconduct in the future, including assessing its internal controls and compliance policies and procedures, and making modifications necessary to ensure that Alibaba Platform's overall Compliance Program is effective.

*Third-Party Management*

23. Each of the Alibaba Platforms will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents, business partners, and sellers who use that Alibaba Platform's ecommerce services in connection with Subject Merchandise, including:

a. properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b. informing agents and business partners of that Alibaba Platform's commitment to abiding by the Drug, Device, and Importation Laws, and of the company's Compliance Program; and

c. seeking a reciprocal commitment from agents and business partners.

24. Where necessary and appropriate, each of the Alibaba Platforms will include standard provisions in agreements, contracts, and renewals thereof with all agents, business partners, and e-commerce sellers that are reasonably calculated to prevent violations of the CSA (21 U.S.C. § 801 et seq.) and the FDCA (21 U.S.C. § 301 et seq.), which may, depending on the

circumstances, include: (a) representations and undertakings relating to compliance with such laws; (b) rights to conduct audits of the books and records of the agent, business partner, or e-commerce seller in support of efforts to ensure compliance with such laws; and (c) rights to suspend or terminate an agent, business partner, or e-commerce seller as a result of any violation of such laws, Alibaba Platform's Compliance Policy, or relevant representations and undertakings related to such matters.

*Mergers and Acquisitions*

25. Each of the Alibaba Platforms will develop and implement policies and procedures for mergers and acquisitions requiring that the applicable Alibaba Platform conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence regarding compliance with the CSA and the FDCA by legal, accounting, and compliance personnel associated with those new business entities.

26. Each of the Alibaba Platforms will ensure that its Compliance Program, including procedures regarding compliance with the CSA and the FDCA, applies as quickly as is practicable to newly-acquired businesses or entities that are merged with that Alibaba Platform, and will promptly (a) train the directors, officers, employees, agents, and business partners consistent with Paragraph 17; (b) where warranted, conduct an audit of all newly acquired or merged businesses as quickly as is practicable concerning compliance with the CSA and the FDCA; and (c) where warranted, based on the nature and scale of the acquired business, each Alibaba Platform will ensure that it establishes a plan to implement the compliance program systems and controls described in this Attachment C into its newly-acquired businesses or entities as quickly as practicable, with priority given to implementing the transaction monitoring system, Law Enforcement Green Channel access, and seller due diligence procedures described herein.

*Monitoring and Testing*

27. Each of the Alibaba Platforms will conduct periodic reviews and testing of all elements of its Compliance Program to evaluate and improve their effectiveness in preventing and detecting violations of the CSA and the FDCA; and related policies and procedures, taking into account relevant developments in the field and evolving international and industry standards.

28. Each of the Alibaba Platforms will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and testing of platform transactions.

*Analysis and Remediation of Misconduct*

29. In the event an Alibaba Platform identifies material misconduct related to violations of the CSA and the FDCA, it will conduct a root cause analysis of that misconduct, including any prior misconduct such as any prior misconduct relating to this investigation, to identify any systemic issues and any control failures. That Alibaba Platform will timely and appropriately remediate the root causes of the identified misconduct. That Alibaba Platform will ensure that root causes, including systemic issues and controls failures, and relevant remediation are shared with management as appropriate.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT B

## AUS Merchant Services, Inc. et al. Non-Prosecution Agreement (AUS Agreement)

The reproduced source document follows this cover page.

U.S. Department of
JUSTICE

The Department of Justice is posting this court document as a courtesy to the public. An official copy of this court document can be obtained (irrespective of any markings that may indicate that the document was filed under seal or otherwise marked as not available for public dissemination) on the Public Access to Court Electronic Records website at https://pacer.uscourts.gov. In some cases, the Department may have edited the document to redact personally identifiable information (PII) such as addresses, phone numbers, bank account numbers, or similar information, and to make the document accessible under Section 508 of the Rehabilitation Act of 1973, which requires federal agencies to make electronic information accessible to people with disabilities.

**United States Department of Justice**
*United States Attorney's Office*
*District of Rhode Island*

One Financial Plaza, 17th Floor
Providence, Rhode Island 02903

June 29, 2026

Sharon Cohen Levin, Esq.
Sullivan & Cromwell LLP
125 Broad St
New York, NY 10004
***Counsel for AUS Merchant Services, Inc.***

**Re: AUS Merchant Services, Inc. et al. Non-Prosecution Agreement**

Dear Counsel:

The Government and AUS Merchant Services, Inc. ("AUS" or the "Company") enter into this Non-Prosecution Agreement ("Agreement") for misdemeanor violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.* The Government agrees not to prosecute AUS during the term of this Agreement or thereafter for any violation related to the conduct described in the Statement of Facts, attached hereto as **Attachment A**. The Parties agree to certain terms and obligations as set forth below.

## A. Definitions

1. In this Agreement, the following terms shall have the meanings provided below. Capitalized terms used but not defined in this Section have the meanings given elsewhere in this Agreement.

a. **"AUS"** means AUS Merchant Services, Inc. (formerly known as Alipay U.S., Inc. and Alipay U.S. Escrow, Inc.), a Delaware company with its principal place of business at 525 Almanor Avenue, Sunnyvale, California 94085.

b. **"Business Day"** means any day other than a Saturday, Sunday, or legal public holiday in the United States (as defined by 5 U.S.C. § 6103(a)).

c. **"Government"** means the United States Department of Justice, including the United States Attorney's Office for the District of Rhode Island, the United States Department of Justice's Enforcement & Affirmative Litigation Branch, and the United States Department of Justice's Money Laundering, Narcotics and Forfeiture Section.

d. **"Parties"** means the Government and AUS.

e. **"Subject Merchandise"** means drugs (as defined in 21 U.S.C. § 321(g)), devices (as defined in 21 U.S.C. § 321(h)), equipment used to manufacture counterfeit drugs (including tableting and encapsulating machines, punches, dies, plates, stones, and other things referenced in 21 U.S.C. §§ 331(i)(2) and 843(a)(5)-(7)), controlled substances (as defined in 21 U.S.C. § 802(6)), listed chemicals or chemical mixtures (as defined in 21 U.S.C. §§ 802(33) and (40)), anabolic steroids (as defined in 21 U.S.C. § 802(41)(A) and (C)), and other items regulated by the FDCA.

**B. Acceptance of Responsibility**

2. AUS admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as set forth in the Statement of Facts provided in **Attachment A** and incorporated by reference into this Agreement, and that the facts described in **Attachment A** are true and accurate.

3. In any prosecution or proceeding against AUS, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the Government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the Government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. Additionally, AUS shall not assert any claim that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines"), or any other federal rule.

**C. Term of the Agreement**

4. AUS's obligations under this Agreement shall have a term of three years from the date on which the Agreement is executed (the "Term"). AUS agrees, however, that in the event the Government determines, in its sole discretion, acting reasonably, that AUS has knowingly and materially violated any provision of this Agreement as defined in Section L, Paragraph 23, or has failed to completely perform or fulfill its material obligations under this Agreement, an extension or extensions of the Term may be imposed by the Government, in its sole discretion, for up to a total aggregate additional time period of one year, without prejudice to the Government's rights to proceed as provided in the below breach provisions of this Agreement. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in **Attachment D** and any tolling periods for any applicable statutes of limitation, for an equivalent period. The Government will provide AUS with written notice specifying the alleged violation in reasonable detail no fewer than thirty (30) calendar days before any extension is imposed, and AUS will have thirty (30) calendar days following receipt of such written notice (the "Extension Cure Period") to respond to the Government in writing to explain the nature and circumstances of such breach, as well as the actions AUS has taken to address and remediate the situation, which explanation the Government shall consider in determining whether to extend the Term. The Government shall provide AUS with a written determination specifying the violation upon which the extension is based and the duration of the extension to be imposed.

**D. Relevant Considerations**

5. The Government enters into this Agreement based on the individual facts and circumstances of this case, including those presented by AUS. These facts and circumstances include, but are not limited to, the following:

a. The nature of the conduct described in the Statement of Facts, which involved payment processing related to Subject Merchandise;

b. AUS's acknowledgement that unlawful activities related to Subject Merchandise were committed by third-party actors on the e-commerce platforms that were owned and operated by Alibaba Group Holding Limited and its relevant subsidiaries ("Alibaba"), including Alibaba.com, and whose payments were processed through AUS;

c. AUS's lack of voluntary disclosure credit based on its failure to timely and voluntarily disclose to the Government the conduct described in the Statement of Facts;

d. Gaps in AUS's compliance program that contributed to the offense conduct, including gaps that occurred before the Company finished implementing remedial measures;

e. AUS's credit for its cooperation with the Government's investigation, which included:

i. investigating facts and obtaining information as requested by the Government, which allowed the Government to preserve and obtain evidence as part of their own independent investigation;

ii. at the Government's request, collecting, organizing, and producing voluminous documents in ways that did not implicate foreign data privacy laws;

iii. assisting in making employees available to be interviewed;

iv. creating and producing to the Government certain information from its databases of AUS's payment processing related to Subject Merchandise in ways that did not implicate foreign data privacy laws;

v. making factual presentations to the Government on a wide variety of topics; and

vi. providing separate counsel to witnesses to facilitate the Government's investigation, where appropriate.

f. AUS's engagement in remedial measures, including terminating business relationships with companies and persons known to have been involved in the conduct described in the Statement of Facts; terminating AUS's customers' and users' abilities to use AUS's services to unlawfully advertise, sell, import or export, distribute, or smuggle Subject Merchandise; making investments in staffing and resources for AUS's legal and compliance teams; updating policies, procedures, and supervisory structures with an emphasis on preventing and detecting the unlawful advertisement, sale, import or export, distribution, and smuggling of Subject Merchandise; strengthening controls and enhancing compliance-related documentation; and expanding employee training;

g. AUS's recognition that ongoing commitments to its compliance program protects U.S.-based consumers and merchants as well as the integrity of the financial system;

h. AUS's agreement to further enhance its corporate compliance programs and internal controls with respect to BSA/AML and FDCA compliance —including risk assessment and review, customer and third-party relationships, transaction monitoring, and suspicious activity reporting—as set forth in **Attachment C**;

i. AUS's agreements to continue to cooperate with the Government as described in Section E; and

j. AUS's lack of prior criminal history.

Accordingly, after considering (a) through (j) above, the Government has determined that the appropriate resolution in this case is this Agreement with AUS with a monetary penalty of $85,000,000 ("Monetary Penalty") assessed against AUS for a misdemeanor violation of the FDCA and a civil forfeiture of $190,000,000 ("Forfeiture Amount").

**E. <u>Cooperation Requirements</u>**

6. AUS shall fully cooperate with the Government on any matter that relates to the: (1) conduct described in this Agreement and the Statement of Facts and any individual or entity referred to therein, as well as any other related conduct under investigation by the Government in connection with Subject Merchandise at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term; (2) advertisement, sale, import, export, distribution, or smuggling of Subject Merchandise through AUS's payment-processing services; (3) possible violations of the FDCA by buyers and sellers who use AUS's payment-processing services; and (4) compliance with the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311 *et seq*., and AML laws and regulations. AUS's obligations to cooperate with the Government under this Section shall end on the date that the investigations and prosecutions of all such matters conclude or the date that the Term ends, whichever date is later.

7. AUS's cooperation pursuant to this Section is subject to applicable laws and regulations, including valid claims of federal attorney-client privilege and attorney work-product doctrine. If AUS withholds information based on the assertion of any such law, regulation, or privilege, AUS shall provide the Government with a log that describes the withheld information and the foundation of the law, regulation, or privilege within thirty (30) Business Days of making their determination to withhold the information; AUS's cooperation and disclosure obligations under this Section include, but are not limited to, the following:

a. AUS shall designate one or more agents to accept and process the Government's requests for cooperation within fifteen (15) Business Days of signing this Agreement. AUS shall accept the Government's requests for cooperation via email through one or more dedicated email addresses.

b. Within fifteen (15) Business Days of receiving a request for cooperation, AUS shall conduct a diligent search for, and inform the Government whether it has identified, responsive information. If AUS identifies responsive information, AUS shall provide the Government with an estimated timeframe within which it expects to produce the information. Unless otherwise agreed to by the Government, this timeframe shall not exceed sixty (60) calendar days from the date that AUS receives the Government's request.

c. AUS shall provide quarterly reports listing: (1) all Suspicious Activity Reports filed; and (2) any credible allegations of FDCA or Controlled Substances Act violations that AUS learns was committed by users of AUS's payment-processing services in the United States.

d. AUS shall provide complete, truthful, and accurate information to the Government.

e. In its sole discretion, the Government may share any information, testimony, documents, records, or other tangible evidence that AUS provides to the Government with any federal, state, or foreign government authority.

**F. <u>Monetary Penalty</u>**

8. AUS agrees that the Monetary Penalty in the amount of eighty-five million dollars ("$85,000,000" or "$85 million") is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Section D. AUS agrees to pay the Monetary Penalty of $85 million to the U.S. Treasury no later than thirty (30) Business Days after the Effective Date of this Agreement in accordance with payment instructions provided by the Government in its sole discretion.

9. AUS's payment of the Monetary Penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Government that the Monetary Penalty is the maximum penalty that may be imposed in any future prosecution, and the Government is not precluded from arguing in any future prosecution that a court should impose a higher fine, although the Government agrees that under those circumstances, the Government will

recommend to a court that the Monetary Penalty paid by AUS pursuant to this Agreement be applied toward any fine that a court might impose as part of its judgment against AUS. AUS acknowledges that such a recommendation will not be binding in any court.

10. AUS acknowledges that no U.S. tax deduction may be sought in connection with the payment of any part of the Monetary Penalty. AUS shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source with regard to the penalty amount that AUS pays pursuant to this Agreement.

**G. <u>Civil Forfeiture</u>**

11. AUS acknowledges that money and/or property is subject to civil forfeiture because of overseas merchants' and their United States-based buyers' violations of the FDCA transacted through Alibaba's online platforms, including Alibaba.com. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), AUS consents to civil forfeiture of one hundred ninety million dollars ("$190,000,000 or "$190 million") ("Forfeiture Amount").

12. AUS shall pay the Forfeiture Amount, plus any associated transfer fees, no later than thirty (30) Business Days after the Effective Date of this Agreement in accordance with payment instructions provided by the Government in its sole discretion. AUS hereby releases any and all claims that it may have to the Forfeiture Amount and agrees that the forfeiture of such funds may be accomplished either administratively or judicially at the Government's election, and waives the requirements of any applicable laws, rules, or regulations governing the forfeiture of assets, including those requiring notice of forfeiture. If the Government seeks to forfeit the Forfeiture Amount judicially, AUS waives all requirements pertaining to forfeiture set forth in Title 18, United States Code, Section 983, including the filing of a civil forfeiture complaint as to the Forfeiture Amount and notice of the same, and consent to entry of an order of forfeiture directed to such funds. If the Government seeks to forfeit AUS's Forfeiture Amount administratively, AUS consents to the entry of a declaration of forfeiture and waives the requirements of Title 18, United States Code, Section 983 regarding notice of seizure in non-judicial forfeiture matters.

13. AUS agrees to sign any additional documents necessary to complete forfeiture of the Forfeiture Amount. AUS also agrees that it shall not file any petitions for remission, restoration, or any other assertion of ownership or request for return relating to the Forfeiture Amount, or any other action or motion seeking to collaterally attack the seizure, restraint, forfeiture, or conveyance of the Forfeiture Amount, nor shall AUS assist any others in filing any such claims, petitions, actions, or motions.

14. AUS's payment of the Forfeiture Amount is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Government that the Forfeiture Amount surrendered by AUS is the maximum forfeiture that may be imposed in any future prosecution, and the Government is not precluded from arguing in any future prosecution that a court should impose a higher criminal forfeiture amount or substitute money judgment in a criminal proceeding, although the Government agrees that under those circumstances, the Government will recommend to a court that the Forfeiture Amount paid by AUS pursuant to this Agreement be applied toward any criminal forfeiture or substitute money judgment that a court

might impose as part of its judgment. AUS acknowledges that such a recommendation will not be binding on any court.

15. AUS acknowledges that it shall not claim, assert, or apply for, either directly or indirectly, any tax deduction, tax credit, or any other offset with regard to any U.S. federal, state, or local tax or taxable income in connection with the payment of any part of the Forfeiture Amount. AUS shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source with regard to the Forfeiture Amount that AUS pays pursuant to the Agreement.

### H. Conditional Release from Liability

16. Except as otherwise provided in this Agreement, the Government agrees that it will not bring any criminal or civil case against AUS relating to (i) any of the conduct described in the Statement of Facts of this Agreement; (ii) any of the information disclosed by AUS to the Government as part of this investigation prior to executing this Agreement; or (iii) any information known by the Government prior to the execution of this Agreement that relates to the conduct described in the Statement of Facts to this Agreement. However, the Government may use any information related to the conduct described in the Statement of Facts against AUS: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; or (c) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. Nothing herein shall preclude AUS from presenting this Agreement, and the Government's agreement herein, to any other law enforcement, regulatory, or government authority as evidence of cooperation with, and resolution of claims by, the Government with respect to the conduct described herein.

17. This Agreement does not provide any protection against prosecution for any future conduct by AUS. In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with AUS.

### I. Corporate Compliance Program

18. AUS shall implement (or continue to the extent already implemented) a corporate compliance program that meets the minimum elements and standards provided in **Attachment C**. AUS's corporate compliance program shall be designed (or continue to the extent already implemented) to detect and prevent violations of the BSA, laws prohibiting money laundering and unlicensed money transmission, other laws prohibiting illicit finance, and violations of the FDCA through AUS's payment processing services. No later than thirty (30) calendar days after the Term expires, AUS, through its Chief Executive Officer and Chief Compliance Officer, will certify to the Government, in the form of executing the document attached as **Attachment E** to this Agreement, that AUS has met its compliance obligations pursuant to this Agreement. Such certification will be deemed a material statement and representation by AUS to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519.

19. AUS will periodically review its corporate compliance program and correct any deficiencies within AUS's ethics programs, policies, procedures, systems, and internal controls

regarding compliance with the BSA, laws prohibiting money laundering, and other laws prohibiting illicit finance.

**J. Compliance Monitoring**

20. For the purpose of assessing or determining compliance with this Agreement, the Government may, upon written notice to AUS:

a. require AUS to submit written reports, certifications, or other information relating to compliance with any provision of this Agreement;

b. interview, under oath or otherwise, any of AUS's officers, employees, or agents who may have relevant knowledge; and

c. require AUS to produce documents, communications, data, and other information in its possession, custody, or control relating to compliance with any provision of this Agreement, subject to applicable laws and regulations.

21. AUS shall designate one or more agents of AUS to accept and process the Government's requests related to compliance monitoring within seven (7) Business Days of signing this Agreement. AUS shall accept the Government's requests for compliance monitoring information via email through one or more dedicated email addresses maintained by each company. AUS shall comply with the Government's compliance monitoring requests within thirty (30) calendar days of receiving the Government's written notice. In its sole discretion, the Government may grant extensions of time for AUS to comply with the Government's requests for compliance monitoring information.

**K. Non-Prosecution**

22. The Government agrees that if AUS complies with its obligations under this Agreement, (a) the Government will not bring any criminal case or other enforcement action against AUS or any of its present or former subsidiaries or affiliates relating to any of the conduct described in the Statement of Facts; and (b) at the conclusion of the Term, this Agreement shall expire. In assessing AUS's compliance, the Government shall consider the totality of AUS's conduct under this Agreement and shall not declare a failure to comply based solely on minor, or promptly cured technical violations, which shall be determined at the Government's discretion, acting reasonably. To the extent there is conduct disclosed by AUS that is not set forth in this Agreement, such conduct shall not be exempt from further prosecution and is outside the scope of this Agreement. AUS expressly acknowledges and agrees that this Agreement does not preclude the filing of a case arising from conduct that is not described in this Agreement and the Statement of Facts.

**L. Breach of the Agreement**

23. If, during the Term, AUS (a) commits any felony under United States law; (b) knowingly and willfully provides in connection with this Agreement materially false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) knowingly and materially fails to cooperate as provided in Section E of this Agreement; (d) knowingly fails to implement compliance programs in all material respects as provided in Section I of this Agreement and **Attachment C**; or (e) otherwise knowingly and materially fails to perform or fulfill any term or condition of this Agreement, AUS shall be in breach, and thereafter be subject to prosecution for violations of applicable federal law, including, but not limited to, for conduct described in the attached Statement of Facts, regardless of whether the Government obtains knowledge of the breach after the Term expires.

24. Any prosecution resulting from a knowing and material breach of this Agreement, as defined in Section L, Paragraph 23, may be pursued by the Government in the United States District Court for the District of Rhode Island or any other appropriate venue. As to the conduct described in the Statement of Facts, AUS knowingly waives any constitutional or statutory right to venue and to presentment to or indictment by a grand jury for felony crimes, and consents to the filing of an information or complaint for said crimes. Determination of whether AUS has breached this Agreement and whether to pursue prosecution shall be in the Government's sole discretion, acting reasonably, after good-faith consideration of any written response submitted by AUS pursuant to Paragraph 26. Any such prosecution may be premised on information provided by AUS.

25. Any prosecution relating to the conduct described in this Agreement or relating to the conduct of AUS in connection with a violation of the FDCA known to the Government prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against AUS notwithstanding the expiration of the statute of limitations, for the period between the signing of this Agreement and the expiration of the Term plus six months. Thus, by signing this Agreement, AUS agrees that the statute of limitations with respect to any such prosecution against AUS that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus six months. In addition, AUS agrees to toll the running of the statute of limitations as to any violation that occurs during the Term for one year from the date upon which the violation occurs, and that this period shall be excluded from any calculation of time for purposes of the application of any applicable statute of limitations.

26. In the event the Government determines that AUS has knowingly and materially breached this Agreement, as defined in Section L, Paragraph 23, the Government agrees to provide AUS with written notice of such breach prior to instituting any prosecution resulting from such breach. Written notice of breach shall include: (a) the provision breached; (b) the approximate date of the breach; and (c) a description of the breach sufficient to permit AUS to cure. Within thirty (30) calendar days of receipt of such notice, AUS shall have the opportunity to respond to the Government in writing to explain the nature and circumstances of such breach, as well as the actions AUS has taken to address and remediate the breach, which explanation the Government shall consider in determining whether to pursue prosecution of AUS.

27. In the event that the Government determines that AUS has knowingly and materially breached this Agreement, as defined in Section L, Paragraph 23: (a) all statements made by or on behalf of AUS to the Government, including the Statement of Facts, and any testimony given by AUS before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Government against AUS; and (b) AUS shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, Section 1B1.1(a) of the USSG, or any other federal rule that any such statements or testimony made by or on behalf of AUS prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current officer, director, or employee, or any person acting on behalf of, or at the direction of, AUS will be imputed to AUS for the purpose of determining whether AUS has knowingly and materially violated any provision of this Agreement as defined in Section L, Paragraph 23 shall be in the sole discretion of the Government, acting reasonably.

28. It is further understood that within thirty (30) calendar days after receiving a notice of breach, or to such longer period as the Government may agree in writing, AUS may cure the breach to the Government's reasonable satisfaction ("Cure Period").

29. AUS acknowledges that the Government has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if AUS breaches this Agreement and this matter proceeds to judgment. AUS further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

30. On the date that the period of non-prosecution specified in this Agreement expires, AUS, by its respective Chief Executive Officer and the Chief Compliance Officer, shall submit their certification set forth in **Attachment D** and certify to the Government that AUS has met its obligations pursuant to this Agreement. Each certification will be deemed a material statement and representation by AUS in a matter within the jurisdiction of the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the District of Rhode Island.

## M. Applicability to AUS's Related Business Entities

31. Except as may otherwise be agreed by the Government and AUS in connection with a particular transaction, AUS agrees that in the event that, during the Term, AUS undertakes any change in corporate form, including if AUS sells, merges, or transfers business operations that are material to AUS's consolidated operations, or to the operations of any of its subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, AUS shall include in any contract for sale, merger, transfer, or other

change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

32. The purchaser or successor in interest must also agree in writing that the Government's ability to declare breach under this Agreement is applicable in full force as to that entity. AUS agrees that the failure to include these provisions in the transaction will make any such transaction null and void. AUS shall provide notice to the Government at least thirty (30) calendar days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Government shall notify AUS within fifteen (15) calendar days if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If, at any time during the Term, AUS engages in a transaction that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Government may deem it a breach of this Agreement pursuant to Section L, paragraph 23 of this Agreement. Nothing in this Agreement shall restrict AUS from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Government, acting reasonably.

**N. Public Statements by AUS**

33. AUS shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for AUS, make any public statement, contradicting in whole or in part the acceptance of responsibility by AUS as set forth in this Agreement. Any such contradictory statement shall, subject to cure rights of the Company described in this paragraph, constitute a knowing and material breach of this Agreement, as defined in Section L, Paragraph 23, and AUS thereafter shall be subject to prosecution as set forth in this Agreement. The decision whether any public statement by any such person contradicting a fact contained in this Agreement will be imputed to AUS for the purpose of determining whether it has knowingly and materially breached this Agreement, as defined in Section L, Paragraph 23, shall be in the sole discretion of the Government, acting reasonably.

34. If the Government determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Government shall notify AUS, and AUS may avoid a breach of this Agreement by publicly repudiating such statement(s) within ten (10) Business Days after notification. AUS shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in this Agreement provided that such defenses and claims do not contradict, in whole or in part, a statement contained in this Agreement. This paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of AUS in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of AUS. Any determination by the Government, acting reasonably, that a public statement constitutes a knowing and material breach of this Agreement shall be subject to the 30-day written notice and opportunity to respond procedure set forth in Paragraph 26 before any prosecution may be initiated.

35. If AUS issues a press release or holds any press conference in connection with this Agreement, AUS shall first consult with the Government to determine: (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Government and AUS; and (b) whether the Government has any objection to the release.

36. The Government agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of AUS's cooperation and remediation. By agreeing to provide this information to such authorities, the Government does not agree to advocate on behalf of AUS. Instead, the Government only agrees to provide facts to be evaluated independently by such authorities.

**O. <u>Limitations on Binding Effect of Agreement</u>**

37. This Agreement is binding on AUS and the United States Department of Justice, including the United States Attorney's Office for the District of Rhode Island, the United States Department of Justice's Enforcement & Affirmative Litigation Branch, and the United States Department of Justice's Money Laundering, Narcotics and Forfeiture Section. It does not bind any other federal agencies, or any state, local, or foreign law enforcement or regulatory agencies. The Government shall bring the cooperation of AUS and its compliance with its obligations under this Agreement to the attention of such agencies and authorities if requested to do so by AUS.

**P. <u>Notice</u>**

38. Any notice to the Government under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

Chief, Criminal Division
U.S. Attorney's Office
District of Rhode Island
One Financial Plaza, 17th Floor
Providence, RI 02903

Director, Enforcement & Affirmative Litigation Branch, Civil Division
U.S. Department of Justice
450 5th Street NW, Room 6400 South
Washington, DC 20001

Chief, Bank Integrity Unit
Money Laundering, Narcotics, and Forfeiture Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue NW
Washington, DC 20005

39. Any notice to AUS under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to:

AUS Merchant Services, Inc.
525 Almanor Avenue
Sunnyvale, CA 94085

40. Notice shall be effective upon actual receipt by the Government or AUS. Notice shall also be given by email to any email addresses designed by the Government or AUS.

**Q. <u>Complete Agreement</u>**

41. The Government and AUS acknowledge that each party has had a full opportunity to negotiate the terms of this Agreement. The rule of construction that interprets contracts against the drafter, therefore, shall not apply to this Agreement. This Agreement, including its attachments, sets forth all the terms of the Agreement between AUS and the Government. No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Government, the attorneys for AUS, and a duly authorized representative of AUS. The following documents are attached to and incorporated into this Agreement:

**Attachment A:** The AUS Merchant Services, Inc. Statement of Facts

**Attachment B:** The AUS Merchant Services, Inc. Certificate of Corporate Resolutions

**Attachment C:** The AUS Merchant Services, Inc. Corporate Compliance Program

**Attachment D:** The AUS Merchant Services, Inc. Disclosure Certification

**Attachment E:** The AUS Merchant Services, Inc. Compliance Certification

**AGREED AND CONSENTED TO:**

***The United States of America***

CHARLES C. CALENDA
First Assistant United States Attorney

Date: 6/29/2026 By: [signature]
Dulce Donovan
Executive Assistant U.S. Attorney

Date: 6/29/2026 By: Julianne Klein
Julianne Klein
Assistant U.S. Attorney

LISA K. HSIAO
Director
Enforcement and Affirmative Litigation Branch,
Civil Division

Date: 6/29/2026 By: ______________________
Patrick R. Runkle
Assistant Director

Date: 6/29/2026 By: ______________________
Colin W. Trundle
Trial Attorney

Date: 6/29/2026 By: ______________________
Cadesby B. Cooper
Trial Attorney

MARGARET A. MOESER
Chief
Money Laundering, Narcotics and Forfeiture
Section, Criminal Division

Date: 6/29/2026 By: ______________________
Rachel N. Agress
Trial Attorney

Date: 6/29/2026 By: ______________________
Elysa Wan
Trial Attorney

**AGREED AND CONSENTED TO:**

***AUS Merchant Services, Inc.***

Date: June 29, 2026 By: ______________________
Roseate Wagner
Chief Executive Officer and President
AUS Merchant Services, Inc.

Date: June 29, 2026 By: ______________________
Sharon Cohen Levin, Esq.
Counsel for AUS Merchant Services, Inc.

**ATTACHMENT A**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Non-Prosecution Agreement (the "Agreement") between the Government and AUS (as defined in the Agreement). AUS agrees and stipulates that the following information is true and accurate. AUS admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees and agents as set forth below. Should the Government later pursue the prosecution that is covered by this Agreement, AUS agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts describe events that occurred between approximately January 2020 and December 2023.

**A. AUS Background and Business Model**

1. AUS (formerly known as Alipay U.S., Inc. and Alipay U.S. Escrow, Inc.) was registered in Delaware and maintained its principal place of business at 525 Almanor Avenue, Sunnyvale, California 94085.

2. Partnering with certain of its affiliates, AUS offered payment processing services to the e-commerce platforms that were owned and operated by Alibaba Group Holding Limited and its relevant subsidiaries ("Alibaba"), including Alibaba.com. Alibaba Group Holding Limited was organized and existed under the laws of the Cayman Islands, with its principal executive offices in Hangzhou, China.

3. AUS's business model included, but was not limited to, providing payment processing and settlement services to enable overseas sellers on Alibaba.com to accept payments from United States-based buyers. When AUS facilitated payment processing and settlement services for Alibaba's merchants selling to United States-based buyers, it received certain information about transactions. The information generally included the merchant's and buyer's identities as well as a description of the product ordered ("sale order") through Alibaba.com. AUS commenced payment processing and settlement services for Alibaba.com transactions in 2020.

4. AUS's payment processing and settlement services included accepting United States Dollar-denominated payments on behalf of overseas merchants linked to sales orders on Alibaba.com.

5. Payors could make payments linked to Alibaba's e-commerce transactions in multiple ways, including through credit card payments, other alternative payment methods, or, solely for Alibaba.com, wire transfer. The United States Dollar-denominated wire transfer payments directed to overseas merchants on Alibaba.com were accepted by AUS into one of two United States based-bank accounts of AUS. When Alibaba.com buyers paid via wire transfer in U.S. dollars, the checkout page instructed buyers to include in the wire transfer instructions what was identified as the overseas merchant's "beneficiary account number" as well as the Alibaba.com order number.

6. The "beneficiary account number" was a unique routable identification number, which caused the deposits to be transferred to one of AUS's United States-based bank accounts, and for AUS or its affiliate to associate that credit with a specific merchant. Once payments were deposited into AUS's United States-based bank accounts, AUS transferred the funds to offshore accounts held by an AUS affiliate. The AUS affiliate then handled settlement of the transaction to the overseas merchant associated with that particular "beneficiary account number."

7. Beginning in July 2021, AUS also offered settlement services to support payments to merchants using the Alibaba.com Pay service ("Alibaba.com Pay"), which was separate from the Alibaba.com e-commerce platform. Unlike the global payment processing and settlement services for orders made on the Alibaba.com e-commerce site, merchants uploaded supporting documentation into a portal for sales consummated outside of the e-commerce site. Such transactions were higher risk because the Alibaba e-commerce platform did not electronically monitor data in real time as to the nature and purpose of the transaction.

**B. Legal and Regulatory Background**

8. Congress enacted the Bank Secrecy Act ("BSA") to address an increase in criminal money laundering activity utilizing financial institutions. The BSA requires financial institutions to establish, implement, and maintain risk-based anti-money laundering ("AML") programs to combat money laundering and the financing of terrorism through financial institutions.

9. AUS is a "financial institution" as defined in the BSA. 31 U.S.C. § 5312(a)(2); 31 C.F.R. § 1010.100. As a financial institution and money services business ("MSB"), AUS is required to establish, implement, and maintain an effective AML compliance program that, at a minimum, provides for: (a) internal policies, procedures, and controls reasonably designed to prevent money laundering; (b) a program design commensurate with the risks posed by the location, size, nature, and volume of the financial services provided by the MSB; (c) an individual to coordinate and monitor day-to-day compliance with the BSA and AML requirements; (d) an ongoing employee training program; (e) independent review of programs; and (f) procedures reasonably designed to assure compliance with BSA and AML requirements when conducting operations via data processing systems. 31 U.S.C. § 5318(h); 31 C.F.R. § 1022.210.

10. To satisfy the BSA's requirements, an MSB must maintain a risk-based AML program, tailor its systems for identifying suspicious activity to effectively monitor its customer base and the products and services it offers, and report suspicious activity. Moreover, an MSB's AML policies, procedures, and controls must be calibrated to address emerging and evolving risk, including risk associated with new products and services and new patterns of suspicious activity.

11. The BSA authorizes the United States Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") to "require any financial institution, and any director, officer, employee, or agent of any financial institution, to report any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1).

12. At all times relevant to this case, by regulation, FinCEN required MSBs to file a Suspicious Activity Report ("SAR") on any transaction involving or aggregating at least $2,000

where the MSB "knows, suspects, or has reason to suspect." 31 C.F.R. § 1022.320(a)(2). These requirements apply to a transaction that:

a. involves funds derived from illegal activities or is intended or conducted in order to hide or disguise funds or assets derived from illegal activities (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any federal law or regulation or to avoid any transaction reporting requirement under federal law or regulation;

b. is designed to evade any requirements of the BSA or of any other regulations promulgated under the BSA;

c. has no business or apparent lawful purpose, and the MSB knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or

d. involves use of the MSB to facilitate criminal activity.

13. MSBs have an obligation to file a SAR "no later than 30 calendar days after the date of initial detection . . . of facts that may constitute a basis for filing a SAR." *Id.* § 1022.320(b)(3).

## C. AUS's Risk Function and AML Compliance Program Did Not Prevent Federal Food, Drug, and Cosmetic Act ("FDCA") Violations by Alibaba Merchants and Other Bad Actors.

14. With respect to AUS's U.S.-based customers, AUS conducted "Know Your Customer" protocols and due diligence. With respect to AUS's affiliates' overseas customers, AUS relied upon AUS's overseas affiliates to conduct certain functions of its AML compliance program for overseas merchants, including those customers using AUS for wire transfers. Until 2022, AUS relied upon AUS's overseas affiliates to monitor transactions involving overseas merchants selling goods on Alibaba.com, including those using AUS's unique routable identification numbers for wire transfers. In 2022, AUS also began using its own transaction monitoring system, previously used for other products—for transactions originating on Alibaba.com, rather than continuing to rely on its overseas affiliates. However, when implementing this change, AUS failed to fully incorporate wire data from its United States-based bank accounts to supplement the sales order data that it used to monitor. As a result, AUS's monitoring did not always show that some of these wire transfer transactions were funded by payments originating from high-risk jurisdictions or from multiple payors on a single invoice.

15. AUS and its affiliates would, in certain instances, report merchants who sold Subject Merchandise on Alibaba's e-commerce platforms, including Alibaba.com, to Alibaba, rather than systematically restricting those merchants themselves.

16. At times, Alibaba.com's overseas merchants used AUS's payment processing and settlement services to facilitate the sale and importation of Subject Merchandise, including pharmaceutical products, into the United States, in violation of the FDCA.

17. In October 2022, AUS created a case investigating Merchant A, an Alibaba overseas merchant who used AUS's payment processing and settlement services. An AUS employee reviewed the sales order information and noted that Merchant A had sold prohibited Subject Merchandise to United States customers using AUS's payment processing services. AUS filed a regulatory report in connection with Merchant A's transaction in October 2022 and relevant prior activity. In January 2023, Merchant A sold additional prohibited Subject Merchandise to a United States customer. In July 2023, an AUS employee reviewed the transaction and sales order and noted that the product was "prohibited" and could not "be sold online without prescription," but concluded that the activity was below the regulatory reporting requirements.

18. AUS acknowledges that it processed transactions for sales between overseas merchants for Alibaba.com and United States-based buyers, which involved Subject Merchandise that was imported into the United States in violation of law. AUS agrees not to contest the forfeiture of the Forfeiture Amount of $190 million pursuant to Title 18, U.S. Code, Section 545.

## ATTACHMENT B

## THE AUS MERCHANT SERVICES, INC. CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, AUS Merchant Services, Inc. ("AUS") has been engaged in discussions with the United States Attorney's Office for the District of Rhode Island, the United States Department of Justice's Enforcement & Affirmative Litigation Branch, and the United States Department of Justice's Money Laundering, Narcotics and Forfeiture Section (collectively, the "Government"); and

WHEREAS, in order to resolve such discussions, it is proposed that AUS enters into a certain non-prosecution agreement with the Government (the "Agreement"); and

WHEREAS, AUS's internal counsel, together with outside counsel for AUS (collectively, "AUS Counsel"), have advised AUS's Board of Directors of its rights, possible defenses, the provisions of the U.S. Sentencing Guidelines, and the consequences of entering into such Agreement with the Government;

Therefore, the Board of Directors has RESOLVED that:

1. AUS agrees to pay a monetary penalty in the amount of $85,000,000 and consents to a civil forfeiture of $190,000,000 pursuant to Sections F and G of the Agreement;

2. AUS accepts the terms and conditions of this Agreement, including, but not limited to: (a) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts in **Attachment A** of the Agreement of any objection with respect to indictment and venue and consents to the filing of a civil forfeiture complaint, as provided under the terms of the Agreement, in the United States District Court for the District of Rhode Island, or any other appropriate venue; and (b) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Government prior to the date on which the Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement;

3. Roseate Wagner, Chief Executive Officer and President of AUS, is hereby authorized, empowered, and directed, on behalf of AUS, to execute the Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as AUS Counsel may approve;

4. Roseate Wagner, Chief Executive Officer and President of AUS, is hereby authorized, empowered, and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement, or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5. All of the actions of AUS Counsel, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoptien of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of AUS.

Date: June 29, 2026

By: [signature]
Richard Chih-Chiu Lin
Board of Directors
AUS Merchant Services, Inc.

# ATTACHMENT C

## THE AUS MERCHANT SERVICES, INC. CORPORATE COMPLIANCE PROGRAM

In order to ensure the adequacy of its internal controls, policies, and procedures regarding compliance with the Bank Secrecy Act, Title 31, United States Code, Section 5311, *et seq.* ("BSA") and anti-money laundering ("AML") laws and regulations, which include but are not limited to Title 31, Code of Federal Regulations, Part 1022 (collectively, "BSA and AML Laws"), and the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.) ("FDCA"), AUS Merchant Services, Inc. ("AUS"), a payment processor operating in the United States, agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

AUS has taken steps to remediate and enhance its BSA/AML and other compliance programs to prevent violations of the FDCA and other federal laws. These efforts included the hiring of additional staff and retaining the support of outside compliance consultants and counsel.

Where necessary and appropriate, AUS agrees to ensure that its compliance program, including internal controls, compliance policies, and procedures, complies with BSA and AML Laws and other federal laws. AUS further agrees to ensure that its compliance program is designed to detect, deter, investigate, and report violations of the FDCA and other federal laws, where required. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of AUS's existing internal controls, compliance program, policies, and procedures:

*Commitment to Compliance*

1. AUS will ensure that its directors and management provide strong, explicit, and visible support for compliance with BSA/AML Laws, the FDCA, and the Controlled Substances Act ("CSA"). AUS directors and management will demonstrate this commitment through their actions and communications with employees.

2. AUS will continue to ensure that management reinforces AUS's commitment to compliance policies and principles related to BSA/AML, the FDCA, and prevention of federal criminal statutory violations. Management will enforce adherence to those policies and principles. AUS will continue to foster a culture of ethics and compliance with the laws of the United States in its day-to-day operations at all levels of AUS.

*Risk Assessment and Review*

3. AUS will continue to utilize a risk management process to identify, analyze, and address the individual circumstances of AUS, in particular the risks facing AUS from the potential sale of Subject Merchandise in the United States through its payment processing for e-commerce services and from violations of BSA and AML Laws.

4. On the basis of its risk assessment, AUS shall continue to take appropriate steps to re-design, enhance, implement, or modify its compliance program to reduce the risk of violations of BSA and AML Laws, and the FDCA.

*Policies and Procedures*

5. AUS will continue to maintain a clearly articulated and visible corporate policy against violations of BSA and AML Laws and the FDCA. These policies shall be memorialized in written compliance policies.

6. AUS will continue to maintain and appropriately enhance compliance policies and procedures designed to reduce the prospect of violations of BSA and AML Laws and the FDCA, including addressing any systemic issues. AUS will continue to take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violations of BSA and AML Laws and the FDCA by personnel at all levels of AUS. These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of AUS in the United States or foreign jurisdictions, including, but not limited to, agents, intermediaries, consultants, representatives, distributors, contractors, suppliers, and joint venture partners (collectively, "agents and business partners"). AUS shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of AUS.

7. Within ninety (90) calendar days of the execution of the Agreement, AUS shall implement an electronic portal or mailbox ("Law Enforcement Mailbox" or "Mailbox") that is dedicated to producing information related to United States-based users of AUS's online services in response to United States-based legal process, including valid U.S. subpoenas, court orders, and search warrants, that is related to United States-based criminal investigations. The Law Enforcement Mailbox shall be available to federal, state, and local law enforcement agencies in the United States. AUS agrees to waive any federal or state statutory right to personal service of United States-based legal process that is related to United States-based criminal investigations. AUS will comply with such legal process unless it receives relief from doing so by a court of competent jurisdiction in the United States. AUS will provide appropriate instructions on how to use the Law Enforcement Mailbox. The Mailbox is for the exclusive use of U.S.-based law enforcement agencies conducting criminal investigations.

8. AUS will continue to maintain a system of internal controls reasonably designed to ensure the completeness and accuracy of records to the extent required by applicable laws and regulations.

9. AUS will continue to maintain a system to retain books and records, including a system of internal controls, reasonably designed to ensure the prevention and detection of violations of BSA/AML Laws, the FDCA, and the CSA.

10. AUS will continue to review its compliance policies and procedures regarding BSA, AML, FDCA, and other applicable federal laws as needed, to address changing and emerging risks.

*Suspicious Activity Reports*

11. AUS has created and will continue to maintain and appropriately enhance policies and procedures to ensure that it will continue to follow all laws and regulations concerning the filing of Suspicious Activity Reports ("SARs") in the United States for any suspicious activity, as defined by the BSA and its implementing regulations. This includes, but is not limited to, filing SARs identifying: suspicious activity identified by AUS related to transactions or attempted transactions that involve $2,000 or more in funds or in aggregate funds and are to, from, or through the United States, regardless of where in the world the suspicious transactions originate or are received, and regardless of where in the world the data relating to such transactions is located.

*Transaction Monitoring and Reporting*

12. As part of its compliance program, AUS has instituted and will continue to maintain and appropriately enhance its transaction monitoring program. The transaction monitoring program operated by AUS will be adaptive to identified risks, including risks identified internally by AUS, by regulators, and in written findings, including review of publicly available information and law enforcement referrals or inquiries. AUS will continue to ensure the transaction monitoring program is informed by its risk profile and appropriately accounts for the areas of greatest risk, with particular emphasis on higher-risk products, services, customers, and geographies. AUS will continue to regularly review its transaction monitoring program, including its scope, resources, and coverage. AUS will continue to test and update the transaction monitoring program as needed to ensure it appropriately addresses risk areas.

13. As part of its compliance program, AUS has instituted and will continue to maintain and appropriately enhance procedures for monitoring transactions settled or cleared on behalf of any other money services business or e-commerce businesses that AUS provides services to, which includes collection, transmission, and monitoring of transactions and counterparty information for all transactions processed through AUS. Transaction monitoring will conform with applicable laws and regulations. AUS will maintain clear records of the data it utilizes to conduct transaction monitoring, including a description of the categories of data used by AUS for transaction monitoring that is made available upon request to U.S. regulators.

14. AUS has instituted and will continue to maintain and appropriately enhance its policies, procedures, and processes for managing alerts identified by its transaction monitoring program. This includes, but is not limited to, making decisions on SARs, and completing and filing SARs. AUS will continue to ensure adequate staff are assigned to the identification, research, and reporting of suspicious activities.

15. AUS will continue to maintain and appropriately enhance its policies, procedures, and processes for identifying subjects of law enforcement requests, monitoring the transaction activity of those subjects when appropriate, identifying suspicious activity related to those subjects, and filing, as appropriate, SARs related to those subjects.

16. AUS has and will continue to generate reports for its BSA Officer's review which includes patterns or outliers in transaction activity that may be indicative of illicit conduct. AUS's BSA Officer or their designee, who shall be located in the United States, will continue to review

patterns or outliers in transaction activity and shall consider those reports in enhancing AUS's compliance with BSA and AML Laws, including the reporting of potential FDCA violations and other federal criminal statutes. AUS's management and AUS's BSA officer will continue to select filtering criteria and thresholds to produce such transaction reports, subject to review and approval, that will continue to enable AUS to detect potential patterns and typologies of unusual activity and for AUS management to receive reports of that activity.

17. AUS's transaction monitoring systems have been and will continue to be independently tested and reviewed for reasonable filtering criteria and thresholds, and such reviews are included in independent audits of AUS's compliance program and function.

*Third-Party Relationships*

18. As part of its compliance program, AUS will continue to institute and enhance appropriate, risk-based policies and procedures related to third-party money services business or e-commerce businesses who utilize AUS payment processing or settlement services in accordance with applicable laws and regulations.

*Independent, Autonomous, and Empowered Oversight*

19. AUS has assigned and will continue to assign responsibility to one or more senior corporate executives of AUS for the implementation and oversight of AUS's compliance policies and procedures regarding BSA and AML Laws and the FDCA. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, AUS's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

20. AUS has implemented and will continue to enhance and maintain mechanisms designed to ensure that its policies and procedures regarding BSA and AML Laws and the FDCA are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) training for all directors and officers, all employees in positions of leadership or trust, any positions that require such training (*e.g.*, internal audit, sales, legal, compliance, finance), and, where necessary and appropriate, agents and business partners; (b) metrics for measuring knowledge retention and effectiveness of the training; and (c) corresponding certifications by all such directors, officers, employees, agents and business partners, certifying compliance with the training requirements. AUS will continue to conduct training in a manner tailored to the audience's size, sophistication, and subject-matter expertise and, where appropriate, will continue to discuss prior compliance incidents.

21. AUS will continue to maintain or, where necessary, establish an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with its policies and procedures regarding

BSA and AML Laws and the FDCA, including when such individuals need advice on an urgent basis, or need advice in any foreign jurisdiction in which AUS operates.

*Confidential Reporting Structure and Investigation of Misconduct*

22. AUS will continue to maintain or, where necessary, establish an adequate system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of AUS's policies and procedures regarding BSA and AML Laws and the FDCA.

23. AUS will continue to maintain or, where necessary, establish an effective process and sufficient resources for responding to, investigating, and documenting allegations of violations of BSA and AML Laws, its compliance policies, and the FDCA. AUS will continue to handle the investigations into such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

24. AUS will conduct a root cause analysis of any shortcomings related to compliance with BSA and AML Laws, the FDCA, or AUS's compliance policies, which shall include the review of any prior failures during the time period covered in the Agreement. This root cause analysis shall identify whether there are any systemic issues and/or any control failures. AUS will timely and appropriately remediate any identified issues related to compliance with BSA and AML Laws, the FDCA, or AUS's compliance policies. AUS will ensure that root causes, including systemic issues and control failures, and relevant remediation are shared with management as appropriate.

*Mergers and Acquisitions*

25. AUS will continue to develop and implement policies and procedures for mergers and acquisitions requiring that AUS conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence regarding compliance with BSA and AML Laws and the FDCA by legal, accounting, and compliance personnel associated with those new business entities.

26. AUS will continue to ensure its compliance policies and procedures regarding BSA and AML Laws and the FDCA apply as quickly as is practicable to newly-acquired businesses or entities merged with AUS, and will promptly (a) train the directors, officers, employees, agents, and business partners consistent with Paragraph 20; (b) where warranted, conduct an audit of all newly acquired or merged businesses as quickly as is practicable concerning compliance with BSA and AML Laws and the FDCA; and (c) where warranted, establish a plan to integrate the acquired businesses or entities into AUS's enterprise resource planning systems as quickly as practicable.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT C

## ECF No. 14 - Order Denying Initial Early-Discovery Motion Without Prejudice

The reproduced source document follows this cover page.

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**BRADLEY BURCHFIELD, individually and as the direct purchaser/beneficial owner of the subject claim** **PLAINTIFF**

**v.** **No. 4:26-cv-611-DPM**

**ALIBABA GROUP HOLDING LIMITED; ALIBAA.COM SINGAPORE E-COMMERCE PTE. LIMITED, a/k/a Alibaba.com Singapore E-commerce Private Limited; ALIBABA.COM U.S. LLC; ALIBABA.COM U.S. E-COMMERCE CORP., a/k/a Alibaba.com US E-Commerce Corp.; ALIBABA GROUP (U.S.) INC.; ALIEXPRESS E-COMMERCE ONE PTE. LTD.; AUS MERCHANT SERVICES, INC., f/k/a Alipay U.S., Inc. and Alipay U.S. Escrow, Inc.; ZICHANG NEW MATERIALS (SHANDONG) CO., LTD; ZHISHANG NEW MATERIALS (SHANDONG) CO., LTD.; SHAANXI BLOOM TECH CO., LTD; JOHN DOE, Alibaba Platform Payment, Owner, Operator, Parent, Subsidiary, Affiliate, Agent, Business Partner, Compliance, Payment Routing, or Alter-Ego Entities 1-10; and JOHN DOE Seller/Merchant Account Operators, Sales Agents, Payment Beneficiaries, Payment Processors, Payment Routing Participants, Chemical Product Solicitors,** **DEFENDANTS**

**Import/Shipment Participants, and Co-Conspirators 1–20**

## ORDER

*First,* Burchfield amended his complaint as a matter of course. *Doc. 11;* Fed. R. Civ. P. 15(a)(1). His request to do so is moot. If Burchfield wishes to amend again, he must ask for leave. Fed. R. Civ. P. 15(a)(2). *Second,* this case is just beginning. There's no need for the Court to rule on discovery now. And, of course, the defendants must follow all applicable Federal Rules of Civil Procedure. Motion, *Doc. 2,* denied without prejudice.

So Ordered.

D.P. Marshall Jr.
D.P. Marshall Jr.
United States District Judge

14 July 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT D

## ECF No. 15 - Appearance of Counsel for AGHL and Alibaba.com US E-Commerce Corp.

The reproduced source document follows this cover page.

AO 458 (Rev. 06/09) Appearance of Counsel

# UNITED STATES DISTRICT COURT

for the

Eastern District of Arkansas

BRADLEY BURCHFIELD, et al.

*Plaintiff*

v.

ALIBABA.COM SINGAPORE E-COMMERCE PRIVATED LIMITED, et al.

*Defendant*

Case No. 4:26-cv-00611-DPM

## APPEARANCE OF COUNSEL

To: The clerk of court and all parties of record

I am admitted or otherwise authorized to practice in this court, and I appear in this case as counsel for:

Alibaba Group Holding Limited and Alibaba.com US E-Commerce Corp.

Date: July 20, 2026

B. Robert Liu NY Bar: 5697552
*Attorney's printed name and bar number*

1 World Trade Ctr Ste 8500, New York,NY 10007
*Address*

robert.liu@balancelawfirm.com
*E-mail address*

(212) 741-8080
*Telephone number*

(631) 490-4465
*FAX number*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT E

## June 18, 2026 Alibaba Customer-Service Response Concerning Order 919060905010275828

The reproduced source document follows this cover page.

EXHIBIT E · JUNE 18, 2026 CUSTOMER-SERVICE RESPONSE

 Exhibit-I

M Gmail Burchfield Bradley <burchfieldbradley123@gmail.com>

**Solution for Trade Assurance Order 91906090501027582**

Alibaba Customer Service <queryreply@service.alibaba.com> Thu, Jun 18, 2026 at 1:28 AM
To: burchfieldbradley123@gmail.com

Hi Bradley,

We have received your complaint regarding to this order 91906090501027582, please rest assured that this case been escalated to our senior team.

Since this order is over three years old, the logistics information can no longer be verified. Additionally, the platform has no record of you contacting customer service regarding this order.

However, we fully understand your concerns, to better assist you and enhance your purchasing experience on our platform, we will help you apply 500USD Alibaba credit (validity period is 90days from the date of issue) to settle this case. This credit can be applied to your future trade assurance order, including product and shipping costs, but please kindly note it cannot be applied to payment processing fees, taxes, or other additional services.
You may check the credit amount/validity in My Alibaba > Coupons and Credit.

Important note: All discounts (includes coupons & credit) can be combined used in your future trade assurance order as long as your order exceeds the minimum amount of USD 0.30.

Alibaba.com Credit cannot be used to settle the remaining balance of an order.

Please reply AGREE if you can accept this option.

Thank you for your kindly trust and patience with us.

Best Regard,
Alibaba Service Team

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT F

## Proof of Service of Amended Complaint on Alibaba.com US E-Commerce Corp.

The reproduced source document follows this cover page.

4:26-cv-611-DPM

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 22 2026

TAMMY H. DOWNS, CLERK
By: [signature] DEP CLERK

Federal Amended

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Alibaba.Com U.S. ECommerce LLC
C/o Incorporating Serv. Ltd.
7801 Folsom Blvd Ste 202
Sacramento, CA 95826

9590 9402 9767 5266 0385 99

2. Article Number (Transfer from service label)

9589 0710 5270 3840 0925 39

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X [signature] ☐ Agent ☐ Addressee

B. Received by (Printed Name): Kristin B

C. Date of Delivery: 07-14-26

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
Mail
Mail Restricted Delivery
(over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053 Domestic Return Receipt

USPS TRACKING #

SACRAMENTO CA 957
14 JUL 2026 PM 3 L

9590 9402 9767 5266 0385 99

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

Bradley Burchfield
5420 Kavanaugh Blvd #7927
Little Rock, AR 72217

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT G

## CHS Properties Docket Screenshot Showing Notice of Plaintiff's Videotaped Deposition

*Offered for the limited purpose stated in the opposition; this screenshot is not itself a judicial finding of expert qualification.*

The reproduced source document follows this cover page.

EXHIBIT G · CHS PROPERTIES DOCKET SCREENSHOT (ENTRY 39)

## CHS Properties, LLC v. Axis Surplus Insurance Company

| | | | |
|---|---|---|---|
| **Arkansas Western District Court** | | **Case Filed:** | Feb 14, 2025 |
| **Judge:** | Timothy L Brooks | **Terminated:** | Jan 21, 2026 |
| **Case #:** | 6:25-cv-06020 | **Case in other court:** | Garland County Circuit Court, 26CV-24-01688 |
| **Nature of Suit** | 110 Contract - Insurance | | |
| **Cause** | 28:1441 Petition for Removal- Breach of Contract | | |

Docket Parties (2)

**Docket last updated: 07/21/2026 11:59 PM CDT**

**Wednesday, January 21, 2026**

41 1 pgs | order | Order of Dismissal | Wed 01/21 1:53 PM
ORDER OF DISMISSAL WITH PREJUDICE. Signed by Chief District Judge Timothy L Brooks on January 21, 2026 (mbm)

**Tuesday, January 13, 2026**

40 order | 1 Terminate Hearings Order Cancelling Deadline | Tue 01/13 2:32 PM
TEXT ONLY ORDER Cancelling Settlement Conference as the parties have notified the court that they have reached a settlement. Signed by Honorable Spencer G Singleton on January 13, 2026. (vme)

**Monday, December 15, 2025**

39 notice | Notice (Other) | Mon 12/15 9:41 AM
NOTICE by Axis Surplus Insurance Company of Videotaped Deposition of Bradley Burchfield (Grabouski, Laura)

**Tuesday, December 09, 2025**

38 order | Order Setting/Resetting Hearings | Tue 12/09 3:57 PM
TEXT ONLY ORDER Resetting Settlement Conference: Settlement Conference reset for 2/5/2026 10:00 AM before Magistrate Judge Spencer G. Singleton.. Signed by Honorable Spencer G Singleton on December 9, 2025. (vme)

37 3 pgs | order | Order on Motion to Amend/Correct | Tue 12/09 11:41 AM
ORDER granting35 Motion to Amend/Correct Settlement Conference. Reset for February 5, 2026, 10:00 a.m. Hot Springs. Signed by Honorable Spencer G Singleton on December 9, 2025. (vme)

36 order | Order Referring Motion | Tue 12/09 11:13 AM
TEXT ONLY ORDER REFERRING MOTION:35 Joint MOTION to Amend/Correct The Settlement Conference Scheduling Order filed by Axis Surplus Insurance Company to Honorable Spencer G. Singleton. Signed by Chief District Judge Timothy L Brooks on December 9, 2025. Motions referred to Spencer G Singleton.(sic)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT H

## Permanently Redacted Invoice for Expert-Witness Testimony in CHS Properties

*Bank-account, routing, and payment information has been permanently removed.*

The reproduced source document follows this cover page.

# Burchfield Sales & Consulting LLC

PO BOX 7927
Little Rock, AR 72207
Phone: (479) 223-0038
Fax: (000) 000-0000

# INVOICE

**INVOICE: 00003**
**DATE: 12/15/25**

**TO:**

National Insurance Advocates
5900 Balcones Drive, STE 100
Austin, TX 78731

**FOR:**

Consulting Services
CHS PROPERTIES LLC
125 OAK ST.
HOT SPRINGS, AR 71901

| DESCRIPTION | HOURS | RATE | AMOUNT |
|---|---|---|---|
| EXPERT WITNESS TESTIMONY | 4.5 | $200.00 | $900.00 |
| | | | 0 |
| | | | 0 |
| | | | 0 |
| REDACTED PAYMENT INFORMATION | | | |
| REDACTED | | | |
| REDACTED | | | |
| | | | |
| | | | |
| REDACTED | | | |
| | | | DUE |
| | | **TOTAL** | **$900.00** |

Make all checks payable to Burchfield Sales & Consulting LLC
Total due in 15 days. Overdue accounts subject to a 1.40% per day late fee.

**THANK YOU FOR YOUR BUSINESS!**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT I

## Declaration of Jieyun Li (ECF No. 17-7)

The reproduced source document follows this cover page.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS**

BRADLEY BURCHFIELD,

Plaintiff,

v.

ALIBABA.COM SINGAPORE E-COMMERCE PRIVATE LIMITED, *et al.*,

Defendants.

No. 4:26-cv-00611-DPM

**DECLARATION OF JIEYUN LI**

I, Jieyun Li, declare as follows:

1. I make this declaration based on personal knowledge and my review of corporate records in the regular course of my duties. I am over the age of eighteen and am authorized to make the statements set forth in this declaration. If called as a witness, I could and would competently testify to the statements set forth below.

2. I am Senior Legal Counsel providing legal services to Alibaba Group Holding Limited ("AGHL"), one of the defendants in this lawsuit. AGHL and certain other companies—including Defendant Alibaba.com Singapore E-Commerce Private Limited ("Alibaba Singapore") and Defendant Alibaba.com US E-Commerce Corp.—are affiliated companies.

3. My duties and responsibilities include providing legal services and guidance to "Alibaba" companies, including AGHL. As part of my job, I coordinate and supervise the work of outside counsel representing "Alibaba" companies in U.S. litigation, including AGHL in this lawsuit. I have learned, and on that basis can testify to, the following information in the course of providing legal services and guidance to "Alibaba" companies, including AGHL.

4. AGHL is a corporation that is incorporated under the laws of the Cayman Islands and has its principal place of business in the People's Republic of China.

5. AGHL is a non-operating holding company that has numerous subsidiaries.

6. AGHL is a separate legal entity from all of its subsidiaries. AGHL maintains its own books and records separate from those of any subsidiary.

7. Alibaba.com ("the Alibaba.com Platform") is an electronic web-based platform for exchanging information and offering services online between buyers and sellers all over the world. The Alibaba.com Platform is a "business-to-business" platform, which means that the platform connects potential buyers that are businesses and potential sellers that are businesses.

8. Alibaba Singapore, which is an indirect subsidiary of AGHL, owns and operates the Alibaba.com Platform. Alibaba Singapore is not organized under the laws of any state in the United States of America and does not have any offices in the United States of America. AGHL does not exercise day-to-day control over Alibaba Singapore, Alibaba.com US E-Commerce Corp., or any other AGHL subsidiaries.

9. AGHL does not own, operate, or control the Alibaba.com Platform and does not exercise any control over any products listed for sale, or actually sold, by third-party sellers on the Alibaba.com Platform.

10. AGHL is not registered to do business in the State of Arkansas or in any other state in the United States of America. AGHL does not direct, target, or specifically tailor any of its business activities to or at the State of Arkansas or the United States of America.

11. AGHL does not have any offices in the State of Arkansas or elsewhere in the United States of America.

12. AGHL does not have any employees in the State of Arkansas, in the United States of America, or anywhere else in the world.

13. AGHL did not participate in or supervise any transaction where Plaintiff Bradley Burchfield (or his company) allegedly bought or tried to buy a product on the Alibaba.com Platform from a third-party seller called Zichang New Materials (shandong) Co. Ltd. ("Zichang").

14. AGHL does not represent—and is not an agent for—any buyers or any sellers in any transactions where a buyer and a seller have made contact via the Alibaba.com Platform, so AGHL was not an agent for Zichang when Mr. Burchfield (or his company) allegedly bought or tried to buy a product from Zichang.

15. AGHL does not have any communications with users or members of the Alibaba.com Platform, so Mr. Burchfield could not have communicated with AGHL about any product that Mr. Burchfield (or his company) allegedly bought or tried to buy from Zichang.

16. AGHL does not send advertisements, marketing e-mails, or other messages—or control or have any input into the content of advertisements, marketing e-mails, or other messages—that may be sent or otherwise transmitted to potential buyers of products that sellers make available for purchase on the Alibaba.com Platform. Therefore, neither Mr. Burchfield nor his company could have received: (a) any advertisements, marketing e-mails, or other messages from AGHL; or (b) any advertisements, marketing e-mails, or messages where AGHL had any control over their content.

17. AGHL does not introduce potential buyers to sellers or otherwise play any role in creating any contacts between sellers and potential buyers, so AGHL could not have introduced Mr. Burchfield (or his company) to Zichang or played any role in creating any contacts between him (or his company) and Zichang.

18. AGHL plays no role in the sale process involving a product offered for sale by a seller to a buyer via the Alibaba.com Platform, so AGHL could not have played any role in the sale process involving any purchase (or attempted purchase) by Mr. Burchfield (or his company) of a product offered for sale by Zichang.

19. AGHL plays no role in manufacturing any product offered for sale by a seller to a buyer via the Alibaba.com Platform, so AGHL could not have played any role in manufacturing the product that Mr. Burchfield (or his company) allegedly bought or tried to buy from Zichang.

20. AGHL plays no role in the shipping and distribution process for any product offered for sale by a seller to a buyer via the Alibaba.com Platform, so AGHL could not have played any role in the shipping or distribution process for the product that Mr. Burchfield (or his company) allegedly bought or tried to buy from Zichang.

21. AGHL does not take possession or control of, and does not take title to, products offered for sale on the Alibaba.com Platform, so AGHL could not have taken possession or control of, and could not have taken title to, the product that Mr. Burchfield (or his company) allegedly bought or tried to buy from Zichang.

22. Zichang has never been an agent for AGHL. AGHL has never stated or done anything to suggest, or create the appearance, that Zichang is AGHL's agent.

23. While Corporation Service Company serves as AGHL's agent for service of process in the United States, their authorization is strictly limited. They do not have the legal authority to accept service of general civil lawsuits against AGHL.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Case 4:26-cv-00611-DPM Document 17-7 Filed 07/20/26 Page 5 of 5

Executed on this 21 day of July, 2026.

Jieyun Li

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT J

## Declaration of Xingjian Zhao (ECF No. 17-8)

The reproduced source document follows this cover page.

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| BRADLEY BURCHFIELD,<br><br>Plaintiff,<br><br>v.<br><br>ALIBABA.COM SINGAPORE E-COMMERCE PRIVATE LIMITED, *et al.*,<br><br>Defendants. | No. 4:26-cv-00611-DPM |

**DECLARATION OF XINGJIAN ZHAO**

I, Xingjian Zhao, declare as follows:

1. I make this declaration based on personal knowledge and my review of corporate records in the regular course of my duties. I am over the age of eighteen and am authorized to make the statements set forth in this declaration. If called as a witness, I could and would competently testify to the statements set forth below.

2. I am Senior Legal Counsel for Alibaba.com Hong Kong Limited, which provides legal services to "Alibaba" entities and affiliates, including Defendant Alibaba.com US E-Commerce Corp.

3. As part of my duties and responsibilities, I coordinate and supervise the work of outside counsel representing "Alibaba" companies in U.S. litigation, including Defendant Alibaba.com Singapore E-Commerce Private Limited and, in particular, Defendant Alibaba.com US E-Commerce Corp. In the course of providing legal services and guidance to "Alibaba" companies, I have learned, and on that basis can testify to, the following information.

4. Alibaba US E-Commerce Corp. is a corporation that is incorporated under the laws of the State of Delaware and has its principal place of business in the State of New York.

5. Alibaba US E-Commerce Corp. is a separate legal entity and maintains its own books and records.

6. Alibaba US E-Commerce Corp. does not own, operate, or control the Alibaba.com Platform and does not exercise any control over any products listed for sale, or actually sold, by third-party sellers on Alibaba.com ("the Alibaba.com Platform").

7. Alibaba US E-Commerce Corp. is not registered to do business in the State of Arkansas. Alibaba US E-Commerce Corp. does not direct, target, or specifically tailor any of its business activities to or at the State of Arkansas.

8. Alibaba US E-Commerce Corp. has no office in the State of Arkansas.

9. Alibaba US E-Commerce Corp. has no employee in the State of Arkansas.

10. Alibaba US E-Commerce Corp. did not participate in or supervise any transaction where Plaintiff Bradley Burchfield (or his company) allegedly bought or tried to buy a product on the Alibaba.com Platform from a third-party seller called Zichang New Materials (shandong) Co. Ltd. ("Zichang").

11. Alibaba US E-Commerce Corp. does not represent – and is not an agent for – any buyers or any sellers in any transactions where a buyer and a seller have made contact via the Alibaba.com Platform, so Alibaba US E-Commerce Corp. was not an agent for Zichang when Mr. Burchfield (or his company) allegedly bought or tried to buy a product from Zichang.

12. Alibaba US E-Commerce Corp. does not have any communications with users or members of the Alibaba.com Platform, so Mr. Burchfield could not have communicated with

Alibaba US E-Commerce Corp. about any product that Mr. Burchfield (or his company) allegedly bought or tried to buy from Zichang.

13. Alibaba US E-Commerce Corp. does not send advertisements, marketing e-mails, or other messages – or control or have any input into the content of advertisements, marketing e-mails, or other messages – that may be sent or otherwise transmitted to potential buyers of products that sellers make available for purchase on the Alibaba.com Platform. Therefore, neither Mr. Burchfield nor his company could have received: (a) any advertisements, marketing e-mails, or other messages from Alibaba US E-Commerce Corp.; or (b) any advertisements, marketing e-mails, or messages where Alibaba US E-Commerce Corp. had any control over their content.

14. Alibaba US E-Commerce Corp. does not introduce potential buyers to sellers or otherwise play any role in creating any contacts between sellers and potential buyers, so Alibaba US E-Commerce Corp. could not have introduced Mr. Burchfield (or his company) to Zichang or played any role in creating any contacts between Mr. Burchfield (or his company) and Zichang.

15. Alibaba US E-Commerce Corp. plays no role in the sale process involving a product offered for sale by a seller to a buyer via the Alibaba.com Platform, so Alibaba US E-Commerce Corp. could not have played any role in the sale process involving any purchase (or attempted purchase) by Mr. Burchfield (or his company) of a product offered for sale by Zichang.

16. Alibaba US E-Commerce Corp. plays no role in manufacturing any product offered for sale by a seller to a buyer via the Alibaba.com Platform, so Alibaba US E-Commerce Corp. could not have played any role in manufacturing the product that Mr. Burchfield (or his company) allegedly bought or tried to buy from Zichang.

17. Alibaba US E-Commerce Corp. plays no role in the shipping and distribution process for any product offered for sale by a seller to a buyer via the Alibaba.com Platform, so Alibaba

US E-Commerce Corp. could not have played any role in the shipping or distribution process for the product that Mr. Burchfield (or his company) allegedly bought or tried to buy from Zichang.

18. Alibaba US E-Commerce Corp. does not take possession or control of, and does not take title to, products offered for sale on the Alibaba.com Platform, so Alibaba US E-Commerce Corp. could not have taken possession or control of, and could not have taken title to, the product that Mr. Burchfield (or his company) allegedly bought or tried to buy from Zichang.

19. Zichang has never been an agent for Alibaba US E-Commerce Corp. Alibaba US E-Commerce Corp. has never stated or done anything to suggest, or create the appearance, that Zichang is Alibaba US E-Commerce Corp.'s agent.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 20th day of July, 2026.

Xingjian Zhao

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT K

## Nonparty Document Subpoena Directed to CSC

*Included as supplied by Plaintiff; this exhibit does not by itself establish completed service or compliance.*

The reproduced source document follows this cover page.

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 22 2026

TAMMY H. DOWNS, CLERK
By: ______ DEP CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

**BRADLEY BURCHFIELD**
Plaintiff,

Civil Action No.
4:26-cv-00611-DPM

v.

**ALIBABA GROUP HOLDING LIMITED, et al.**
Defendants.

## NOTICE OF INTENT TO SERVE NONPARTY DOCUMENT SUBPOENA

Pursuant to Federal Rule of Civil Procedure 45(a)(4), Plaintiff Bradley Burchfield gives notice that, after this notice and the attached copy of the subpoena have been served on each party, Plaintiff intends to serve a document-only subpoena on nonparty Corporation Service Company at 300 S. Spring Street, Suite 900, Little Rock, Arkansas 72201.

The subpoena seeks narrowly defined records concerning CSC Transmittal No. 34483454 and CSC's July 9, 2026 rejection of federal process directed to Alibaba Group Holding Limited in this action. The subpoena does not require testimony, does not command a personal appearance, and expressly excludes records concerning any Arkansas state-court summons or mailing.

A copy of the proposed subpoena and Attachment A is served with this notice. Plaintiff will not serve the subpoena on Corporation Service Company until the Rule 45(a)(4) notice requirement has been satisfied.

Date: 7/22/26

Respectfully submitted,

Bradley Burchfield

Bradley Burchfield, Pro Se
5420 Kavanaugh Blvd #7927
Little Rock, AR 72217
Phone: 479-223-0038
Email: burchfieldbradley123@gmail.com

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS

**BRADLEY BURCHFIELD**
Plaintiff,

**Civil Action No.**
**4:26-cv-00611-DPM**

v.

**ALIBABA GROUP HOLDING LIMITED, et al.**
Defendants.

## CERTIFICATE OF SERVICE

I certify that on July 22, 2026, before service of the subpoena on Corporation Service Company, I served a copy of the Notice of Intent to Serve Nonparty Document Subpoena, the proposed subpoena, and Attachment A on each named party in this action by U.S. Mail at the address stated below:

| Party | Address Used | Method |
|---|---|---|
| Alibaba Group Holding Limited | c/o Corporation Service Company<br>19 West 44th Street, Suite 200<br>New York, NY 10036 | U.S. Mail |
| Alibaba.com Singapore E-Commerce Pte. Limited<br>*a/k/a Alibaba.com Singapore E-Commerce Private Limited* | 51 Bras Basah Road, #01-21, Lazada One<br>Singapore 189554 | U.S. Mail |
| Alibaba.com U.S. LLC | c/o Corporation Service Company<br>251 Little Falls Drive<br>Wilmington, DE 19808 | U.S. Mail |
| Alibaba.com U.S. e-Commerce Corp.<br>*a/k/a Alibaba.com US E-Commerce Corp.* | c/o Incorporating Services, Ltd.<br>7801 Folsom Blvd., Suite 202<br>Sacramento, CA 95826 | U.S. Mail |
| Alibaba Group (U.S.) Inc. | c/o Incorporating Services, Ltd.<br>3500 S. Dupont Hwy.<br>Dover, DE 19901 | U.S. Mail |
| AliExpress E-Commerce One Pte. Ltd. | c/o Alibaba Group Holding Ltd., Legal Department<br>26/F Tower One, Times Square<br>1 Matheson Street, Causeway Bay, Hong Kong | U.S. Mail |
| AUS Merchant Services, Inc.<br>*f/k/a Alipay U.S., Inc. and Alipay U.S. Escrow, Inc.* | c/o The Corporation Trust Company<br>1209 Orange Street<br>Wilmington, DE 19801 | U.S. Mail |
| Zichang New Materials (Shandong) Co., Ltd. | Room A2-907, Xinyuanxin Center<br>Huaxin Road, Jinan, Shandong, China | U.S. Mail |
| Zhishang New Materials (Shandong) Co., Ltd. | 400 S. El Camino Real<br>San Mateo, CA 94402 | U.S. Mail |
| Shaanxi Bloom Tech Co., Ltd. | 400 S. El Camino Real<br>San Mateo, CA 94402 | U.S. Mail |

Bradley Burchfield
Date: 7/22/26

*Unidentified Doe defendants are not listed because no mailing address has been identified.*

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Arkansas

Bradley Burchfield
*Plaintiff*
v.
Alibaba Group Holding Limited, et al.
*Defendant*

Civil Action No. 4:26-cv-00611-DPM

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: CORPORATION SERVICE COMPANY, through its Custodian of Records
300 S. Spring St. Suite 900
Little Rock, AR 72201

*(Name of person to whom this subpoena is directed)*

☒ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: The documents and electronically stored information described in "Attachment A", incorporated into this subpoena. This Subpoena concerns only CSC's receipt, processing and rejection of federal process in Civil Action No: 4:26-cv-00611-DPM and CSC Transmittal No. 34483454. No Arkansas State-Court service records are requested.

| Place: 300 S. Spring St. Suite 900<br>Little Rock, AR 72201<br>Electronic production permitted to:<br>burchfieldbradley123@gmail.com | Date and Time:<br>Thirty (30) days after Service, but not earlier than September 11, 2026 at 5:00 pm Central time. |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 7/22/26

**TAMMY H. DOWNS**
*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

OR

*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Bradley Burchfield
Pro Se representing Plaintiff , who issues or requests this subpoena, are:
5420 Kavanaugh Blvd. #7927, Little Rock, AR 72217; 479-223-0038
Email: burchfieldbradley123@gmail.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No.

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________________

on *(date)* ______________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________

______________________________________________________________________

__________________________________________ on *(date)* ______________ ; or

❒ I returned the subpoena unexecuted because: ______________________________

______________________________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ______________ .

My fees are $ ______________ for travel and $ ______________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

## DOCUMENTS AND ELECTRONICALLY STORED INFORMATION TO BE PRODUCED

*Burchfield v. Alibaba Group Holding Limited, et al. | Case No. 4:26-cv-00611-DPM*

**Scope limitation.** This subpoena is limited to CSC's receipt, intake, coding, processing, rejection, retention, return, and forwarding of the federal summons and First Amended Complaint directed to Alibaba Group Holding Limited in the above-captioned federal action, including CSC Transmittal No. 34483454 and the July 9, 2026 Rejection of Service of Process. It does not request records concerning any Arkansas state-court summons or mailing.

## DEFINITIONS

"**CSC**" means Corporation Service Company and the departments, offices, employees, agents, databases, and service-of-process systems reasonably involved in the federal service attempt described above.

"**Federal Process**" means the federal summons, First Amended Complaint, envelope, certified-mail materials, and any accompanying papers received in connection with Civil Action No. 4:26-cv-00611-DPM.

"**Transmittal**" means CSC Transmittal No. 34483454 and the related July 9, 2026 Rejection of Service of Process.

"**Document**" includes writings, records, forms, images, scans, emails, messages, databases, logs, audit trails, metadata, and other electronically stored information within CSC's possession, custody, or control.

"**Communication**" means any transmission of information by email, letter, message, ticket, note, telephone memorandum, or other medium.

## INSTRUCTIONS

**1.** Search the centralized or other reasonably accessible CSC systems using Transmittal No. 34483454, the party name Alibaba Group Holding Limited, the case number, and the July 9, 2026 rejection date.

**2.** Produce documents as kept in the ordinary course of business or organize and label them to correspond to the numbered requests below.

**3.** Produce searchable PDF files for documents and native or reasonably usable format for logs, spreadsheets, database exports, and other structured data, preserving available date, sender, recipient, and audit metadata.

**4.** Electronic production is permitted. No personal appearance is required.

**5.** CSC may redact unrelated customer information and may mark responsive material confidential. If any responsive material is withheld based on privilege or protection, provide a privilege log sufficient to assess the claim.

**6.** If a request can be answered by producing documents sufficient to establish the requested fact, CSC need not produce duplicative versions of the same information.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** The complete CSC file for Transmittal No. 34483454, including the Federal Process as received; all scans or images; the envelope and mailing label; certified-mail and tracking information; intake records; internal notes; routing entries; status history; audit trail; rejection record; and records showing what CSC retained, returned, destroyed, or forwarded.

**REQUEST NO. 2:** Documents showing the exact rejection reason or reasons selected or applied to the Transmittal, including all reason codes, database fields, decision entries, checkboxes, notes, and documents relied upon. If more than one reason was considered, identify each reason and the final operative reason.

**REQUEST NO. 3:** Documents sufficient to identify each CSC employee, contractor, office, team, or automated system that received, opened, scanned, reviewed, coded, routed, approved, generated, mailed, or otherwise processed the Transmittal, including each person's title or function and the date and time of the act.

**REQUEST NO. 4:** Documents sufficient to explain why the rejection form identifies "Alibaba Group Holding Limited" as the "Party Served" but identifies the "Title of Action" as "Bradley Burchfield vs. Alibaba.com Singapore E-Commerce Private Limited," including the source of each entry, whether either entry was manually entered or system-generated, and whether the title entry affected the rejection decision.

## ATTACHMENT A - DOCUMENT REQUESTS (CONTINUED)

**REQUEST NO. 5:** All nonprivileged communications between CSC and Alibaba Group Holding Limited, any Alibaba affiliate, or any representative or counsel for either concerning the Federal Process, Transmittal No. 34483454, the rejection decision, or the return or forwarding of the Federal Process.

**REQUEST NO. 6:** Documents sufficient to show whether CSC was appointed or authorized, as of July 9, 2026, to receive, accept, transmit, or forward service of process for Alibaba Group Holding Limited in New York, including the effective dates and scope of any appointment and any limitation based on the type of action, court, claim, statute, or method of service. CSC may produce an excerpt, designation record, or other document sufficient to establish the relevant authority and limitations rather than an entire unrelated commercial agreement.

**REQUEST NO. 7:** Documents sufficient to show the source, date, and content of the records CSC consulted when it concluded that it was not the registered or authorized agent for Alibaba Group Holding Limited or that the entity was inactive, had resigned, withdrawn, surrendered, merged, dissolved, or been revoked, including any Secretary of State or other governmental records consulted.

**REQUEST NO. 8:** Documents sufficient to show the CSC policies or procedures in effect on July 9, 2026 that governed intake and rejection of certified-mail service directed to a foreign entity at CSC's New York service-of-process office, including the procedure for selecting the party served, title of action, jurisdiction served, rejection reason, and return-to-sender disposition.

**REQUEST NO. 9:** Documents showing when, where, and by what method CSC sent the rejection notice and returned or disposed of the Federal Process, including mailing, delivery, tracking, chain-of-custody, scan, or destruction records.

**REQUEST NO. 10:** A declaration or certification from a qualified CSC custodian under 28 U.S.C. § 1746 sufficient to authenticate the produced records as records of a regularly conducted activity under Federal Rules of Evidence 803(6) and 902(11), or, alternatively, the name, title, office address, telephone number, and email address of the custodian who can authenticate the records.

**Production contact:** Bradley Burchfield, burchfieldbradley123@gmail.com, 479-223-0038. Electronic production may be arranged by secure link, encrypted email, or other mutually agreeable method.

# FEDERAL RULE OF CIVIL PROCEDURE 45
# REQUIRED PROVISIONS

*Rule 45(c), (d), (e), and (g)*

## Rule 45(c) - Place of Compliance

(1) For a Trial, Hearing, or Deposition. A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person (i) is a party or a party's officer; or (ii) is commanded to attend a trial and would not incur substantial expense.

(2) For Other Discovery. A subpoena may command: (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and (B) inspection of premises at the premises to be inspected.

## Rule 45(d) - Protecting a Person Subject to a Subpoena; Enforcement

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction - which may include lost earnings and reasonable attorney's fees - on a party or attorney who fails to comply.

(2) Command to Produce Materials or Permit Inspection.

(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises - or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the serving party may move the court for the district where compliance is required for an order compelling production or inspection, and any order must protect a nonparty from significant expense resulting from compliance.

(3) Quashing or Modifying a Subpoena. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that fails to allow a reasonable time to comply, requires compliance beyond Rule 45(c)'s geographical limits, requires disclosure of privileged or other protected matter when no exception or waiver applies, or subjects a person to undue burden. The court may also quash or modify a subpoena that requires disclosure of trade secrets or other confidential commercial information, or certain unretained-expert information, and may impose appropriate conditions instead.

# FEDERAL RULE OF CIVIL PROCEDURE 45
# REQUIRED PROVISIONS (CONTINUED)

## Rule 45(e) - Duties in Responding to a Subpoena

(1) Producing Documents or Electronically Stored Information.

(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.

(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources identified as not reasonably accessible because of undue burden or cost. On a motion to compel or for protective order, the responding person must show the inaccessibility; the court may nonetheless order discovery for good cause and may specify conditions.

(2) Claiming Privilege or Protection.

(A) Information Withheld. A person withholding subpoenaed information under a claim of privilege or trial-preparation protection must expressly make the claim and describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing privileged or protected information, will enable the parties to assess the claim.

(B) Information Produced. If information produced is subject to a claim of privilege or protection, the person making the claim may notify any party that received the information. After notification, the receiving party must promptly return, sequester, or destroy the specified information and must not use or disclose it until the claim is resolved; the receiving party may promptly present the information under seal to the court for the district where compliance is required.

## Rule 45(g) - Contempt

The court for the district where compliance is required - and also, after a motion is transferred, the issuing court - may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

null
**Transmittal Number: 34483454**

CSC

# Rejection of Service of Process

**Return to Sender Information:**

Bradley Burchfield null
Pro Se
5420 Kavanaugh Blvd #7927
Little Rock, AR 72217

| | |
|---|---|
| **Date:** | 07/09/2026 |
| **Party Served:** | Alibaba Group Holding Limited |
| **Jurisdiction Served:** | NY |
| **Method Served:** | Certified Mail |
| **Title of Action:** | Bradley Burchfield vs. Alibaba.com Singapore E-Commerce Private Limited |
| **Case/Reference No:** | 4:26CV611-DPM |

The service of process received for the party served, as listed above, cannot be forwarded to the intended party for one of the reasons listed below:

- **Agent** - According to our records and the records at the Secretary of State, or other appropriate state agency, we are not the registered agent for the company you are trying to serve or the status of the entity is no longer active.
- **Name** - Because two or more companies can have very similar names, the name of the company to which service of process is directed MUST BE IDENTICAL to the company name on file with the Secretary of State or other appropriate state agency.
- **Resignation** - CSC has resigned as the registered agent for the company being served.

Or the entity served is inactive at the state for one of the reasons listed below:

- **Withdrawn**
- **Surrendered**
- **Merged Out of Existence**
- **Dissolved**
- **Revoked**

It is your responsibility to verify this information with the Secretary of State or other appropriate state agency.

Our customer records are confidential. We do not release any information related to our customers, agent representation or service of process received. Please contact the Secretary of State or other appropriate agency for more information.

For an electronic copy of the identified service of process, send your request by e-mail to sop@cscglobal.com. Please include the transmittal number located in the upper right-hand corner of this letter.

SENDER: COMPLETE THIS SECTION

COMPLETE THIS SECTION ON DELIVERY

[illegible]

2. Article Number (Transfer from service label)

9589 0710 5270 2535 0404 64

PS Form 3811, July 2020 PSN 7530-02-000-9053

Domestic Return Receipt

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT L

## Notice of Intent to Serve the CSC Nonparty Document Subpoena on Counsel of Record

*Notice to counsel is distinct from proof that CSC was served.*

The reproduced source document follows this cover page.

## Case No. 4/26-cv-00611-DPM

**Burchfield Bradley** <burchfieldbradley123@gmail.com> Wed, Jul 22, 2026 at 4:49 PM
To: robert.liu@balancelawfirm.com

Please see attached. Have a nice day.

Bradley Burchfield
Burchfield Sales & Consulting LLC
479-223-0038
burchfieldbradley123@gmail.com
burchfieldbradley123@icloud.com
ID#2503103532

**NON PARTY DOCUMENT SUBPOENA.pdf**
10455K

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT M

## Trade Assurance Purchase Contract

The reproduced source document follows this cover page.

print this page 中文版本

# Trade Assurance Purchase Contract

## (this "Contract")

Order No. : 91906090501027582

Version: 20210428003656

Date: 2021-06-01

Seller's Registered Company Name: Zichang New Materials (shandong) Co., Ltd.

Seller's Registered Company Address: Room A2-907, Xinyuanxin Center, Huaxin Road,Jinan,Shandong,CN

Email: sweety@sdzcchemical.com

Buyer's Registered Company Name/Contact Name : Burchfield Sales and Consulting LLC

Buyer's Registered Company Address/Shipping Address: 121 2nd st Apt A Hot Springs, AR 71913,Hot Springs,Arkansas,US

Email: burchfieldbradley123@gmail.com

## Important Conditions

By logging onto the Alibaba.com international platform, and clicking and agreeing to this Contract, both Buyer and Seller acknowledge, agree and confirm to be bound by the terms and conditions of this Contract and the applicable " Trade Assurance Services Rules ", including in particular those terms which are in bold and underlined. Unless otherwise defined herein, capitalized terms used in this Contract shall have the same meaning as those defined in the applicable " Trade Assurance Services Rules ".

## Contract Terms

Seller agrees to provide Trade Assurance Services to Buyer pursuant to this Contract. Seller hereby agrees to sell, and Buyer agrees to purchase, the products of Seller under the terms and conditions set forth in this Contract. Each of Seller and Buyer represents and warrants that it has obtained all necessary rights and authorizations to sell (in the case of Seller) or purchase (in the case of Buyer) the products respectively pursuant to this Contract.

### 1. Trade Terms

Trade Terms (Incoterms 2010) :EXW

## 2. Products

| No. | Product Name | Product Description and Specifications | Product SKU | Quantity | Unit | Unit Price | Contract Sum |
|---|---|---|---|---|---|---|---|
| 1 | factory N-Isopropylbenzylamine CAS 102-97-6 | | | 1.00 | Kilograms | USD 615.00 | USD 615.00 |

| | | | |
|---|---|---|---|
| Discount (if any): | USD 0.00 | Shipping Fee: | USD 50.00 |
| | | Total Amount: | USD 715.00 |

attachment files:

## 3. Delivery Terms

3.1 Shipping Address: Bradley Burchfield +1 8706174081, Burchfield Sales and Consulting LLC, 6834 Cantrell Road Suite 210 little rock Arkansas 72207, 4 mile corner, Arkansas, 72207, United States of America

3.2 Transportation Method: Express

3.3 Shipping Fee: The shipping fee for this Contract is USD 50.00

3.4 Insurance charges: The insurance charges for this Contract is USD 50.00

3.5 Shipment Date* :*Shipment Date refers to such date as indicated for completion of the shipping out of Products at the Port/Place of Loading or pickup of the express delivery of the Products: Seller should ship out Products at the designated Port/Place of Loading within 7 calendar day(s) after receiving the Deposit.

3.6 Identification of Actual Date of Shipment: Unless otherwise mutually agreed by the Buyer and Seller, for the purposes of the Trade Assurance Terms of this Contract, the date of shipment according to the records of the Alibaba.com transaction system, except where Seller provides original

| | |
|---|---|
| | conclusive information on date of shipment to the contrary (in which case such inf ormation shall prevail). |
| 3.7 Port / Place of Destination Tip s: | Ports / Places of Destination in Iran, North Korea, Syria, Cuba, Sudan, Egypt and th e Crimea region are not currently covered by Trade Assurance. |

## 4. Payment Terms

| | |
|---|---|
| 4.1Total Amount: | The Total Amount for this Contract is USD 715.00 |
| 4.2 Deposit before Shipment (if ap plicable): | The Deposit (if applicable) before shipment for this Contract is USD 715.00 |
| 4.3 Discount: | The Discount for this Contract is USD 0.00 |
| 4.4 Remaining Balance(if applicab le): | The Remaining Balance (if applicable) to this Contract shall be USD 0.00. Seller ret ains all ownership to the Product before Buyer completes payment of the Balance Amount (if applicable) under this Contract unless otherwise agreed between the S eller and Buyer, in which case Seller and Buyer shall act accordingly to such altern ative arrangements. |
| 4.5 Payment Method : | Remittance to be made through those Payment Methods supported by Alibaba.co m to the designated Beneficiary Bank Account under this Contract. |
| 4.6 Deadline of Payment of Depos it by Buyer (if applicable) : | Buyer must remit the Deposit (if applicable) to the Beneficiary Bank Account set fo rth in this Contract within 15 days (with the 15th day inclusive) from the date both Seller and Buyer have executed this Contract and before shipment, otherwise Selle r shall have the right to unilaterally terminate this Contract. |
| 4.7Deadline for paying Remaining Balance by Buyer(if applicable) : | Unless otherwise mutually agreed between Seller and Buyer, Buyer shall pay the fu ll amount of the Remaining Balance (if applicable) upon receiving the copy of bill o f lading (or other delivery voucher). |
| 4.8 Bank Charges : | Buyer shall bear any and all relevant bank charges. |

## 5. Liquidated Damages

5.1 Unless otherwise provided in this Contract, or unless Buyer and Seller have agreed otherwise, Buyer's unilateral ter mination of this Contract without cause and/or failure to pay the Remaining Balance in accordance with this Contract shall constitute a material breach of this Contract. If both Buyer and Seller have separately agreed on a sum to be paid as liquidated damages pursuant to the breach, such sum shall be remitted to the Beneficiary Bank Account under this Contract or deducted directly from any and all Payment that has been received by Seller.

5.2 Unless otherwise agreed by both Buyer and Seller, if the events of breach under the "Trade Assurance Terms" secti on (Section 6) occurs after Buyer pays the Deposit (if applicable) in full, this Contract shall be terminated accordingly a nd Seller shall bear the relevant liability as agreed.

## 6. Trade Assurance Terms

6.1 Trade Assurance Amount :

The Trade Assurance Amount for this Contract is USD 715.00

Trade Assurance Amount (as defined in the applicable " Trade Assurance Services Rules ")

6.2 Trade Assurance Scope:

Trade Assurance until 30 days (inclusive of the 30th day) after the Date of the Con firmed Receipt of the Products

*See Section 6.3 for detailed terms and conditions.

6.3 Trade Assurance Obligations:

6.3.1 Seller agrees to be liable for Trade Assurance Obligations if the Seller commi ts any of the following breaches:

(1)Shipping out Products later than Shipment Date in section 3.5 or did not ship o ut the Products at all; or

(2)Failing to: (i) deliver Products in compliance with the Product Description and S pecifications, or (ii) provide valid documentation in support of change of ownershi p of the Products to the Buyer, or (iii) provide valid documentation including but no t limited to corresponding invoice (or certification) in support of delivery, or (iv) co mmits any other material breach of this Contract, either (i) to (iv) scenario resultin g in a material damage to the value of the Products or the commercial objective k nown or should be known to both Seller and Buyer becoming unachievable.

6.3.2 Upon the occurrence of (1) or (2) of above 6.3.1, Seller shall assume the foll owing Trade Assurance Obligations:

Seller agrees to fully refund the Contract Sum received by the Seller or an amount mutually agreed upon by the Buyer and Seller (in accordance with the system reco rds of the Complaints Platform), or other amount as designated by Alibaba.com (Partial refund shall be conditional upon the Buyer's acceptance of the Seller's act of breach of contract).

6.3.3 If Buyer has not paid the Remaining Balance in accordance with the terms of this Contract, the Seller's Trade Assurance Obligations under the Contract shall be corresponded to payment of the purchase price received by the Seller.

6.4 Refund on behalf of the Seller :

If Buyer submits a request to Alibaba.com for Dispute Determination in accordanc e with the terms of applicable " Trade Assurance Services Rules" during the corres ponding Claim Period, and the determination of Alibaba.com confirms that Seller h as committed a breach of any of the conditions in sections 6.3.1(1), (2) or (3), the n Buyer may receive refund to be paid for and on behalf of the Seller in accordanc

e with the terms and conditions of the applicable " Trade Assurance Services Rules " subject to the Trade Assurance Amount specified in this Contract. When the Trade Assurance Amount is zero (0) as agreed under section 6.1, Seller shall itself refund payment to Buyer.

6.5 Claim Period:

Buyer must submit a request to Alibaba.com for Dispute Determination (section 6.6) within the applicable Claim Period set out below, failing which, Alibaba.com shall have no obligation to make any refunds for and on behalf of Seller (unless Alibaba.com in its sole discretion decides to extend the Claim Period).

6.5.1 Where the Buyer complains the Seller of breaches sections 6.3.1 (1) and/or (2), the Buyer shall lodge a dispute claim no later than 30 days (inclusive of the 30th day) after the Date of Confirmed Receipt of the Products. 6.5.2 Date of Confirmed Receipt of the Products means either (1) the day when the Buyer clicks "Confirm" on the order system to confirm the receipt of the Products or (2) if the buyer did not click "Confirm" in the order system, then depending on which shipment method, should be no later than the following days after the Actual Date of Shipment (i) by express: 15 days; (ii) by air freight: 30 days; (iii) by land transportation, sea freight or postal parcel: 60 days; (iv) from overseas warehouse: 10 days. For the avoidance of doubt, the system's default Date of Confirmed Receipt shall only apply upon (i) receipt of Products or (ii) where there is no logistics status available. Where the logistics status states that the Products are still being delivered, the Date of Confirmed Receipt shall only be the day when the Buyer clicks "Confirm" on the order system to confirm the receipt of the Products. Where there is only partial shipment of the Products, the Claim Period shall commence on the Shipment Date of the final consignment of the remaining Products.

6.6 Dispute Determination:

If Seller refused to fulfill the "Trade Assurance Terms", Buyer may submit a request to Alibaba.com for dispute determination in accordance with the terms of " Trade Assurance Services Rules ". Each of the Buyer and Seller agrees to abide by the terms and conditions of the " Trade Assurance Services Rules " (including those versions updated from time to time).

## 7. Insurance

Unless otherwise agreed by both Buyer and Seller, if the Trade Terms selected for this Contract is Free on Board (FOB) or Cost and Freight (CFR), then insurance is to be effected by Buyer at Buyer's cost. Alternatively if the Trade Terms selected for this Contract is Cost, Insurance and Freight (CIF), then Seller must obtain insurance for the shipment at Seller's cost.

## 8. Product Inspection

If Buyer and Seller agreed to arrange for the products go through a product inspection process, the parties may agree on the terms of the inspection, such as method, inspection institution, fees, and etc., by way of a supplemental

agreement. If both Parties have agreed "Inspection & Logistics Service Trade Assurance", Buyer shall also be entitled to have the Products inspected before shipping (and Seller shall provide all necessary assistance to complete the relevant inspection so that the shipping of Products remains unaffected), so that Buyer can benefit from information relating to the inspection and shipping of the Products.

## 9. Force Majeure

If either Buyer or Seller is unable to perform or delayed in performing its obligations under this Contract due to events beyond its reasonable control (including but not limited to war, industry actions, acts of God, breakdown of network or public utilities), the party encountering such events shall not be liable thereto.

## 10. Termination

10.1 Either Buyer or Seller may terminate this Contract without liability to the other party if the Contract is terminated a s follows:

**a) Seller terminates this Contract before Buyer has paid the Deposit or Total Amount (as applicable);**

**b) Seller terminates this Contract after returning Deposit (if applicable) to Buyer, and if other sums have also bee n received by Seller, such other sums received as well, in accordance with this Contract; or**

**c) This Contract is terminated in accordance with other terms agreed by both parties in writing.**

10.2 Unless otherwise expressly provided in this Contract, neither Buyer nor Seller may unilaterally terminate this Cont ract.

10.3 Upon termination of this Contract, the Seller and Buyer shall agree in writing on such other terms not explicitly set out in this Contract (such as, but not limited to, any arrangements relating to return of Products).

## 11. Tax

Unless otherwise agreed, all amounts required to be paid by Seller or Alibaba.com under the "Trade Assurance Services Rules" do not include any taxes, duties or other assessments levied or based upon such amounts. Buyer shall be responsible for all such taxes, duties, other assessments due under this Agreement and on all amounts payable hereunder. Taxes will be added to the amounts payable by Buyer to Seller or Alibaba.com (as the case may be) as

applicable and as required by law such that the net amount actually received by Seller or Alibaba.com (as the case may be) equals the full amount of the payment due hereunder. For greater certainty, Taxes will not be added to the amounts payable by Buyer to Seller or Alibaba.com (as the case may be) where Buyer has provided with evidence to Seller's or Alibaba.com 's (as the case may be) satisfaction of a lawful and applicable exemption for such Taxes.

If Buyer is or may be required under any law or regulation of any governmental entity or authority, domestic or foreign, to withhold or deduct any withholding tax from any amount due to Seller or Alibaba.com pursuant to this Agreement, the amount payable by Buyer shall be increased to the extent necessary to ensure that after making such deduction or withholding, Seller or Alibaba.com (as the case may be) receives and retains a net sum equal to the sum it would have received but for such deduction or withholding being required. Buyer shall promptly deliver to Seller or Alibaba.com (as the case may be) all receipts and/or certificates or other proof evidencing the amounts (if any) paid in respect of any such deduction or withholding. In determining whether and to what extent a deduction or withholding of tax is required by law, the Parties shall cooperate with each other and with Alibaba.com and use their reasonable efforts to apply for any exemption, and shall bear their respective cost and expenses in this regard.

The Buyer and the Seller shall each be responsible for the direct tax liability imposed on its own net income, unless otherwise agreed between the Buyer and the Seller.
Buyer shall be responsible for the payment of all other taxes including the local levies imposed by any relevant government authority in connection with Alibaba.com's provision of any services relating to this Contract. Buyer agrees to execute any and all documents with the Seller or such party as the Seller designated for the benefit of Alibaba.com to give effect to this provision.

If Seller or Buyer under this transaction is subject to any tax (such as US State Sales Tax) obligation or liability under any law or regulation of any local or non-local taxation authority of any jurisdiction, Seller or Buyer shall independently assume such obligation or liability, and Alibaba.com does not assume any tax obligation or liability attributable to Seller or Buyer. For the overseas warehouse goods, Seller shall be responsible independently for the processing fee and related taxes (including but not limited to customs duties) in relation to the import, customs clearance, logistics of goods. Alibaba.com does not assume any obligation or liability for the responsibility and expense for the Seller's goods.

"Taxes" refer to all federal, state, provincial, territorial, county, municipal, local, or foreign taxes and fees, including but not limited to sales, use, license, excise, goods and services, value added, stamp or transfer taxes, duties, imposts, levies, assessments, tariffs, fees, charges or withholdings of any nature whatsoever levied, imposed, assessed or collected by a taxation authority together with all interest, penalties, fines, or other additional amounts imposed in respect thereof, but for greater certainty excludes any of the foregoing which are (i) based on gross or net income, (ii) franchise tax, or (iii) property, personal property, or rental taxes (collectively referred to as "Excluded Taxes"). Each party shall be responsible for any and all Excluded Taxes that it is liable for under applicable law.

"Taxation Authority" refers to any government, state, municipality or any local, provincial, state or other fiscal, customs, excise or taxing authority, body or official anywhere in the world with responsibility for, and competency to, impose, collect, audit, assess, administer or levy any Taxes or make any decision or ruling in respect of any Taxes.

## 12. Other conventions

| | |
|---|---|
| 12.1 Limitation of Liability: | TO THE MAXIMUM EXTENT PERMITTED BY LAW, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL OR INCIDENTAL DAMAGES (INCLUDING WITHOUT LIMITATION DAMAGES FOR LOSS OF PROFITS OR REVENUE, INTERRUPTION OF BUSINESS, LOSS OF BUSINESS INFORMATION OR DATA, ETC) ARISING IN CONNECTION WITH THIS CONTRACT, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR EVEN IF THE POSSIBILITY OF SUCH DAMAGES IS FORESEEABLE. TO THE MAXIMUM EXTENT PERMITTED BY LAW, EITHER PARTY'S AGGREGATE LIABILITY UNDER THIS CONTRACT SHALL NOT EXCEED THE TOTAL ORDER AMOUNT OF THIS CONTRACT. |
| 12.2 Governing Law: | This Contract shall be governed by and construed in accordance with the laws of the People's Republic of China without recourse to its conflict of laws principles. |

| | |
|---|---|
| 12.3 Disputes : | Any dispute between both parties that arise out of this Contract (the "Dispute") shall first be resolved amicably by negotiation. The parties agree to submit a request to Alibaba.com for dispute determination in the event that both parties fail to reach a settlement on the Dispute. If either party does not agree to the final determination or decision made by Alibaba.com in connection with the Dispute, the Dispute may be referred to and resolved by arbitration at the Shenzhen Court of International Arbitration, and the party should inform alibaba.com. |
| 12.4 Notice : | Any and all notice and other communications in respect of this Contract shall be in writing in English and sent by email, or international express courier to the address of the other party stated in this Contract. Any changes to the address shall be notified to the other party within five (5) calendar days from the date the change has taken effect. Unless otherwise provided in this Contract or in the " Trade Assurance Services Rules ", any notice given pursuant to this clause shall be deemed effective if: i) delivered by email, when the email is successfully sent; ii) if sent by international express courier, when the courier has been received by the recipient. |
| 12.5 Contract Term : | This Contract is established from the time Buyer has clicked "confirm Contract" on the Alibaba.com.<br>This Contract shall take effect from the time Buyer had remitted the Deposit or the Total Amount (as applicable) to Seller in accordance with Contract. |
| 12.6 Electronic Order : | This Contract constitutes an electronic Contract between Seller and Buyer and shall have the same validity and binding effect as if the Contract is executed by both parties on paper. |
| 12.7 Export and Import Agent : | Seller may agree separately on the rights and obligations for its import and export agent in fulfilling the relevant obligations pursuant to this Contract. Seller shall be liable for any acts committed by its import and export agent for any obligations that are performed by the agent for and on behalf of Seller in connection with this Contract. |
| 12.8 Other Provisions : | Neither party may assign this Contract, in whole or in part, to any third party. In the event of any inconsistency between the Chinese and English versions of this Contract, the English version shall prevail. |
| 12.9 Remarks : | |

**The end of text**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT N

## Receipt for Trade Assurance Order 91906090501027582

The reproduced source document follows this cover page.

# Receipt

Receipt number: #91906090501027582

Receipt date: 10:41 AM, May 29th, 2026 (PDT)

Marketplace Operator:

**Alibaba.com Singapore E-Commerce Private Limited**
51 Bras Basah Road, #01-21 Lazada One, Singapore 189554

Sold by:

**Zichang New Materials (shandong) Co., Ltd.**
Room A2-907, Xinyuanxin Center, Huaxin Road, Jinan, Shandong, CN

Buyer's company address:

**Burchfield Sales and Consulting LLC**
121 2nd st Apt A Hot Springs, AR 71913, Hot Springs, Arkansas, US

Ship to:

**Bradley Burchfield**
Bradley Burchfield +1 8706174081, Burchfield Sales and Consulting LLC, 6834 Cantrell Road Suite 210 little rock Arkansas 72207, 4 mile comer, Arkansas, 72207, United States of America

Order number: **#91906090501027582**

Order date: **8:55 PM, Jun 1st, 2021 (PDT)**

**Order details**

| Item description | Qty | Unit price (excl. tax) | Total amount (excl. tax) |
|---|---|---|---|
| factory N-Isopropylbenzylamine CAS 102-97-6 | 1.00 | USD 615.0000 | USD 615.00 |
| | Subtotal | | USD 615.00 |
| | Shipping fee | | USD 50.00 |
| | Logistics insurance fee | | USD 50.00 |
| | **Order total** | | **USD 715.00** |

**Payment information**

| | |
|---|---|
| Order total | USD 715.00 |
| Payment processing fee | USD 21.38 |
| **Amount paid** | **USD 736.38** |
| Paid on June 01, 2021 (Credit/debit card) | USD 736.38 |

**Notice:**

- Alibaba.com reserves the right to determine and conclude payment processing fee in this receipt.
- This is a computer-generated document and no signature is required.
- You alone shall bear any adverse consequences arising from tampering with the content for purposes other than intended.
- This receipt is not a tax invoice. You may download a tax invoice after your order is completed.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT O

## Email Referred to by Plaintiff as the 'Keep Silent' Email

The reproduced source document follows this cover page.

Gmail

Burchfield Bradley <burchfieldbradley123@gmail.com>

## Details N-Isopropylbenzylamine

4 messages

**sales@bloomtechz.com** <sales@bloomtechz.com> Sun, Jan 9, 2022 at 8:47 PM
To: burchfieldbradley123@gmail.com

**Fresh batch out!**
**Only 16kg Blue Pure N iso crystal in stock, if miss each other, wait another month.**
**Price list (EXW USD$):**
**100g, $298usd, 500g, $496, 1kg, $820**



**Very Important information of Isopropylbenzylamine, CAS 102-97-6 crystal series product:**
Welcome to become a new comer of our group of buyers, I am Aurora Song, sales manager.
**WhatsApp/WeChat: +86 17791833715**
Frankly, the most we have been asked is the **effect.**

We have made many kinds of chemicals into crystals successfully. The **FAQ** pls check below:
**1.How we set the price**
We set the product price according to the price of raw materials and product production cycle, The price has nothing to do with whether the product is nice to use.
**2.Which is the best**
From shape, Pure N ISO is big bar, it is the best. From smell, the 170N ISO and 2A4P is the best. Or some other new kinds of chemical, we researched it for our stable buyers, we can't disclose it to you.
If you request the big bar crystal is no smell, it is impossible. Because it is the theory of chemistry, it is nothing to do with capacity.
**Each words and pictures here is real, dont talk about any fake here!**
**3.Could you disclose the shortcoming of our product?**
Yes, Pure N ISO has a bit of smell, and our 170MP N ISO is little smell. 2A4P is also little smell, in addition, it

has many other positive comments from other users.
**4.Crystal Mixed service**
It must be a legal product, otherwise you have better keep silent.
**Welcome to buy more chemicals from our company, welcome to be the senior buyer of our company and we can share more technology support for you!**

Maybe some of yours want to use the crystal for diluting, or want it has some effect of you want.

From the opinion of chemical researching, this is the Same Molecule Formula of C10H15N.

Does this chemical meet your requirements? Is it easy to use? This depends not only on

his molecule formula, but also on his chemical space structure and the pharmaceutical properties

that this structure should give.

## Price List(Without Shipping fee)

**1.CAS 102-97-6, N-Isopropylbenzylamine(N ISO)**

100g,$168, 500g,$389, 1kg,$650/kg

Please choose one specification below:

(1)Pure N iso 210, Largest crystal, smell

Pink/Blue/Yellow/Green etc. color N ISO,

1kg, $980/kg, Customization, Food grade

(2)N-ISO mixed 180 Medium

(3)N-ISO mixed 170, Smallest crystal, No smell

**2.CAS 4395-73-7, 4-Isopropylbenzylamine(4 ISO)**

100g,$280, 500g,$900, 1kg,$1,500/kg

**3.CAS 22374-89-6, 2-Amino-4-phenylbutane(2A4P)**

100g,$280, 500g,$900, 1kg,$1,500/kg

---

**Burchfield Bradley** <burchfieldbradley123@gmail.com> Sun, Apr 10, 2022 at 10:12 AM
To: sales@bloomtechz.com

Alex how you doing? Actually this product doesn't have a schedule with the DEA. But it's illegal in this state. I use it for a rust inhibitor, as was advertised. It didn't work.
[Quoted text hidden]
--
Hope credit

---

**Burchfield Bradley** <burchfieldbradley123@gmail.com> Fri, Jun 10, 2022 at 12:43 PM
To: nick@covenantrecovery.com

[Quoted text hidden]

---

**Burchfield Bradley** <burchfieldbradley123@gmail.com> Mon, Jun 13, 2022 at 11:01 AM
To: s.nathan300192@yahoo.com

---------- Forwarded message ---------
From: <sales@bloomtechz.com>
Date: Sun, Jan 9, 2022 at 8:47 PM
Subject: Details N-Isopropylbenzylamine
To: <burchfieldbradley123@gmail.com>

[Quoted text hidden]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT P

## January 2016 Haihangchem Email Chain

*Included as source material; it does not alone establish the complete purchase, shipment, laboratory-test, or criminal-case chain.*

The reproduced source document follows this cover page.

Outlook

## RE: Urgent things !!! COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita -Haihang Industry

**From** Brad Burchfield <boatsofavalon@outlook.com>
**Date** Sat 1/16/2016 11:06 PM
**To** export023@haihangchem.com <export023@haihangchem.com>

Made a mistake won't be needing your services.

---

Date: Thu, 14 Jan 2016 09:50:50 +0800
From: export023@haihangchem.com
To: boatsofavalon@outlook.com
Subject: Re:RE: Urgent things !!! COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita - Haihang Industry

Dear Bull Peterbilt,

May i please know that what is your biggest budget for this products at now?? Then i will check here and choose the best quantity for you.

Waiting your kindly reply~

----------

Thanks & Best regards
Rita Tian
International Dept.
*******************************************************
**Haihang Industry Co., Ltd.**
**Add: 11/f,Sanqing Fengrun BLDG, No.100 South Gongye Road, Jinan City, China. PC.250100.**
**Contact: Rita Tian**
**Tel : +86 - 531-88031599**
**Fax : +86 - 531 - 85821093**
**Mobile : +86 -15153118489**
**Skype: haihang023**
**Wetchat: ritatian2011**
**Website : www.haihangchem.com**
**E-mail : export023@haihangchem.com**
*******************************************************

-------------Original Message-------------
From: boatsofavalon@outlook.com
To: export023@haihangchem.com
Subject: RE: Urgent things !!! COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita - Haihang Industry
Date: 2016-01-14 02:55:43

---

If I bought it in liquid form would it be cheaper? And what is the process to crystallize it myself? It would be a few weeks before I made a purchase.

---

Date: Wed, 13 Jan 2016 14:12:41 +0800
From: export023@haihangchem.com
To: boatsofavalon@outlook.com
Subject: Re:RE: Urgent things !!! COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita - Haihang Industry

Dear Bull Peterbilt,

I can understand that you need to consider your budget.

But dear, as i have said , at now , we have another customer order this , we could produce it by our production dept for you also based on usd315.00/kg.

If few weeks, i am not sure if we send out all our stock?? If then, we could only produce it for 500g in our lab.
So , i wonder if you can conform the purchase things timely~

Waiting your kindly reply~

----------
Thanks & Best regards
Rita Tian
International Dept.
*******************************************************
**Haihang Industry Co., Ltd.**
**Add: 11/f,Sanqing Fengrun BLDG, No.100 South Gongye Road, Jinan City, China. PC.250100.**
**Contact: Rita Tian**
**Tel : +86 - 531-88031599**
**Fax : +86 - 531 - 85821093**
**Mobile : +86 -15153118489**
**Skype: haihang023**
**Wetchat: ritatian2011**
**Website : www.haihangchem.com**
**E-mail : export023@haihangchem.com**
*******************************************************

-------------Original Message-------------
From: boatsofavalon@outlook.com
To: export023@haihangchem.com
Subject: RE: Urgent things !!! COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita - Haihang Industry
Date: 2016-01-13 12:08:18

---

I'll keep you in mind but right now I don't have the money. It'll be a few weeks. Thanks

---

Date: Wed, 13 Jan 2016 09:10:20 +0800
From: export023@haihangchem.com
To: boatsofavalon@outlook.com
Subject: Re:RE: Urgent things !!! COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita - Haihang Industry

Dear Bull Peterbilt,

Great day.

dear , it is like this, we now have no stock for crystal format , and you need. With sincerity we want to cooperate with your company, we would like to produce the 500g by our lab at cost USD315.00/500g.

At now, lucky our another customer need this one, we could produce it for you by production dept . The price is USD315.00/kg. but dear, 500g for production dept are too less to produce, you please understand this.~

So may i please know that which one do you prefer?? a or b ???
a. usd315.00/500g produced by our lab in crystal format.
b. USD315.00/kg produced by our production dept , this one need to conform timely.

No matter what your decision is, kindly please let me know ~

Waiting your kindly reply~

----------

Thanks & Best regards
Rita Tian
International Dept.
******************************************************
**Haihang Industry Co., Ltd.**
**Add: 11/f,Sanqing Fengrun BLDG, No.100 South Gongye Road, Jinan City, China. PC.250100.**
**Contact: Rita Tian**
**Tel : +86 - 531-88031599**

**Fax : +86 - 531 - 85821093**
**Mobile : +86 -15153118489**
**Skype: haihang023**
**Wetchat: ritatian2011**
**Website : www.haihangchem.com**
**E-mail : export023@haihangchem.com**
****************************************************

--------------Original Message-------------
From: boatsofavalon@outlook.com
To: export023@haihangchem.com
Subject: RE: Urgent things !!! COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita - Haihang Industry
Date: 2016-01-12 23:30:51

---

All I need for a sample is the 500g at the price based on a $315/kg. Which would be $140, correct?

---

Date: Tue, 12 Jan 2016 23:22:38 +0800
From: export023@haihangchem.com
To: boatsofavalon@outlook.com
Subject: Re:RE: Urgent things !!! COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita - Haihang Industry

Dear Bull Peterbilt,

Okay, dear , Just now i called with our production dept, they said lucky we now producing for another customer, so we can supply you 1kg produced by production dept instead of lab with 500g,

So the price will keep as before: usd 315.00/kg by courier door to door with freight including based on 1kg.

Can you conform this timely?? As i need to tell our production dept to produce extra 1kg for you.

Thanks & waiting your reply~

----------
Thanks & Best regards
Rita Tian
International Dept.
****************************************************

**Haihang Industry Co., Ltd.**
**Add: 11/f,Sanqing Fengrun BLDG, No.100 South Gongye Road, Jinan City, China. PC.250100.**
**Contact: Rita Tian**
**Tel : +86 - 531-88031599**

**Fax : +86 - 531 - 85821093**
**Mobile : +86 -15153118489**
**Skype: haihang023**
**Wetchat: ritatian2011**
**Website : www.haihangchem.com**
**E-mail : export023@haihangchem.com**
*****************************************************

--------------Original Message-------------
From: boatsofavalon@outlook.com
To: export023@haihangchem.com
Subject: RE: Urgent things !!! COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita - Haihang Industry
Date: 2016-01-12 22:55:32

---

315 was the price of a kg. Wouldn't pay more than 140 for 500.

---

Date: Tue, 12 Jan 2016 20:51:23 +0800
From: export023@haihangchem.com
To: boatsofavalon@outlook.com
Subject: Urgent things !!! COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita -Haihang Industry

Dear Bull Peterbilt,

How are you ??
Kindly please let me know your comment now on the products of N-Isopropylbenzylamine CAS: 102-97-6?? We can supply you for 500g for you N-Isopropylbenzylamine CAS: 102-97-6 in crystal format with the best price of :

**USD315.00/500g by courier door to door with freight including based on 500g.**

Hope we could keep a good communication with you ~
Looking forward to your kindly reply~

----------
Thanks & Best regards
Rita Tian
International Dept.
*****************************************************
**Haihang Industry Co., Ltd.**
**Add: 11/f,Sanqing Fengrun BLDG, No.100 South Gongye Road, Jinan City, China. PC.250100.**
**Contact: Rita Tian**
**Tel : +86 - 531-88031599**
**Fax : +86 - 531 - 85821093**
**Mobile : +86 -15153118489**

**Skype: haihang023**
**Wetchat: ritatian2011**
**Website : www.haihangchem.com**
**E-mail : export023@haihangchem.com**
*****************************************************

--------------Original Message-------------
From: export023@haihangchem.com
To: boatsofavalon@outlook.com
Subject: Re:RE: COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita -Haihang Industry
Date: 2016-01-09 09:21:47

---

Dear Bull Peterbilt,

Great day .

As you know , we here produce the product in crystal format, 50g is not very easy for our production dept. As for us one batch need at least for 100kgs.

In order to start our long time business relationship, i keep talking with my boss, and finally we could produce 500g for you. You please do not worry about this, we have deal with this product for more than 10 years, we can guaranteed our quality.Hope you understand this.

Also , could you kindly please let me know your contact detail information including: company name, contact person, delivery address, mobile phone??

Waiting your kindly reply~

- - - - - - - - - -

Thanks & Best regards
Rita Tian
International Dept.
*****************************************************
**Haihang Industry Co., Ltd.**
**Add: 11/f,Sanqing Fengrun BLDG, No.100 South Gongye Road, Jinan City, China. PC.250100.**
**Contact: Rita Tian**
**Tel : +86 - 531-88031599**
**Fax : +86 - 531 - 85821093**
**Mobile : +86 -15153118489**
**Skype: haihang023**
**Wetchat: ritatian2011**
**Website : www.haihangchem.com**
**E-mail : export023@haihangchem.com**
*****************************************************

-------------Original Message-------------
From: boatsofavalon@outlook.com
To: export023@haihangchem.com
Subject: RE: COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita -Haihang Industry
Date: 2016-01-09 03:31:41

---

I have a large need for your product but am unsure if this is the correct product I need. Would your boss consider a 250g $50 order for a sample. If this product works there will be many more orders.

---

Date: Fri, 8 Jan 2016 15:06:36 +0800
From: export023@haihangchem.com
To: boatsofavalon@outlook.com
Subject: Re:RE: COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita -Haihang Industry

Dear Bull Peterbilt,

Thanks for your kindly reply.

Here i just discussed with my technicist again, with sincerity we would like to cooperate with your company, finally my boss agree that we can produce 500g for you N-Isopropylbenzylamine CAS: 102-97-6 in crystal format with the best price of :

**USD315.00/kg by courier door to door with freight including based on 500g.**

If you conform the information, contact me freely~
Looking forward to your kindly reply~

----------

Thanks & Best regards
Rita Tian
International Dept.
*****************************************************
**Haihang Industry Co., Ltd.**
**Add: 11/f,Sanqing Fengrun BLDG, No.100 South Gongye Road, Jinan City, China. PC.250100.**
**Contact: Rita Tian**
**Tel : +86 - 531-88031599**
**Fax : +86 - 531 - 85821093**
**Mobile : +86 -15153118489**
**Skype: haihang023**
**Wetchat: ritatian2011**
**Website : www.haihangchem.com**
**E-mail : export023@haihangchem.com**
*****************************************************

-------------Original Message-------------
From: boatsofavalon@outlook.com
To: export023@haihangchem.com
Subject: RE: COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita -Haihang Industry
Date: 2016-01-08 12:45:26

---

A kilogram or less sample would be needed first. Actually the smaller the better. And after that I'm not sure the quantity.

---

Date: Fri, 8 Jan 2016 12:10:32 +0800
From: export023@haihangchem.com
To: boatsofavalon@outlook.com
Subject: Re:RE: COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita -Haihang Industry

Dear Bull Peterbilt,

I have just talked with our technicist , your required crystal format is N-Isopropylbenzylamine HCL and we can produce it for you too.

The N-Isopropylbenzylamine HCL need another more step than N-Isopropylbenzylamine liquid. Here we want to know what exactly quantity do you need?? Then i will ask if our production dept can do it as your quantity.

Looking forward to your kindly reply~

----------
Thanks & Best regards
Rita Tian
International Dept.
******************************************************
**Haihang Industry Co., Ltd.**
**Add: 11/f,Sanqing Fengrun BLDG, No.100 South Gongye Road, Jinan City, China. PC.250100.**
**Contact: Rita Tian**
**Tel : +86 - 531-88031599**
**Fax : +86 - 531 - 85821093**
**Mobile : +86 -15153118489**
**Skype: haihang023**
**Wetchat: ritatian2011**
**Website : www.haihangchem.com**
**E-mail : export023@haihangchem.com**
******************************************************

-------------Original Message-------------
From: boatsofavalon@outlook.com

To: export023@haihangchem.com
Subject: RE: COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita -Haihang Industry
Date: 2016-01-08 11:56:42

---

I'm looking for the crystal form of the product not the liquid.

---

Date: Fri, 8 Jan 2016 09:47:36 +0800
From: export023@haihangchem.com
To: boatsofavalon@outlook.com
Subject: COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6 From Rita -Haihang Industry

Dear Bull Peterbilt,

Enclosed you please check our COA & Photo of N-Isopropylbenzylamine CAS: 102-97-6, If you have any other question , contact me freely~

dear, kindly please let me know know what your comments on our price?? And what exactly quantity do you need??

By the way, you skype ID is : **boatsofavalon**, right?? I have add you on skype , you please accept~Then we can chat freely on it .

Looking forward to your kindly reply~

----------

Thanks & Best regards
Rita Tian
International Dept.

*****************************************************
**Haihang Industry Co., Ltd.**
**Add: 11/f,Sanqing Fengrun BLDG, No.100 South Gongye Road, Jinan City, China. PC.250100.**
**Contact: Rita Tian**
**Tel : +86 - 531-88031599**
**Fax : +86 - 531 - 85821093**
**Mobile : +86 -15153118489**
**Skype: haihang023**
**Wetchat: ritatian2011**
**Website : www.haihangchem.com**
**E-mail : export023@haihangchem.com**
*****************************************************

-------------Original Message-------------
From: export023@haihangchem.com
To: boatsofavalon@outlook.com

Subject: Re:RE: Quotation of N-Isopropylbenzylamine CAS: 102-97-6 From Rita -Haihang Industry
Date: 2016-01-08 09:11:08

---

Dear Bull Peterbilt,

Good evening,

It is clear liquid. not crystal format with the assay more than 98%, later i will sent you the COA for your reference~

dear, may i please know what your comments on our price?? And what exactly quantity do you need??

Looking forward to your kindly reply~

----------

Thanks & Best regards
Rita Tian
International Dept.
*****************************************************

**Haihang Industry Co., Ltd.**
**Add: 11/f,Sanqing Fengrun BLDG, No.100 South Gongye Road, Jinan City, China. PC.250100.**
**Contact: Rita Tian**
**Tel : +86 - 531-88031599**
**Fax : +86 - 531 - 85821093**
**Mobile : +86 -15153118489**
**Skype: haihang023**
**Wetchat: ritatian2011**
**Website : www.haihangchem.com**
**E-mail : export023@haihangchem.com**
*****************************************************

--------------Original Message-------------
From: boatsofavalon@outlook.com
To: export023@haihangchem.com
Subject: RE: Quotation of N-Isopropylbenzylamine CAS: 102-97-6 From Rita -Haihang Industry
Date: 2016-01-08 01:43:40

---

Is this the crystal form of the product?

---

Date: Tue, 5 Jan 2016 18:04:50 +0800
From: export023@haihangchem.com
To: boatsofavalon@outlook.com
Subject: Quotation of N-Isopropylbenzylamine CAS: 102-97-6 From Rita -Haihang Industry

Dear Bull Peterbilt,

This is Rita from Haihang Industry, very nice to contact you.

Happy to know that you are looking for the N-Isopropylbenzylamine CAS: 102-97-6 , we are professional manufacturer of this products, below you please check our price :
Re this products, we now have about 3MT in our stock ,and we could supply you 1kg for you test approval, the price as below:

1. Product: N-Isopropylbenzylamine
2. **Price: USD315.00/kg by courier door to door with freight including based on 1kg.**
3. CAS: 102-97-6 assay: 98%
4. Packing: 1kg/bag
5. Payment: T/T West Union or Paypal
6. Delivery: within 2-3 days after receipt of your payment.
7. Validity date: 7 working days.

Dear , could you kindly please let me know the below:
a. Have you ever bought this product before? from China??
b. what about your future quantity of this product??
c. what your comment on our price??

Thanks & waiting your kindly reply~smiley

----------

Thanks & Best regards
Rita Tian
International Dept.

*******************************************************
**Haihang Industry Co., Ltd.**
**Add: 11/f,Sanqing Fengrun BLDG, No.100 South Gongye Road, Jinan City, China. PC.250100.**
**Contact: Rita Tian**
**Tel : +86 - 531-88031599**
**Fax : +86 - 531 - 85821093**
**Mobile : +86 -15153118489**
**Skype: haihang023**
**Wetchat: ritatian2011**
**Website : www.haihangchem.com**
**E-mail : export023@haihangchem.com**
*******************************************************

-------------Original Message-------------
From: alisourcepro@service.alibaba.com

To： export036@haihangchem.com
Subject：您对United States买家的报价已经成功发送!
Date：2016-01-04 17:20:12

---

www.Alibaba.com AliSourcePro My Alibaba | Trade Manager | 外贸圈

您的报价已成功发送至买家

此邮件为系统邮件，请勿直接答复

尊敬的中国供应商会员（Member ID: cn1515309815lfps）：

恭喜您！您针对 RFQ 102-97-6 的报价已成功发送至买家。立即 查看并联系买家

重要提醒:
为保障您和买家的信息安全，预计2015年4月20日起，阿里巴巴的官方邮件中不再包含买家联系信息，您可以在My Alibaba后台查看买家联系信息，谢谢您的支持和配合。

RFQ Subject: 102-97-6

Buyer Name: bull peterbilt

Company Name: No Company Name

Country/Region: United States

您也可以登录“My Alibaba” > “采购直达” > “报价管理”，查看报价详情信息及买家信息。
了解采购直达服务> 查看更多采购直达买家需求（RFQ） 立即登录采购直达频道>

86 185*****990 这是您在阿里巴巴上绑定的手机号码，如有缺失或错误，则该邮件并非发送自阿里巴巴。确保您的账户安全，请注意核对。

祝您早日与买家达成交易!

阿里巴巴采购直达团队

Mobile App | Customer Services | My Alibaba | Business Identity

This email was sent to
Click here to unsubscribe from Alibaba.com emails
點擊 此處 退訂來自阿里巴巴的郵件

Read our Privacy Policy and Terms of Use

Alibaba.com Hong Kong Limited.
26/F Tower One, Times Square, 1 Matheson Street, Causeway Bay, Hong Kong
Tel: (+852) 2215-5100
Email: alibaba@service.alibaba.com

阿里巴巴香港有限公司
香港銅鑼灣勿地臣街1號時代廣場1座26樓
電話：(+852) 2215-5100
電郵： alibaba@service.alibaba.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT Q

## Platform Monitoring / 1000kg Order Record Supplied by Plaintiff

The reproduced source document follows this cover page.

My Alibaba

Upgrade to Gold Supplier | My Account | Help | English

Sell

Home
Messages
Buying Leads
Orders
Transactio
Contacts
My Lists
Trade Services

Search

**Amy Shao** 2022-4-25
Shenzhen Conquest Communication Eq...
[Message]

**Anna Ran** 2022-4-24
Suzhou Xiaoli Pharmatech Co., Ltd.
[Inquiry]

**Sunny Lin** 2022-4-20
Sheng Shi Yuan (Xiamen) Hardware Pro...
[Inquiry]

**grace hu...** 2022-4-15
Hebei Shengyuan Jinlong Imp. & Exp. C ..
what product do you need?

**Starry Liao** 2022-4-14
Changsha Xiangqian Supply Chain Man...
Dear friend!◆◆ We would ...

**Rose Hou** 2022-4-13
Yiwu Meian Arts & Crafts Co., Ltd.
you need one colour how ...

**Cassie Yi** 2022-4-13
Changsha Ayhhed Biotechnology Co., Ltd.
ok

**Vivian Ya...** 2022-4-13
Hangzhou Singer Building Materials Co.,...
So if you will sell in USA m...

**Jason Wa...** 2022-4-13
Hebei Luantong Trade Co., Ltd.
yes, our quality is high and ...

**Erica N** 2022-4-13
Beijing Hanbo Technology Deve...
[Image]

**Cristina S...** 2022-4-12
Shaanxi Chuzhan Chemical Co.,...
[Message]

**Lucy cai** 2022-2-26
Shenzhen Laserwin Technology Ltd.
Hello We have a live show ...

**N Hitech** 2022-2-16
Shenzhen Hitech Development Technol...

**JoJo Luo** 2022-1-21
Shenzhen Hosto Logistics Technology C...
[Message]

Can not find old inquiry messages? Old inquiry messages will be stored in Buying Leads.

**sweety yin**
Local Time:
11:53 PM

I GOT IT TODAY. BETTER THAN WHAT I GOT BEFORE BUT I CANT REALLY SEE IT CAUSE GLASS DIRTY. BUT THE PIECES POP CRISP WHEN BREAK THEM AND IT DOESNT BEND. STRAIGHT LINES RUN PARALLEL.

Read

sweety yin 2021-06-19 22:30

wow !!!Great !

sweety yin 2021-06-19 22:31

friend ,Due to Alibaba's monitoring, orders over $5000 must be delivered to Alibaba for transportation. It will bring you and me a lot of inconvenience. Therefore,I sent you Proform Invoice of 1000 kg order .Plz pay for us by bank .Hoping you will kindly understand .

sweety yin 2021-06-19 22:31

PI—1000kg order.pdf
238.55 K

sweety yin 2021-06-19 22 31

plz check PI ,Any questions about PI ,plz tell me .

sweety yin 2021-06-19 22:32

The mode of shipping is up to you .

Booking your shipment? Check out the shockingly simple experience at Alibaba.com Freight.
Compare rates

2021-06-20 10:37

I got it. better than what usually comes in but test piece was dirty.

Read

sweety yin 2021-06-20 20:03

HI

sweety yin 2021-06-20 20:04

if you have any questions and new needs ,plz just contact me .Beucase i am the only one who charge your business .

sweety yin 2021-06-20 20:15

Rate supplier | Start Order | Logistics Inquiry

The buyer's account is invalid and cannot be replied to.

## Conversation

**View More >**

Inquiries | Quotations



No inquiries with this supplier

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT R

## November 21, 2025 Axis Notice of Oral and Videotaped Deposition of Bradley Burchfield

*The notice establishes that Axis formally noticed the deposition; it does not itself identify Plaintiff as an expert or constitute a judicial qualification ruling.*

The reproduced source document follows this cover page.

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

| | | |
|---|---|---|
| CHS PROPERTIES, LLC,<br>Plaintiff, | §<br>§<br>§ | |
| v. | § | CIVIL ACTION NO. 6:25-cv-06020-TLB |
| AXIS SURPLUS INSURANCE COMPANY,<br>Defendant. | §<br>§<br>§ | |

**DEFENDANT AXIS' SURPLUS INSURANCE COMPANY NOTICE OF INTENTION TO TAKE THE ORAL AND VIDEOTAPED DEPOSITION OF BRADLEY BURCHFIELD**

TO: Plaintiff, CHS PROPERTIES, LLC, by and through its attorneys of record, Anthony Pastor, National Insurance Advocates, PLLC, 6619 S. Dixie Highway, Suite 363, Miami, Florida 33143.

PLEASE TAKE NOTICE that beginning at **10:00 a.m. on Monday, December 15, 2025**, and continuing thereafter from day to day until completed, Defendant AXIS Surplus Insurance Company, by and through **its** attorneys of record, will take the oral and videotaped deposition of **BRADLEY BURCHFIELD** at the time and place designated below to be used in the above-styled and numbered suit.

The deposition will commence at 10:00 a.m. on Monday, December 15, 2025, and continue thereafter from day to day until completed. The deposition will be conducted remotely, with access instructions to be sent separately. Moreover, all parties are advised that the deposition will be recorded stenographically before an official court reporter, and will be recorded by certified videographer.

Respectfully submitted,

Ellen Van Meir
Texas State Bar No. 00794164
evanmeir@nicolaidesllp.com
Laura J. Grabouski, *pro hac vice granted*
Texas State Bar No. 24031595
lgrabouski@nicolaidesllp.com
NICOLAIDES FINK THORPE
MICHAELIDES SULLIVAN, LLP
2911 Turtle Creek Blvd., Suite 1025
Dallas, TX 75219
469.777.8871
469.290.9041 – FAX

**COUNSEL FOR DEFENDANT**
**AXIS SURPLUS INSURANCE COMPANY**

## CERTIFICATE OF SERVICE

This is to certify that on November 21, 2025, a true and correct copy of the foregoing was served via e-mail upon plaintiff's counsel of record:

Anthony Pastor
anthony@nia.law
intake@nia.law
NATIONAL INSURANCE ADVOCATES, PLLC
701 South Street, Suite 100
Mountain Home, AR 72653
**Counsel for plaintiff**

Michelle Miranda
mmiranda@plglawyersfl.com
Maxwell Barnard
mbarnard@plglawyersfl.com
NATIONAL INSURANCE ADVOCATES, PLLC
5900 Balcones Drive, Suite 100
Austin, TX 78731
***Pro Hac Vice* Counsel for plaintiff**

Laura J. Grabouski

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

---

Burchfield v. Alibaba.com Singapore E-Commerce Private Limited, et al.

**No. 4:26-cv-00611-DPM**

# EXHIBIT S

## Bradley Burchfield Declaration Regarding Personal Funding and LLC Status

*UNSIGNED DRAFT: Plaintiff must verify every statement, complete the execution date and place, and sign under penalty of perjury before filing.*

The reproduced source document follows this cover page.

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

BRADLEY BURCHFIELD, individually and as the
direct purchaser/beneficial owner of the subject claim,

Plaintiff,

Case No. 4:26-cv-00611-DPM

v.

JURY TRIAL DEMANDED

ALIBABA.COM SINGAPORE E-COMMERCE PRIVATE
LIMITED, et al.,

Defendants.

**DECLARATION OF BRADLEY BURCHFIELD REGARDING PERSONAL FUNDING OF SUBJECT TRANSACTION**

I, Bradley Burchfield, declare as follows:

**1.** I am the Plaintiff in this action. I am over eighteen years old, competent to make this declaration, and have personal knowledge of the facts stated here.

**2.** This declaration concerns Alibaba.com Trade Assurance Order No. 91906090501027582, dated June 1, 2021, involving Zichang New Materials (Shandong) Co., Ltd.

**3.** I personally provided all funds used to make the $736.38 payment associated with the Order.

**4.** At the time of the transaction, Burchfield Sales and Consulting LLC had no bank account and did not fund the transaction.

**5.** At the time of the transaction, I was the sole member and owner of Burchfield Sales and Consulting LLC and its only employee.

**6.** Although the LLC's name appears in the contract or receipt, I personally bore the economic loss associated with the payment and alleged nondelivery.

**7.** I have not used the LLC to conceal my identity or avoid responsibility, and I am not attempting to appear as legal counsel for the LLC in this action.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. See 28 U.S.C. § 1746.

Executed on: ____________________, 2026

Place of execution: ______________________________

______________________________________

Bradley Burchfield